**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| SIERRA CLUB, *et al.*, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 20-cv-3060-PX |
| NATIONAL MARINE FISHERIES | * | |
| SERVICE, *et al.*, | * | |
| Defendants. | | |

\*\*\*\*\*\*

**MEMORANDUM OPINION**

Pending in this Administrative Procedure Act (the "APA") and Endangered Species Act (the "ESA") case is the motion to transfer venue filed by Defendants National Marine Fisheries Service ("NMFS") and Chris Oliver, Assistant Administrator for National Oceanic and Atmospheric Administration ("NOAA") Fisheries.  ECF No. 16.[1]  The matter is fully briefed, and no hearing is necessary.  *See* Loc. R. 105.6.  For the following reasons, the motion is DENIED.

**I.     Background**

This matter involves regulating oil and gas activities in land under federal waters known as the Outer Continental Shelf ("OCS").  Located in the Gulf of Mexico, the region of the OCS relevant here (the "Gulf OCS") begins about three miles offshore from the outer boundary of several states including Texas and Louisiana and extends to the outer boundary of the United States' Exclusive Economic Zone located 200 nautical miles from shore.  ECF No. 1 ¶ 34; 43

---

[1] The motion is joined by the Intervenor-Defendants American Petroleum Institute, International Association of Geophysical Contractors, National Ocean Industries Association, and Chevron U.S.A., Inc.  ECF Nos. 57, 59.

U.S.C. §§ 1301(a)(2), 1331 *et seq*.; 48 Fed. Reg. 10,605 (Mar 14, 1983). As the "epicenter of the nation's offshore oil and gas industry," the Gulf OCS is home to "tens of thousands of active wells, thousands of production platforms, tens of thousands of miles of underwater pipelines" and a commensurate high volume of vessel trips. ECF No. 1 ¶ 3. At the same time, the Gulf OCS is inhabited by scores of endangered or threatened marine species protected under the ESA. *Id.* ¶ 43. Chief among them are the Bryde's whale and the Kemp's ridley sea turtle, both of whom are at grave risk of extinction. *Id.* ¶¶ 44–45.

The Outer Continental Shelf Lands Act (the "OCSLA"), 43 U.S.C. § 1331 *et seq.*, proscribes the development of the OCS's oil and gas resources to include leases extended to private corporations to explore, develop and produce oil and gas extracted from the area. The Department of the Interior, through its agencies, is responsible for enforcing safety and environmental standards for offshore oil and gas activities. 30 C.F.R. § 550.101. Section 7 of the ESA applies to federal gas an oil leases extended pursuant to OCSLA. ECF No. 1 ¶ 50. Section 7 mandates federal agencies to ensure that any contemplated agency action "is not likely to jeopardize the continued existence of any endangered [] or threatened species or result in the destruction or adverse modification of habitat of such species[.]" 16 U.S.C. § 1536(a)(2); ECF No. 1 ¶ 5. Accordingly, any agency whose contemplated action "may effect" ESA protected species must first initiate "formal consultation" with the appropriate wildlife service prior to taking any such action. 50 C.F.R. § 402.14(a); ECF No. 1 ¶ 25.

Pertinent to this matter, Defendant NMFS is the federal agency within NOAA that is tasked with ensuring that agency action complies with the ESA as applied to marine species. ECF No. 1 ¶ 20. Defendant Oliver leads these efforts. *Id.* ¶ 21. Formal consultation requires NMFS to evaluate the current status and environmental baseline of affected species and critical

habitats, assess cumulative effects on such species and habitats, and ascertain whether effects of the proposed action, when added to the environmental baseline together with any cumulative effects, is likely to jeopardize the continued existence of the species or adversely modify their critical habitats.  50 C.F.R. § 402.14(g).

NMFS memorializes its formal consultation in a biological opinion that sets forth its findings and conclusions.  16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h).  If NMFS concludes adverse effects are likely, it must also propose "reasonable and prudent alternatives" designed to avoid such adverse effects.  16 U.S.C. § 1536(b)(3)(A); ECF No. 1 ¶ 157.  NMFS must separately determine whether the proposed agency action is likely to incidentally take members of a listed species even if the action would not jeopardize the species or its habitat on the whole; the opinion must also specify the amount or extent of such takes and propose measures to limit the take.  50 C.F.R. § 402.14(i); ECF No. 1 ¶¶ 31–32; *see also* 16 U.S.C. § 1532(19) (defining "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct").

Regarding the Gulf OCS, NMFS has conducted several formal consultations in recent decades pertaining to federal oil and gas leases.  ECF No. 1 ¶¶ 6, 49–53.  After one such consultation in 2007, NMFS issued a biological opinion concluding that the proposed oil and gas activities in the Gulf OCS would not jeopardize ESA protected species or habitats.  *Id.* ¶ 52. NMFS specifically predicted that because the risk of a potentially large oil spill was low, any related harms to the animals and their habitats would be minimal.  *Id.* ¶ 53.

Regrettably, NMFS was flat wrong.  In 2010, the *Deepwater Horizon* oil rig exploded, releasing nearly five million barrels of oil into the Gulf of Mexico or hundreds of times more oil than the worst-case scenario predicted in the 2007 biological opinion.  ECF No. 1 ¶ 54.  The

explosion contaminated over 43,000 square miles of surface waters and over 1,300 miles of shoreline and killed or seriously harmed over 100,000 individuals of species listed as threatened or endangered.  *Id.* ¶ 56.  A decade later, the affected species and habitats have yet to recover from this disaster.  *Id.* ¶¶ 54–57.

In response, NMFS reinitiated formal consultation to review anew federally authorized OCS oil and gas leases.  *Id.* ¶ 58.  After nearly a decade of research, wrangling and associated litigation, the NMFS finally published in March 2020 a 694-page biological opinion on the impact of oil and gas activities in the region.  *See* ECF No. 16-4 (hereinafter the "2020 biological opinion").  The opinion, at bottom, concluded that the proposed action would jeopardize the Bryde's whale but that "reasonable and prudent alternatives" would mitigate related harms.  *Id.* at 624–27.  As to the remaining scores of endangered species, the opinion concluded none would be jeopardized by the proposed activity nor would the animal habitats be adversely modified.  *Id.* at 624.

On October 21, 2020, nonprofit conservation and environmental organizations Sierra Club, Center for Biological Diversity, Friends of the Earth, and Turtle Island Restoration Network (collectively "Plaintiffs") filed this action, alleging that the 2020 biological opinion, to include its environmental analyses, proposed reasonable and prudent alternatives, and take analyses, are arbitrary and capricious in violation of the APA and ESA.  ECF No. 1.  Plaintiffs identify four critical failings of the 2020 biological opinion: (1) failure to correct the flawed analysis that caused NMFS to underestimate the risk of a catastrophic spill like *Deepwater Horizon*; (2) not accounting for the significant alteration to the endangered species habitats caused by the *Deepwater Horizon* disaster; (3) not considering climate-related population shifts that would compound the current threats to the endangered species posed by the proposed leasing

4

activity; and (4) not considering certain sublethal harms to and threats to the recovery of ESA

protected species.  *Id.* ¶¶ 63–124.  Plaintiffs further aver that the 2020 biological opinion

proposes wholly insufficient reasonable and prudent alternatives and fails to set proper

"incidental take" parameters under the ESA.  *Id.* ¶¶ 125–141; 156–170.  As a result, say

Plaintiffs, the 2020 biological opinion is arbitrary and capricious, constitutes an abuse of

discretion, is not in accordance with Section 7 of the ESA, and thus must be vacated.  Plaintiffs

further seek an order that directs NMFS to prepare a "sufficiently protective biological opinion

within six months," and ensure that NMFS complies with "the ESA, APA and every other order

of this Court."  *Id.* at p. 39.

       Defendants now move to transfer this case to the United States District Court for the

Southern District of Texas or for the Eastern District of Louisiana.  ECF No. 16.  For the

following reasons, the motion is DENIED.

## II.    Analysis

       The propriety of transfer is governed by 28 U.S.C. § 1404(a), which states, "[f]or the

convenience of parties and witnesses, in the interest of justice, a district court may transfer any

civil action to any other district or division where it might have been brought or to any district or

division to which all parties have consented."  To prevail on their transfer motion, Defendants

"must show by a preponderance of the evidence that the proposed transfer will better and more

conveniently serve the interests of the parties and witnesses and better promote the interests of

justice."  *Jones v. Koons Auto., Inc.*, 752 F. Supp. 2d 670, 680–81 (D. Md. 2010) (quoting *Helsel

v. Tishman Realty & Constr. Co.*, 198 F. Supp. 2d 710, 711 (D. Md. 2002)) (internal quotation

marks omitted).  They cannot rely on conclusory allegations of hardship to meet this burden, but

rather must demonstrate, by affidavits from witnesses and parties or otherwise, evidence of "the

hardships they would suffer if the case were heard in the plaintiff's chosen forum." *Dow v. Jones*, 232 F. Supp. 2d 491, 499 (D. Md. 2002).

When deciding the propriety of transfer, the Court must first determine whether the action could have been brought in the requested district. *In re: Volkswagen of Am., Inc.*, 545 F.3d 304, 312 (4th Cir. 2008). If venue is proper in the transferee forum, the Court next considers several non-exclusive factors such as "(1) the weight accorded the plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice." *Lynch v. Vanderhoef Builders*, 237 F. Supp. 2d 615, 617 (D. Md. 2002). Importantly the plaintiff's choice of forum is accorded special consideration such that "[u]nless the balance of the factors 'is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.'" *CareFirst, Inc. v. Taylor*, 235 F. Supp. 3d 724, 733 (D. Md. 2017) (quoting *Collins v. Straight, Inc.*, 748 F.2d 916, 921 (4th Cir. 1984)). This Court retains "broad discretion" when deciding the propriety of transfer, *Volkswagen*, 545 F.3d at 312, undertaking "an individualized, case-by-case consideration of convenience and fairness." *United States ex rel. Salomon v. Wolff*, 268 F. Supp. 3d 770, 774 (D. Md. 2017) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)).

Defendants principally contend that because Plaintiffs are not residents of this District and because the "central facts" of the dispute relate to events occurring in the Gulf of Mexico, transfer is warranted to either the Southern District of Texas or the Eastern District of Louisiana. For the following reasons, this Court cannot agree.

### A. Venue in the Transferee Districts

First, the parties hotly contest whether venue is proper in either of the transferee districts. Defendants maintain that because the challenged 2020 biological opinion "pertains specifically

6

to energy development activities only in the Gulf of Mexico," ECF No. 16-1 at 8, then "a substantial part of the events or omissions giving rise to the claim" has occurred in either transferee district.  28 U.S.C. § 1391(e)(1).  Plaintiffs, on the other hand, press that this controversy regards solely the patent insufficiency of the 2020 biological opinion, the creation of which largely occurred in NMFS's headquarters located in Silver Spring.  ECF No. 53 at 20.

To Plaintiff's point, this Court focuses its venue analysis not "only on those matters that are in dispute or that directly led to the filing of the action" but also "the entire sequence of events underlying the claim."  *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004) (quoting *Uffner v. La Reunion Francaise*, *S.A.*, 244 F.3d 38, 42 (1st Cir. 2001)) (internal quotation marks omitted).  Indeed, the magnitude and devastation caused by the *Deepwater Horizon* spill is central to Plaintiffs' APA assertions, a spill so vast it stretched into the coastal waters in each transferee district and throughout the Gulf Coast.  ECF No. 16-4 at 292–93.  Plaintiffs' APA claims, in fact, depend in part on demonstrating that the 2020 biological opinion ignored the devastation to scores of marine populations and habitats that *Deepwater Horizon* had caused. *See* ECF No. 1 ¶¶ 8, 54–58, 63, 65–71, 83–89.  Accordingly, the Court concludes that venue would be proper in either transferee district.  *Cf. In re: Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, 731 F. Supp. 2d 1352, 1355 (U.S. Jud. Pan. Mult. Lit. 2010) (finding E.D. La. appropriate venue to centralize actions brought in district courts in Texas, Mississippi, and Alabama related to *Deepwater Horizon*); *Oceana v. Bureau of Ocean Energy Mgmt.*, 962 F. Supp. 2d 70, 74 (D.D.C. 2013) (plaintiffs "effectively conced[ing]" venue is proper in Southern District of Alabama for APA claims related to *Deepwater Horizon* because of the impact to resources, species and estuary systems located in Alabama).

7

Even so, the Court does not find that Defendants have demonstrated that transfer is warranted under §1404(a). The Court considers each relevant factor in turn.

### B.   Propriety of Transfer under 28 U.S.C. § 1404(a)

First with regard to Plaintiffs' choice of forum, Defendants urge that this Court accord the choice minimal deference because Plaintiffs are not residents of this District and all of the central issues of the case relate to the Gulf. *See* ECF No. 16-1 at 10–14. Generally, the "plaintiff's forum choice of venue is 'entitled to substantial weight.'" *Cross v. Fleet Reserve Ass'n Pension Plan*, 383 F. Supp. 2d 852, 856 (D. Md. 2005) (quoting *Bd. of Trs., Sheet Metal Workers Nat'l Fund v. Baylor Heating & Air Conditioning, Inc.*, 702 F. Supp. 1253, 1256 (E.D. Va. 1988)). But where the plaintiff does not reside in the district, and "none of the conduct complained of occurred in the forum selected and said forum has no connection with the matter in controversy," such deference is unwarranted. *Capella Photonics, Inc. v. Ciena Corp.*, No. GLR-20-0702, 2020 WL 7043848, at *4 (D. Md. Dec. 1, 2020); *Lynch,* 237 F. Supp. 2d at 617.

Although Plaintiffs do not reside in this District, that does not end the analysis. The cornerstone of this controversy is the 2020 biological opinion. NMFS transferred its "consultation lead" for the challenged opinion to its offices in this District. ECF No. 16-4 at 36. The administrative record for the 2020 biological opinion also resides in this District, and nothing otherwise suggests that decisions pertinent to the opinion were made in either transferee district. Given these ties, the Court easily concludes that a portion of the "conduct complained of" took place here. Plaintiffs' choice of forum, therefore, is accorded sufficient deference such that this factor weighs against transfer.

Next, as to convenience for the parties or witnesses, this factor also does not tilt in favor of transfer. Defendants marshal no reason that they or any witnesses would suffer inconvenience

were this case to remain in this District.  Instead, they contend that the convenience factors make little sense in the context of an APA challenge which routinely involves review of an administrative record without the need for trial or extensive witness testimony.  ECF No. 16-1 at 9, 18; ECF No. 54 at 20–21.  Alternatively, Defendants argue Plaintiffs would not be inconvenienced by litigating the case in the transferee districts.

Defendants misunderstand their burden.  "A defendant moving for transfer must show both that the original forum is inconvenient for it and that the plaintiff would not be substantially inconvenienced by a transfer."  *Int'l Painters & Allied Trade Indus. Pension Fund v. Marrero Glass & Metal Inc.*, No. ELH-18-452, 2019 WL 423409, at *5 (D. Md. Feb. 1, 2019) (quoting 15 C. Wright & Miller, Fed. Practice & Procedure § 3849 (4th ed.))  Notably, "transfer will be refused if the effect of a change of venue would be merely to shift the inconvenience from one party to the other."  *Id.*  To say that an APA matter does not give rise to traditional convenience concerns is quite different from showing that the original forum is inconvenient.  Defendants may very well be correct that questions of convenience are irrelevant in this APA challenge, but if true, then Defendants have failed to show why the forum district is inconvenient for them.

More to the point, Defendants ignore that the administrative record itself is in this District.  Because the administrative record may very well be the only "source of proof that will be seen by the Court, it is appropriate to consider its location."  *See Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d 10, 15–16 (D.D.C. 2000).  Defendants have not credibly articulated any difficulty arising from litigating the matter a mere few miles from where the record resides, as opposed to hundreds of miles away, in the transferee districts.  Thus, the convenience in this APA action weighs against transfer.

Lastly, as to whether transfer is in the interest of justice, this factor is "'amorphous and somewhat subjective' and allows a court to 'consider many things.'" *Capitol Payment Sys., Inc. v. Di Donato*, No. ELH-16-882, 2017 WL 2242678, at *11 (D. Md. May 23, 2017) (quoting Wright & Miller, *supra*, § 3854). Defendants frame the dispute in this case as concerning a "local controversy" that will directly impact the economic activity in the Gulf states, and so should be left to the district where the impact of the decision will be most acutely felt. ECF No. 16-1 at 14–18; ECF No. 54 at 2, 9–20. *See also* ECF No. 19-1 at 5–7. Although "localized controversies" ofttimes ought be resolved at home, *see Am. Dredging Co. v. Miller*, 510 U.S. 443, 448 (1994), this case does not present a particularly "local" controversy warranting transfer. *Cf. Trout Unlimited v. Dep't of Agric.*, 944 F. Supp. 13, 19–20 (D.D.C. 1996) (transferring case to District of Colorado where Plaintiffs' residence and the property at issue were both located in Colorado, administrative decision made in the state, and possible issues of Colorado law were involved); *Alaska Wilderness League v. Jewell*, 99 F. Supp. 3d 112, 116 (D.D.C. 2015) (factor weighs in favor of transfer to District of Alaska where challenged regulation governed *only* activities "around (and within) Alaska's sovereign territory," and concerned a species whose "entire population inhabits the waters and shores surrounding Alaska"); *Kentuckians for Commonwealth, Inc. v. Riverburgh*, 204 F.R.D. 301, 305 (S.D.W.V. 2001) (declining transfer because "locus of the decision-making is a reasonable and fair venue" where proposed mining permitting affected several states).

The "concrete effects" of the challenged agency decisions "will be felt nationally," supporting Plaintiffs' choice to bring suit where the agency is headquartered.[2] *See, e.g., Oceana,*

---

[2] Defendants argue that even if similar APA challenges to agency action support venue in the District of Columbia, where the agencies are headquartered, no authority supports venue in the District of Maryland. ECF No. 54 at 11. But here NMFS is headquartered in this District. And Defendants apparently viewed the issues as appropriately national in scope because NMFS transferred the process and decision-making related to the 2020

*Inc. v. Pritzker*, 58 F. Supp. 3d 2, 11 (D.D.C. 2013); *Wilderness Soc'y,* 104 F. Supp. 2d at 13

(concluding agency choice to lease oil and gas resources on National Petroleum Reserve in

Alaska was a "national policy decision" concerning a "national resource," not "an isolated, local

environmental issue"); *Greater Yellowstone Coal. v. Kempthorne*, No. 07-2111 (EGS), 2008 WL

1862298, at *7 (D.D.C. Apr. 24, 2008) (denying transfer of case involving snowmobile

regulations in Yellowstone and Grand Teton National Parks in part due to "national scope of the

environmental issues at stake").  At bottom, the outcome of this litigation will affect how and

under what terms the federal government may extend oil and gas leases in the Gulf OCS while

protecting endangered species.  These interests—drilling for globally consumed resources while

also preserving wildlife at risk of extinction throughout the Gulf OCS—cannot fairly be claimed

by any given local community.  *See* ECF No. 1 at 34–39; 43 U.S.C. § 1332 (3) & (4) (explaining

that the OCS is "a vital national resource reserve held by the Federal Government for the public"

and providing guidelines "in recognition of the national interest in the effective management" of

such environments); 16 U.S.C. § 1531(a)(3) (explaining that ESA protected species "are of

esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its

people").  *Cf. Pritzker*, 58 F. Supp. at 11 (noting that "the Atlantic Ocean" does not belong to the

proposed transferee state); *Oceana v. Bureau of Ocean Energy Mgmt.*, 962 F. Supp. 2d 70, 77

(D.D.C. 2013) (noting that previous ESA challenges found to be local controversies have "rarely

been as broad as the entire Gulf Coast region.").

It is no understatement, then, that the impact of Plaintiffs' requested relief—to vacate the

2020 biological opinion as arbitrary and capricious—stretches far beyond the local economic

---

biological opinion away from its regional Gulf office in Florida to the agency's national headquarters.  ECF No. 16-4 at 36.

interests of southern Texas and Eastern Louisiana.  In this very real sense, the broad import of the case eclipses the stated "localized controversies."  Thus, the Plaintiffs' choice of forum should be honored.

**III.     Conclusion**

Defendants have failed to demonstrate that transfer is warranted under 28 U.S.C. § 1404(a).  On balance, neither the Southern District of Texas or the Eastern District of Louisiana will provide a more convenient or equitable stage for litigating this matter than that which the Plaintiffs chose when filing their case here.  Defendants' motion is, therefore, DENIED.

A separate order follows.

| 5/24/2021 | /s/ |
|---|---|
| Date | Paula Xinis |
| | United States District Judge |