**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

SIERRA CLUB, et al.,                          *
                                              *
                   Plaintiffs,                *
                                              *
            v.                                *
                                              *
NATIONAL MARINE FISHERIES                     *
SERVICE, et al.,                              *
                                              *   No. 8:20-cv-03060-DLB
                   Defendants,                *
                                              *
            and                               *
                                              *
AMERICAN PETROLEUM INSTITUTE,                 *
et al.,                                       *
                                              *
                   Intervenor-Defendants.     *

**MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TOPLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

<u>**TABLE OF CONTENTS**</u>

**Page**

INTRODUCTION ...................................................................................................................1

LEGAL BACKGROUND......................................................................................................2

   1. Endangered Species Act...............................................................................................2

   2. The Outer Continental Shelf Lands Act ("OCSLA") ..................................................3

FACTUAL BACKGROUND.................................................................................................4

STANDARD OF REVIEW ...................................................................................................6

ARGUMENT.........................................................................................................................6

   I.   NMFS's Jeopardy Analysis Complies With The ESA..............................................6

      A.   NMFS reasonably considered the probability of an extremely large oil spill (>1 MMbbl). ...........................................................................................................7

         1.   NMFS reasonably deferred to BOEM's and BSEE's expertise with respect to the probability of an extremely large oil spill....................................................9

         2.   NMFS conducted an independent assessment of the probability of an extremely large oil spill. ...........................................................................................10

         3.   The Ji study supports the low probability of an extremely large oil spill..................12

         4.   Plaintiffs identify no better information than the Ji study. ........................................15

      B.   NMFS reasonably considered the probability of very large oil spills  (≥10,000 bbl). ...16

      C.   NMFS reasonably analyzed oil spill-related effects. ....................................................19

      D.   NMFS reasonably accounted for Deepwater Horizon-related impacts..........................21

      E.   NMFS reasonably accounted for climate change impacts. ...........................................25

      F.   NMFS reasonably considered both survival and recovery..............................................28

   II.   NMFS's RPA Complies With The ESA. .......................................................................30

   III.   NMFS's ITS Complies With The ESA. .......................................................................35

      A.   The ITS appropriately excludes oil spill take............................................................35

B.    The ITS complies with ESA requirements for other anticipated incidental take of whales. ..............................................................................................................37

C.    NMFS's selected surrogate for vessel strike take is reasonable. ...................................40

IV.    Remedy ..........................................................................................................................43

A.    The only appropriate remedy should be remand of the BiOp and ITS, without vacatur. ...............................................................................................................................44

   1.    Vacatur would be enormously disruptive. ................................................................45

   2.    There is a significant possibility that NMFS will be able to substantiate its decision on remand ..................................................................................................................48

B.    Plaintiffs have not shown that remand without vacatur, for a limited period, will cause significant harm to them or listed species. ....................................................................49

C.    To the extent the Court considers setting a timeline for completion of the reinitiated consultation, it should adopt NMFS's schedule. ........................................................51

CONCLUSION .............................................................................................................................52

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    Page

*Alaska Oil & Gas Ass'n v. Pritzker*,
   840 F.3d 671 (9th Cir. 2016)............................................................................16

*Alaska v. Lubchenco*,
   825 F. Supp. 2d 209 (D.D.C. 2011)................................................................15

*All. for the Wild Rockies v. Bradford*,
   CV 09-160-M-DWM, 2012 WL 12892360 (D. Mont. July 23, 2012)....................13

*Allied–Signal v. U.S. Nuclear Regul. Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993)........................................................................44

*Almy v. Sebelius*,
   679 F.3d 297 (4th Cir. 2012)...........................................................................6

*Appalachian Voices v. U.S. Dep't of Interior*,
   25 F.4th 259 (4th Cir. 2022) ............................................................ 6, 26, 41, 42

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*,
   Serv., 273 F.3d 1229 (9th Cir. 2001)................................................................14

*Bennett v. Spear*,
   520 U.S. 154 (1997) .....................................................................................45

*Bldg. Indus. Ass'n v. Norton*,
   247 F.3d 1241 (D.C. Cir. 2001) .................................................................21, 23

*City of Rockingham, N.C. v.Fed. Energy Regul.Comm'n*,
   702 F. App'x 106 (4th Cir. 2017)....................................................................20

*Cooling Water Intake Structure Coal. v. EPA*,
   905 F.3d 49 (2d Cir. 2018).............................................................................29

*Ctr. for Biological Diversity v. Bernhardt*,
   595 F. Supp. 3d 890 (D. Ariz. 2022)...............................................................28

*Ctr. for Biological Diversity v. EPA*,
   861 F.3d 174 (D.C. Cir. 2017) .......................................................................51

*Ctr. for Biological Diversity v. Raimondo*,
   610 F. Supp. 3d 252 (D.D.C. 2022).................................................................40

*Ctr. for Biological Diversity v. Ross*,
    613 F. Supp. 3d 336 (D.D.C. 2020).......................................................................40

*Ctr. for Biological Diversity v. Salazar*,
    695 F.3d 893 (9th Cir. 2012)..............................................................................23

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
    450 F.3d 930 (9th Cir. 2006)..............................................................................36

*Defs. of Wildlife v. U.S. Dep't of Navy*,
    733 F.3d 1106 (11th Cir. 2013)...........................................................................39

*Defs. of Wildlife v. Zinke*,
    856 F.3d 1248 (9th Cir. 2017)............................................................................21

*Defs. of Wildlife v. DOI*,
    901 *F.3d 339, 345 (4th Cir.* 2019) ......................................................................6

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*,
    423 U.S. 326 (1976) ..........................................................................................51

*Friends of Animals v. Phifer*,
    238 F. Supp. 3d 119 (D. Me. 2017).....................................................................35

*Friends of Animals v. Williams*,
    628 F. Supp. 3d 71 (D.D.C. 2022) ......................................................................49

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
    378 F.3d 1059 (9th Cir. 2004).........................................................................6, 23

*In re Operation of Mo. River Sys. Litig.*,
    421 F.3d 618 (8th Cir. 2005)..............................................................................25

*Intertribal Sinkyone Wilderness Council v. NMFS*,
    970 F. Supp. 2d 988 (N.D. Cal. 2013)................................................................39

*Kern Cnty. Farm Bureau v. Allen*,
    450 F.3d 1072 (9th Cir. 2006)............................................................................17

*Maine Lobsterman's Ass'n v. Nat'l Marine Fisheries Serv.*,
    70 F.4th 582 (D.C. Cir. 2023).............................................................................13

*Mass. ex rel. Div. of Marine Fisheries v. Daley*,
    170 F.3d 23 (1st Cir. 1999).................................................................................16

*McBurney v. Young,*
 667 F.3d 454 (4th Cir. 2012)...............................................................................40

*Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*,
 602 F.3d 687 (5th Cir. 2010)...............................................................................15

*Miccosukee Tribe of Indians v. United States,*
 566 F.3d 1257 (11th Cir. 2009).............................................................. 22, 24, 25

*Mont. Env't Info. Ctr. v. Haaland,*
 *2022* WL 4592071 (D. Mont. Sept. 30, 2022) .....................................................45

*Nat. Res. Def.Council v. K*empthorne,
 No. 1:05-cv-1207 OWW GSA, 2007 WL 4462391 (E.D. Cal. Dec. 14, 2007)................45, 48

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
 524 F.3d 917 (9th Cir. 2008)...............................................................................28

*Nat'l Wildlife Fed'n v. NMFS,*
 184 F. Supp. 3d 861 (D. Or. 2016).................................................................47, 48

*Nat'l Wildlife Fed'n v. NMFS,*
 839 F. Supp. 2d 1117 (D. Or. 2011)....................................................................48

*Neighbors Against Bison Slaughter v. Nat'l Park Serv.*,
 CV 19-128-BLG-SPW, 2021 WL 717094 (D. Mont. Feb. 5, 2021)........................48

*Nw. Env't Advocs. v. NMFS,*
 *No.* C04-0666RSM, 2005 WL 1427696 (W.D. Wash. June 15, 2005) ...................23

*Oceana v. Pritzker,*
 75 F. Supp. 3d 469 (D.D.C. 2014) .......................................................................24

*Ohio Valley Env't Coal. v. Aracoma Coal Co.*,
 556 F.3d 177 (4th Cir. 2009)................................................................................6

*Pollinator Stewardship Council v. EPA,*
 806 F.3d 520 (9th Cir. 2015)...............................................................................49

*PCFFA v. Raimondo,*
 No. 1:20-cv-00431, 2022 WL 789122 (E.D. Cal. Mar. 11, 2022)....................47, 48

*Rock Creek All. v. U.S. Fish & Wildlife Serv.*,
 663 F.3d 439 (9th Cir. 2011)..........................................................................29, 30

*Salmon Spawning & Recovery All. v. NMFS,*
    342 Fed. App'x 336 (9th Cir. 2009) ......................................................................28

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
    747 F.3d 581 (9th Cir. 2014)................................................................... 15, 20, 51

*San Luis & Delta-Mendota Water Auth. v. Locke,*
    776 F.3d 971 (9th Cir. 2014)......................................................................... 21, 23

*Shafer & Freeman Lakes Env't Conservation Corp. v. Fed. Energy Regul. Comm'n,*
    *992 F.3d 1*071 (D.C. Cir. 2021) ............................................................................10

*Sierra Club v. U.S. Army Corps of Eng'rs,*
    909 F.3d 635 (4th Cir. 2018)................................................................................44

*Sierra Club v. U.S. Dep't of Interior,*
    990 F.3d 909 (5th Cir. 2021)..................................................................................6

*Sierra Club v. NMFS, ,*
    *20-cv-3060-PX,* 2021 WL 4704842 (D. Md. May 24, 2021) .................................45

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.,*
    555 F. Supp. 3d 739 (D. Alaska 2021) .................................................................14

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
    985 F.3d 1032 (D.C. Cir. 2021) .....................................................................48, 49

*Sw. Ctr. for Biological Diversity v. Babbitt,*
    215 F.3d 58 (D.C. Cir. 2000) .........................................................................16, 24

*Sw. Ctr. for Biological Diversity,*
    143 F.3d 515 (9th Cir. 1998)................................................................................34

*Trout Unlimited v. Lohn,*
    559 F.3d 946 (9th Cir. 2009)..........................................................................7, 29

*Turtle Island Restoration Network v. U.S. Dep't of,*
    Com., 878 F.3d 725 (9th Cir. 2017) .....................................................................27

*U.S. Fish & Wildlife Service v. Sierra Club,*
    592 U.S. 261 (2021) ...............................................................................................9

*W. Watersheds Project v. Bernhardt,*
    543 F. Supp. 3d 958 (D. Idaho 2021) ..................................................................49

*Wild Fish Conservancy v. Salazar*,
     628 F.3d 513 (9th Cir. 2010)..................................................................................35, 42

*Wildlife v. U.S. Dep't of Interior*,
     931 F.3d 339 (4th Cir. 2019)..........................................................................11, 22, 30

*Wyo. Outdoor Council v. U.S. Forest Serv.*,
     165 F.3d 43 (D.C. Cir. 1999)......................................................................................28

**Statutes**

5 U.S.C. § 706.................................................................................................................43

5 U.S.C. § 706(2)(A)........................................................................................................6

16 U.S.C. § 1371(a)(5).....................................................................................................37

16 U.S.C. § 1371(a)(5)(A)..........................................................................................39, 40

16 U.S.C. § 1387(a)(2).....................................................................................................40

16 U.S.C. § 1387(c)(3)(D).................................................................................................40

16 U.S.C. § 1532(19).........................................................................................................3

16 U.S.C. § 1533(d)...........................................................................................................3

16 U.S.C. § 1536(a)(2)..................................................................................2, 3, 21, 22

16 U.S.C. § 1536(a)(3)(A)..................................................................................................2

16 U.S.C. § 1536(b)(3)(A).........................................................................................passim

16 U.S.C. § 1536(b)(4)...................................................................................3, 37, 38, 45

16 U.S.C. § 1536(o)(2)................................................................................................3, 37

16 U.S.C. § 1538(a)(1)(B)..................................................................................................3

16 U.S.C. § 1539(a)(1).....................................................................................................39

16 U.S.C. § 1540(a)..........................................................................................................45

16 U.S.C. § 1540(b)..........................................................................................................45

43 U.S.C. § 1332(3)............................................................................................................3

43 U.S.C. § 1337 ........................................................................................3

43 U.S.C. § 1340 ........................................................................................3

43 U.S.C. § 1344 ........................................................................................3

43 U.S.C. § 1351 ........................................................................................3

**Regulations**

50 C.F.R. § 17.3 ........................................................................................3

50 C.F.R. § 17.31(a) ..................................................................................3

50 C.F.R. § 402.02 ............................................................................passim

50 C.F.R. § 402.13(a) ................................................................................2

50 C.F.R. § 402.14(c)(1)(i)(D) ..................................................................9

50 C.F.R. § 402.14(c)(1)(i)(F) .............................................................9, 10

50 C.F.R. § 402.14(d) ................................................................................9

50 C.F.R. § 402.14(f) .................................................................................9

50 C.F.R. § 402.14(g)(4) ...................................................................2, 6, 9

50 C.F.R. § 402.14(g)(7) ...........................................................................3

50 C.F.R. § 402.14(h) ................................................................................2

50 C.F.R. § 402.14(h)(3) ...........................................................................2

50 C.F.R. § 402.14(i)(1) .......................................................................3, 36

50 C.F.R. § 402.14(i)(1)(i) ....................................................36, 40, 41, 42

50 C.F.R. § 402.14(i)(4) ..........................................................................36

50 C.F.R. § 402.14(i)(5) ............................................................................3

50 C.F.R. § 402.16(a)(2) .........................................................................36

50 C.F.R. § 402.14(b)(1) ...........................................................................2

**Federal Regulations**

51 Fed. Reg. 19,926 (June 3, 1986) ............................................................................28

53 Fed. Reg. 8,473 (Mar. 15, 1988)...........................................................................39

54 Fed. Reg. 40,338 (Sept. 29, 1989)........................................................................38

86 Fed. Reg. 47022 (Aug. 23, 2021)...........................................................................6

**Other Authorities**

132 Cong. Rec. H10453-02 1986 WL 789325, at *8 (Rep. Jones) ......................................38, 39

Defendants National Marine Fisheries Service ("NMFS") and Janet Coit, in her official capacity as Assistant Administrator for NOAA Fisheries, (collectively, "Defendants") respectfully submit this Memorandum in support of Defendants' Cross-Motion for Summary Judgment and in opposition to Plaintiffs' Motion for Summary Judgment. *See* ECF No. 93; *see also* ECF No. 93-3 ("Pls.' Mem.").

## INTRODUCTION

At issue is NMFS's programmatic biological opinion on the effects of federally regulated oil and gas program activities in the Gulf of Mexico on threatened and endangered species under the Endangered Species Act ("ESA"). This biological opinion covers an extensive range of oil and gas program activities—from pre-lease exploration to well-decommissioning at the end of a lease—over a 50-year period and was the product of an equally extensive consultation process between NMFS and other agencies that spanned nearly a full decade. The resulting biological opinion is sweeping in both scope and detail, reflecting NMFS' and other Federal agencies' commitment to ensuring activities in the Gulf of Mexico related to the Nation's energy production needs are carried out in compliance with the ESA. Plaintiffs, for their part, second-guess NMFS's judgment on a wide range of issues, alleging that NMFS relied on imperfect scientific data, abdicated its duties under the ESA to other agencies, and disregarded pressing threats to species and their habitat. But Plaintiffs' portrayal is inaccurate. Despite Plaintiffs' concerted attempts to find fault with nearly every step of NMFS's decision-making process, the administrative record reveals an agency that sought to grapple with a broad range of complex, evolving, and intertwined issues in a careful and thorough manner resulting in a well-reasoned biological opinion that is entirely consistent with its statutory duties.

At bottom, while Plaintiffs may prefer a different approach, Plaintiffs' arguments make the perfect the enemy of the good. NMFS conducted a thorough review of the best available information, weighed all the relevant factors, and reached reasonable conclusions based on its expert judgment and the entire administrative record. Nothing more is required. Accordingly, for all these reasons, this Court should deny Plaintiffs' Motion for Summary Judgment and grant

Defendants' Cross-Motion for Summary Judgment. If the Court were to find that the challenged biological opinion is legally or scientifically deficient in any way significant enough to overcome the deference due NMFS, however, the appropriate remedy—indeed the only available remedy— is to remand the biological opinion to NMFS for reconsideration. In the meantime, NMFS is engaged in a reinitiated consultation that will result in a new biological opinion. Until that new biological opinion is in place, the Court should decline to vacate the existing biological opinion or incidental take statement ("ITS"). Vacatur would not only undermine critical species protections and result in substantial disruption to vital ongoing energy production, but would also divert already scarce agency resources needed to finish work on the pending reinitiated consultation.

## LEGAL BACKGROUND

**1. Endangered Species Act**. The ESA protects listed species in several ways. As relevant here, ESA Section 7(a)(2) directs each federal agency (the action agency) to insure, in consultation with NMFS (the consulting agency), that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of" a listed species or "result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2). "Formal consultation" is required if either the action agency or NMFS determines that the proposed action is "likely to adversely affect any listed species or critical habitat." 50 C.F.R. §§ 402.14(b)(1), 402.13(a).

Upon the conclusion of formal consultation, NMFS issues a biological opinion ("BiOp") addressing whether the proposed action "is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id*. § 402.14(g)(4), (h)(3); 16 U.S.C. § 1536(a)(3)(A). If NMFS finds that the proposed action is likely to jeopardize the continued existence of an endangered or threatened species, NMFS will suggest "reasonable and prudent alternatives" ("RPAs"), if any, which can be taken by the action agency in implementing the proposed action to avoid the likelihood of jeopardizing the continued existence of listed species or of the destruction or adverse modification of designated critical habitat. *See id*. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h). NMFS must use "the best scientific and commercial data

available" in formulating its BiOp. 16 U.S.C. § 1536(a)(2).

Additionally, ESA Section 9(a)(1) prohibits the unauthorized "take" of members of an endangered species. *Id.* § 1538(a)(1)(B). NMFS has extended that prohibition to threatened species. *Id.* § 1533(d); 50 C.F.R. § 17.31(a). "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). NMFS has further defined the term "harm" to include "significant habitat modification or degradation" that "actually kills or injures wildlife." 50 C.F.R. § 17.3.

If, after formal consultation, NMFS concludes that the proposed action is not likely to cause jeopardy, but will incidentally take members of a listed species, the agency provides an ITS with the BiOp. 16 U.S.C. § 1536(b)(4). An ITS is provided only when take "is reasonably certain to occur." 50 C.F.R. § 402.14(g)(7). An ITS must specify the impact (*i.e.*, the amount or extent) of anticipated take, measures to minimize such impact, and terms and conditions to implement those measures. *Id.* § 402.14(i)(1). Any taking in compliance with the terms and conditions specified in an ITS is exempt from Section 9's take prohibition. *See* 16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(i)(5).

**2. The Outer Continental Shelf Lands Act ("OCSLA")**.  In OCSLA, Congress declared that the Outer Continental Shelf ("OCS")[1] is "a vital national resource" "which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. § 1332(3). OCSLA establishes a graduated four-stage process governing oil and gas development on the OCS: (1) establishment of a national "five-year leasing program" of potential lease sales in areas of the Shelf; (2) lease sales through a competitive sealed-bid auction; (3) approval of plans allowing lessees to conduct exploration activities on the leased areas; and (4) if lessees discover valuable oil and gas deposits, approval of plans authorizing the production of oil and gas from the leased areas. 43 U.S.C. §§ 1337, 1340, 1344, 1351. Of the four OCS regions

---

[1] The OCS refers to all submerged lands lying seaward of state coastal waters under the jurisdiction of the United States. *See* AR 53556.

(Alaska OCS, Atlantic OCS, Gulf of Mexico OCS, and Pacific OCS), the "Gulf of Mexico OCS region has the greatest resource potential for being a major long-term supplier of crude oil and natural gas[.]" AR 53379; *see also* AR 67341.

## FACTUAL BACKGROUND

Prior to the BiOp at issue here, NMFS most recently issued a BiOp for federally regulated oil and gas program activities in the Gulf of Mexico in 2007. *See* AR 72960-3086. As relevant here, NMFS determined in its 2007 BiOp that Gulf of Mexico sales scheduled in a five-year leasing program and associated actions were not likely to jeopardize threatened or endangered species, including most of the same species at issue here, or destroy or adversely modify their designated critical habitat. *See* AR 73058.

On April 20, 2010, the Deepwater Horizon mobile drilling unit exploded, caught fire, and eventually sank in the Gulf of Mexico, ultimately resulting in the release of approximately 3.19 million barrels of oil. AR 40009-10. The Deepwater Horizon incident prompted the Bureau of Ocean Energy Management, Regulation, and Enforcement ("BOEMRE") to request the reinitiation of ESA Section 7 consultation with NMFS to reevaluate the baseline and status of listed species and their habitat in light of the impacts of Deepwater Horizon. *See* AR 14377-78.[2]

Meanwhile, on June 30, 2010, a group of plaintiffs brought a lawsuit in the United States District Court for the Eastern District of Louisiana, alleging that BOEMRE violated the National Environmental Policy Act ("NEPA") by issuing authorizations for seismic surveys related to oil and gas development in the Gulf of Mexico. *See* AR 13254. The lawsuit was ultimately resolved by a settlement agreement entered in 2013, which, *inter alia*, committed BOEM to consult with NMFS, pursuant to ESA Section 7, in connection with the issuance of authorization for seismic survey-related take under the Marine Mammal Protection Act ("MMPA"). *Id.* In addition, in 2018, a group of plaintiffs brought a lawsuit alleging that NMFS had unreasonably delayed completion of this ESA consultation. *Gulf Restoration Network v. NMFS*, No. 8:18-cv-01504-JDW (M.D.

---

[2] BOEMRE was subsequently reorganized, effective October 1, 2011, into two separate agencies: the Bureau of Ocean Energy Management ("BOEM") and the Bureau of Safety and Environmental Enforcement ("BSEE"). *See* AR 13252.

Fla.). Pursuant to a settlement in that case, on March 13, 2020, NMFS issued the programmatic BiOp challenged in this case.

As relevant here, this 2020 BiOp concluded ESA Section 7 consultation between NMFS (as the consulting agency) and BOEM, BSEE, the Environmental Protection Agency ("EPA"), and NMFS's Office of Protected Resources, Permits and Conservation Division (as action agencies) as to all federally regulated oil and gas program activities expected over the next 50 years in the Gulf of Mexico. *See* AR 13255. These activities pertain to "all stages of the leasing program," including exploration (such as pre-leasing geophysical surveys); development (construction of facilities); production (oil and gas extraction); and maintenance and decommissioning (removal of facilities). *Id*.; *see also* AR 13273-74 (describing stages of lease sale). Active oil and gas leases are located almost entirely in the western and central portions of the Gulf of Mexico. *See* AR 13268 (showing active leases in each planning area in Figure 1).

In the BiOp, NMFS examined the effects of oil and gas program activities in an action area covering three planning areas in the Gulf of Mexico, as well as "state coastal waters to shore and 55 km out beyond federal waters[,]" AR 13386 (map showing the action area in Figure 17),[3] and with respect to various listed species and designated critical habitat in the action area. *See* AR 13405 (identifying species in Table 26 and designated critical habitat in Table 27). Based on its species-by-species analysis, including its evaluation of measures to mitigate or avoid effects to species, NMFS concluded that the proposed action "is not likely to jeopardize the continued existence of sperm whale, Northwest Atlantic loggerhead sea turtle, Kemp's ridley sea turtle, North Atlantic [distinct population segment ("DPS")] and South Atlantic DPS green sea turtle, leatherback sea turtle, hawksbill sea turtle, Gulf sturgeon, giant manta ray, and oceanic whitetip shark"; "is not likely to destroy or adversely modify loggerhead or Gulf sturgeon designated critical habitat"; and "is likely to jeopardize the continued existence of the Gulf of Mexico [Rice]'s

---

[3] The eastern portion of the action area is under moratorium, such that "BOEM is not planning any exploration or development activities within that area." AR 13385. In addition, in 2020, the geographic scope of the action under consultation was revised by BOEM to remove most of the eastern planning area and a small portion of the central planning area that are both under a leasing moratorium from the proposed action. *See* AR 13259.

whale." AR 13847.[4] Further, as to the Rice's whale, NMFS proposed a "reasonable and prudent alternative" "to avoid the likelihood of jeopardizing [its] continued existence[.]" AR 13847-48.

## STANDARD OF REVIEW

The Court's review of the BiOp and ITS is governed by the default standard of the Administrative Procedure Act ("APA"). *Defs. of Wildlife v. DOI*, 901 F.3d 339, 345 (4th Cir. 2019). Under the APA, a court may set aside an agency action only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An "agency action is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 269 (4th Cir. 2022) (citation omitted). "Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). A court thus "is not empowered to substitute its judgment for that of the agency" and reviews only "whether the agency considered the relevant factors and whether a clear error of judgment was made." *Id.* Plaintiffs must carry the "demanding burden" of showing that agency action is arbitrary or capricious. *Almy v. Sebelius*, 679 F.3d 297, 307 (4th Cir. 2012).

## ARGUMENT

**I.    NMFS's Jeopardy Analysis Complies With The ESA.**

At the crux of this case is NMFS's jeopardy analysis—*i.e.*, the agency's assessment as to whether the proposed action "is likely to jeopardize the continued existence of listed species." 50 C.F.R. § 402.14(g)(4); *see also id.* § 402.02. Significantly, "the ESA does not prescribe how the jeopardy prong is to be determined." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1067 (9th Cir. 2004); *see also Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909,

---

[4] Based on new taxonomic research, the ESA-listed population of Gulf of Mexico Bryde's whale was renamed Rice's whale. *See* 86 Fed. Reg. 47022 (Aug. 23, 2021). Given the recent briefing in this case referring exclusively to "Rice's whale" and in the interest of consistency, this brief will also use the revised name "Rice's whale."

917 (5th Cir. 2021) (noting "the ESA does not define how to measure whether an action will in fact 'jeopardize the continued existence' of [a listed species]"). Rather, the highly technical task of assessing the likelihood of jeopardy to a listed species—which, *inter alia*, requires a consulting agency to define the full range of potential effects from the proposed action, determine which data and studies constitute the best available information regarding such effects, and decide the most appropriate methodological approach for analyzing the effects—necessarily requires a consulting agency to apply "a great deal of predictive judgment," and "[s]uch judgments are entitled to particularly deferential review." *Trout Unlimited v. Lohn*, 559 F.3d 946, 959 (9th Cir. 2009). So too here, where each step of NMFS's jeopardy analysis required the agency to exercise its predictive judgment.

In this case, Plaintiffs raise objections to each step of NMFS's jeopardy analysis, alleging, *inter alia*, that the agency erred by (1) "[b]lindly adopting [the United States Department of the] Interior's ["Interior"] assertion" regarding the low probability of a worst-case oil spill of more than 1 MMbbl, Pls.' Mem. at 12; (2) "ignoring the likelihood and effects" of oil spills ranging from 100,000 bbl to 1 MMbbl, *id.* at 18, as well as underestimating the "number and size" of oil spills ≥ 10,000 bbl and the potential impacts from such spills, *id*. at 19; (3) failing to adequately account for species "population changes" following Deepwater Horizon, *id*. at 23, and "climate change effects," *id*. at 28, as part of its assessment of baseline conditions; and (4) failing to address the impacts of the proposed action on the "recovery" of listed species, *id*. at 30. None of Plaintiffs' objections to NMFS's jeopardy analysis overcome the deference due to the expert agency.

### A.  NMFS reasonably considered the probability of an extremely large oil spill (>1 MMbbl).

NMFS, with the assistance of BOEM's technical expertise in offshore oil and gas operations and BSEE's related regulatory and safety enforcement expertise, focused considerable attention on the probability of an extremely large oil spill (>1 MMbbl) from the outset of the consultation process, recognizing that Deepwater Horizon underscored the need to incorporate "additional information on the risk of future extremely large spills" as part of the BiOp. AR 13988.

NMFS thus collected and reviewed a wide range of information regarding the risk and frequency of such spills. *See* AR 13987.

NMFS acknowledged the "high uncertainty involved in predicting [such] rare events" with limited data. AR 13746; *see also* AR 13987 (noting that the "lack of data" results in "a high degree of statistical uncertainty"). For this reason, NMFS specifically sought information on the statistical methods and models that may be used to predict extremely large oil spills in the absence of robust historical data. In response, BOEM and BSEE provided NMFS with peer-reviewed studies on the subject. *See* AR 13992-95. Among these studies was a 2014 study by Ji, et al. (oil spill experts at BOEM), which applied a statistical modeling approach known as extreme value theory ("EVT") to compensate for the lack of historical data. *See* AR 67342; *see also* AR 67337-68 ("Ji study"). Based in part on the Ji study, BOEM and BSEE determined that the probability of an extremely large oil spill was "so low that it is not reasonably certain to occur within the time period covered by this [BiOp.]" AR 13746. In turn, NMFS, based on the totality of the information available on extremely large oil spills, including the lack of historical data for such spills and the EVT model in the Ji study, undertook its own assessment but concluded that it was appropriate to "defer to the BOEM and BSEE analysis . . . based on their expertise in this subject," AR 14000. NMFS therefore excluded the "hypothetical occurrence of this low-probability extremely large (greater than 1 Mbbl) event" from its effects analysis. *Id*.

Plaintiffs mischaracterize the cooperative interagency process as NMFS "[b]lindly adopt[ing]" BOEM's and BSEE's risk analysis, Pls.' Mem. at 12, even though doing so was, in their view, "contrary to the record." *Id*. at 13. As detailed below, the record shows otherwise. The chronology in fact highlights that NMFS's ultimate decision to defer to BOEM's and BSEE's analysis regarding the probability of an extremely large oil spill was the product of a thorough and collaborative process among NMFS and the action agencies (BOEM, BSEE, and others). NMFS's decision was reasonable.

1.   **NMFS reasonably deferred to BOEM's and BSEE's expertise with respect to the probability of an extremely large oil spill.**

To start, Plaintiffs assert that NMFS "unlawfully abdicated its responsibility" by deferring to BOEM's and BSEE's assessment as to the probability of an extremely large oil spill. Pls.' Mem. at 11. But Plaintiffs' assertion misapprehends the action agencies' roles in the ESA consultation process. ESA Section 7(a)(2) instructs an action agency not only to ensure that its proposed action will not jeopardize the continued existence of any listed species, but to do so "in consultation with and with the assistance of" the consulting agency. *Id*. § 1536(a)(2). That is, the ESA requires action and consulting agencies to consult with one another in a collaborative manner. *Id*. (in fulfilling the requirements of ESA Section 7(a)(2) "each agency" uses the best scientific and commercial data available); *see also* 50 C.F.R. § 402.14(c)(1)(i)(D), (F). The regulations further require an action agency to provide the consulting agency with "the best scientific and commercial data available or which can be obtained . . . for an adequate review of the effects that an action may have upon listed species or critical habitat." *Id*. § 402.14(d). The regulations also allow a consulting agency to request that an action agency "obtain additional data to determine how or to what extent the action may affect listed species or critical habitat." *Id*. § 402.14(f). Taken together, the ESA and its regulations thus make it plain that consultation is meant to be a collaborative process reflecting the respective input and collective expertise of <u>both</u> the action and consulting agencies. *See also U.S. Fish & Wildlife Service v. Sierra Club*, 592 U.S. 261, 264 (2021) (the goal of the consultation is to assist the Services in preparing the biological opinion).

Such collaboration was particularly sensible here. NMFS, as the consulting agency with responsibility for managing, conserving, and protecting living marine resources on the OCS, has the particular expertise to assess "how [a proposed] agency action affects [listed] species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). BOEM and BSEE bring to the process their highly specialized expertise in offshore oil and gas operations and the statistical methods and models for predicting extremely large oil spills. BOEM is the agency tasked by Congress with offshore "leasing (including pre- and post-lease activities), exploration, and development plan approval,"

AR 13272, and BSEE is the agency tasked with "enforcing safety and environmental regulations, offshore regulatory programs, [and] oil-spill response[.]" *Id.*

NMFS was not required to displace the specialized expertise of the action agencies on particular factual and analytical matters within their authority. Indeed, NMFS must incorporate information from the action agencies as to "the nature and scope of the proposed action" as part of its opinion, 50 C.F.R. § 402.14(c)(1)(i)(F), and BOEM and BSEE were singularly qualified to provide NMFS with information as to oil spill-related issues, including the statistical methods and models used to analyze oil spill risk, *see* AR 13992-95 (summarizing studies on oil spill risk); post-Deepwater Horizon regulatory reforms "to reduce the volume of oil spilled during accidental events by reducing risks and improving control and response," AR 13995; and technological advances in drilling safety, *see id.* (noting that "improvements in the capping stack technology are effective to bringing a spill under control in shorter time periods than occurred for [Deepwater Horizon]"). Hence, it was entirely appropriate for NMFS to defer to BOEM's and BSEE's expertise in assessing the probability of an extremely large oil spill. *See, e.g.*, *Shafer & Freeman Lakes Env't Conservation Corp. v. Fed. Energy Regul. Comm'n*, 992 F.3d 1071, 1090 (D.C. Cir. 2021) (finding consulting agency's findings on "both hydrology and biology" were entitled to deference, even though "personnel who worked on the [BiOp] lacked hydrological expertise," since "the [agency] consulted hydrologists as part of its decision-making process").

### 2. NMFS conducted an independent assessment of the probability of an extremely large oil spill.

Further, while it was reasonable for NMFS to rely on the expertise of BOEM and BSEE in assessing the probability of an extremely large oil spill, NMFS did not do so "[b]lindly" as Plaintiffs assert. Pls.' Mem. at 12. Rather, as Plaintiffs acknowledge, NMFS conducted its own "extremely large spill assessment in Appendix G of the BiOp." *Id.* at 13; *see also* AR 13986-4001 ("Appendix G"). Plaintiffs nonetheless claim an inconsistency between Appendix G and NMFS's subsequent decision to "defer to the BOEM and BSEE analysis . . . based on their expertise in this subject," AR 14000, alleging that NMFS "chose not to use its conclusions or analysis in Appendix

G" and thus "violate[d] the ESA's best available science mandate[.]" Pls.' Mem. at 14.

Plaintiffs overreach. As the consulting agency, NMFS was responsible for reviewing the information submitted by the action agencies and undertaking an independent assessment based, in part, on such information, *see* 16 U.S.C. § 1536(b)(3)(A), and NMFS did so. Appendix G reflects NMFS's efforts to consolidate the best available information on extremely large oil spills from various sources—including BOEM and BSEE—for purposes of its own assessment. NMFS examined, for example, several post-Deepwater Horizon studies on the "statistical methods to predict the risk of extremely large spills," AR 13992, including a thorough review of the Ji study. *See* AR 13994. NMFS also evaluated post-Deepwater Horizon regulatory reforms and technological safety improvements that "reduce the risk of another DWH-sized event." AR 13992; *see also* AR 13995-99.

In the end, after careful review of this best available information, NMFS determined that the most appropriate course was to "defer to the BOEM and BSEE analysis . . . based on their expertise in this subject," AR 14000, and NMFS's decision is entitled to deference. *See Defs. of Wildlife v. U.S. Dep't of Interior*, 931 F.3d 339, 345 (4th Cir. 2019) ("*DoW*") (stating that a consulting agency "may decide which data and studies are the best available" (citation omitted)). Because NMFS made its decision to defer to BOEM's and BSEE's expertise on oil spill probabilities after it had thoroughly considered the Ji study and the other best available information in Appendix G, there is no inconsistency between BOEM's and BSEE's analysis and Appendix G.[5]

---

[5] Plaintiffs point to examples of purported inconsistencies in Appendix G, *see* Pls.' Mem. at 13-14, but none is persuasive. Although NMFS sought to estimate the volume of "the largest spill size possible," AR 14000, an estimate as to volume does not speak to the probability of such a spill actually occurring. Likewise, NMFS examined a 2012 study by Eckle et al. that presented a return frequency of only 17 years for a Deepwater Horizon-sized spill, *see* AR 13994, but the agency noted that the study was based on "[g]lobal data [that] takes into account risk factors potentially not relevant to [the] Gulf of Mexico[.]" AR 13999. NMFS also considered another study with an estimated 26-34 year return frequency, but the estimate was specific to "pre-[Deepwater Horizon] extremely large spill frequency[,]" AR 13987 (emphasis added), and therefore did not account for post-Deepwater Horizon "regulatory and technological advances [that] reduce the risk of another [Deepwater Horizon]-sized event." AR 13992. Plaintiffs also cite two instances in which NMFS referred to an extremely large oil spill as part of its effects analysis, *see* Pls.' Mem. at 14, but noting the mere possibility of such a spill does not equate to a finding that such a spill is reasonably certain to occur, and, if anything, made the effects analysis more, rather than less, conservative.

### 3. The Ji study supports the low probability of an extremely large oil spill.

With respect to the Ji study, Plaintiffs' allegations are several, but they are all based on the underlying notion that there is an inconsistency between the Ji study and BOEM's and BSEE's determination that the probability of an extremely large oil spill "is so low that it is not reasonably certain to occur within the time period covered by this [BiOp.]" AR 13746. Plaintiffs even allege that the Ji study "demonstrates the opposite" of BOEM's and BSEE's risk analysis. Pls.' Mem. at 14. Plaintiffs, however, overstate the case considerably, and do not overcome the deference due.

As an initial matter, it is important to place the Ji study in proper context. The challenge of predicting extremely large oil spills (>1 MMbbl) is that such spills are singularly rare—to date, Deepwater Horizon is the only spill of this size on the OCS. *See* AR 13986. Deepwater Horizon was exceptionally unusual – both in an absolute sense, *see* AR 67340 (noting Deepwater Horizon "is the largest accidental marine oil spill in the history of the petroleum industry"), and a relative sense. *See* AR 13997 (stating Deepwater Horizon "was 8.5 times the cumulative 570,000 bbl that were spilled in the previous 46 years in the U.S."). Thus, because Deepwater Horizon is the only relevant data point for an extremely large oil spill on the OCS, the "fundamental challenge is to accurately describe this risk" given the lack of data "that can serve as benchmarks." AR 13986; *see also* Declaration of Zhen-Gang Ji ("Ji Decl.") ¶ 5.

EVT is a statistical modeling approach that compensates for the lack of data in predicting extreme events and thus "has been widely used in studying rare events, including damage from hurricanes, stock market crashes, insurance claims, flooding, and earthquakes." AR 67339. "The key idea is that probabilities of extreme events can be estimated by fitting a 'model' to a set of extreme event data, which is just the tail of the complete data distribution . . . [t]hen the model can be used to estimate extreme events." AR 67346. As relevant here, the Ji study applied an EVT method to analyze the risk of an extremely large oil spill on the entire OCS. AR 67346-48. Based on the application of EVT methods to "49 years (1964-2012) of OCS oil spill data," AR 67339, the Ji study calculated that the "return period of a catastrophic oil spill in OCS areas is estimated to be 165 years, with a 95% confidence interval between 41 years and more than 500 years." AR

67354.

Plaintiffs raise two objections related to this prediction. First, Plaintiffs suggest that—even though the Ji study found the "most likely" estimate of the "return period of a catastrophic oil spill . . . to be 165 years," AR 67351-54—NMFS (via BOEM and BSEE) should have focused not on this most likely estimate, but rather on the 41-year return period at the lower bound of the confidence interval as the basis for the BiOp's analysis, because a "worst case cannot be excluded" and "to give the benefit of the doubt to the species." Pls.' Mem. at 15. While Plaintiffs may prefer that NMFS focus on the lower bound, none of the cases cited by Plaintiffs shows that NMFS was <u>required</u> to tether its risk assessment to the lowest end of the confidence interval. *See, e.g.*, *All. for the Wild Rockies v. Bradford,* No. CV 09-160-M-DWM, 2012 WL 12892360, at *1 (D. Mont. July 23, 2012) (rejecting argument that the ESA requires the "benefit of the doubt" "be given to the protection of [listed species] where there is conflicting evidence"); *see also Maine Lobsterman's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 599 (D.C. Cir. 2023) ("Statutory text and structure do not authorize the Service to 'generally select the value that would lead to conclusions of higher, rather than lower, risk to endangered or threatened species' whenever it faces a plausible range of values or competing analytical approaches … [the statute] requires the Service to use the best available scientific data, not the most pessimistic.").

Further, despite Plaintiffs' preference for a 41-year return period, the Ji study specifically found a 165-year return period to be the "most likely" scenario for an extremely large oil spill on the OCS. AR 67351. By contrast, the 41-year return period at the lowest end of the confidence interval was not only less representative than this "most likely" scenario, but it also did not reflect the "new regulatory and technological advances [that] reduce the risk of another [Deepwater Horizon]-sized event." AR 13992; *see also* Declaration of Christopher Michael DuFore ("DuFore Decl.") ¶ 5 (noting "significant improvements in production equipment and operations, and improved technologies have led to a positive trend of lower oil spill occurrence rates per volume of oil handled over time"). Moreover, because the Ji study analyzed the probability of an extremely large oil spill occurring in the <u>entire</u> OCS, *i.e.*, a significantly larger area than the Gulf of Mexico

13

OCS, its findings as to the likely return period for such a spill represent an "upper bound of oil spill risk in the [Gulf of Mexico ("GOM").]" Declaration of Zhen-Gang Ji ("Ji Decl.") ¶ 6 (also noting that "[a]n analysis focused on a more geographic tailored area, such as the GOM, would produce a lower oil spill risk, because a GOM-focused analysis would not include the Santa Barbara spill (one of the largest spills to occur on the OCS) in the dataset"). Hence, it was reasonable for NMFS to defer to the Bureaus in their reliance on the "most likely" return period predicted by the Ji study.

Second, based on the calculations of their own proffered oil spill expert, Plaintiffs allege that "the probability of [an extremely large] spill occurring in the BiOp's 50-year term is . . . greater than 25%." Pls.' Mem. at 16; *see also* Declaration of Susan Lubetkin, PhD ("Lubetkin Decl.") ¶ 52 (suggesting "a 26.2% chance" of such a spill). But even assuming Plaintiffs' calculation is correct (which Defendants do not concede), Plaintiffs fail to show any inconsistency between a purported 26.2% probability and BOEM's and BSEE's assessment that the probability of an extremely large oil spill was "so low that it is not reasonably certain to occur[.]" AR 13746. As relevant here, with respect to indirect effects of an action under consultation, the ESA regulations require a consulting agency to evaluate effects "caused by the proposed action" that are "reasonably certain to occur." 50 C.F.R. § 402.02. This latter limit—requiring reasonably certain effects—marks the outer bound of an effects analysis, such that an effects analysis need only extend as far as indirect effects from the proposed action are reasonably certain to occur. Therefore, it is not enough to point to the possibility that an extremely large oil spill <u>might</u> occur over the 50-year period of the BiOp. *Cf. Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1246 (9th Cir. 2001) (affirming district court holding that "mere potential for harm . . . is insufficient" to show reasonable certainty of incidental take). Rather, Plaintiffs must show a reasonable certainty that such a spill will occur. *See* 50 C.F.R. § 402.02.

Plaintiffs make no such showing. Nor could they, and Plaintiffs cite no authority for the notion that a 26.2% probability somehow equates to a reasonable certainty. *Cf. Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739, 801 n.402 (D. Alaska 2021)

(deferring to agency's determination that it "was not required to specify take of polar bear cubs by den disturbance because it determined such take was not reasonably certain to occur" based on "an 84% probability that 0 takes occur"). At most, Plaintiffs' calculation of a 26.2% probability suggests only that an extremely large oil spill is possible—not that such a spill is "reasonably certain to occur." 50 C.F.R. § 402.02; *see also Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 703 (5th Cir. 2010) (upholding agencies' decision to exclude proposed development from effects analysis because the "development of the remaining phases of the quarry is not 'reasonably certain to occur'").

### 4.    Plaintiffs identify no better information than the Ji study.

Plaintiffs' final argument with respect to the probability of an extremely large oil spill—that NMFS failed to account for "increasingly deeper-water drilling and more frequent and intense hurricanes," Pls.' Mem. at 17—is also unpersuasive. Based on its review of the Ji study, NMFS recognized that one "[l]imitation[]" of the model was that it used "mostly shallow water spill data[.]" AR 13999. But Plaintiffs stretch this limitation too far. The Ji study used <u>all</u> oil spill data for the OCS, including Deepwater Horizon and other deepwater spills, *see* AR 13994 (noting that the Ji study included all "Federal OCS oil spill data from 1964-2012"), which also incorporated hurricane-related impacts, *see* AR 67342-43 (observing higher number of spills in "August and September . . . [was] primarily due to hurricanes, a climatological phenomenon unique in the Gulf of Mexico").

Further, under ESA section 7(a)(2), the best available information need not be definitive in every respect. Plaintiffs therefore "cannot insist on perfection" because the "'best scientific . . . data available,' does not mean 'the best scientific data possible.'" *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (citation omitted). Even "[t]he existence of a flaw . . . does not require [a court] to hold that the agency's use of [a] model was arbitrary." *Id.* at 620-21 (citation omitted). Hence, Plaintiffs' attempts to "poke some holes" in the Ji study do not "preclude a conclusion that [the Ji study is] the best available science." *Alaska v. Lubchenco*, 825 F. Supp. 2d 209, 223 (D.D.C. 2011). This is especially true here because Plaintiffs have not

identified any "evidence that is in some way better than the evidence [that the agency] relie[d] on." *Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000); *see also Mass. ex rel. Div. of Marine Fisheries v. Daley*, 170 F.3d 23, 30 (1st Cir. 1999) (stating that, "[i]f no one propose[s] anything better, then what is available is the best"). Even though NMFS acknowledged limitations with certain aspects of the Ji study, there was no better information for predicting an extremely large oil spill on the OCS, *see* AR 13994 (observing that the statistical methods used in the Ji study "have been used with good results for other events that are rare"), and Plaintiffs fail to demonstrate otherwise. *Cf. Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 681 (9th Cir. 2016) (upholding finding in which the agency "candidly disclosed the limitations of the available data and its analysis").

### B.     NMFS reasonably considered the probability of very large oil spills (≥10,000 bbl).

With respect to the separate question of the probability of very large oil spills (≥10,000 bbl), Plaintiffs present a mare's nest of allegations. Some allegations are conclusory, *see, e.g.*, Pls.' Mem. at 18 (alleging, without supporting details, that NMFS "failed to contemplate the likelihood of any spill between 100,000 and 1,000,000 bbl, leaving a 900,000 bbl gap in its catastrophic spill assessment"), while others are counterfactual, *see, e.g.*, *id*. at 19-20 (alleging NMFS erred in its assessment of "very large spills by relying on a dataset of just one spill"). None withstands scrutiny.

First, Plaintiffs fault NMFS for "ignoring the likelihood and effects" of a very large spill involving potentially "several hundreds of thousands of barrels of oil[.]" *Id*. at 18. But as Plaintiffs acknowledge, NMFS conducted an assessment of "the available information used to determine the potential largest spill size volumes[,]" AR 13986, and thus based its effects analysis on a range of predicted spill sizes. *See* AR 13745-46. As relevant here, NMFS determined, based on spill size data provided by BOEM, that the proposed action may result in two very large oil spills, with a median spill size of 100,000 bbl, over the 50-year period covered by the BiOp, *see* AR 13746; *see also*, *e.g.*, AR 13759 (addressing potential effects of "two very large spills"); 13770-71 (impact of

a "very large oil spill scenario"). Far from "fail[ing] to contemplate the likelihood" of a very large oil spill, Pls.' Mem. at 18, the record shows that NMFS squarely considered the risk of such a spill and incorporated a prediction for two such spills into the BiOp. *See* AR 13746; *cf. Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1081 (9th Cir. 2006) (rejecting argument that agency failed to consider data where "the studies are discussed and evaluated throughout the Final Rule").[6]

Second, Plaintiffs make the counterfactual assertion that NMFS's assessment regarding the probability of very large oil spills "underestimated the number and size" of such spills because it was based "on a dataset of just one spill"—Deepwater Horizon. Pls.' Mem. at 19-20. Not so. In reviewing the historical data on very large oil spills, NMFS examined information on all spills ≥1,000 bbl dating as far back as 1964, *see* AR 5880-84 (listing prior oil spills in Tables 3-14 and 3-15); 13988-90 (listing prior oil spills in Tables 1 and 2), including the three pre-1971 "very large drilling-related blowouts" ≥ 10,000 bbl described in Appendix G and cited by Plaintiffs. AR 13988-89 (describing one spill in 1969 (80,000 bbl) and two spills in 1970 (65,000 bbl and 53,000 bbl)); *see* Pls.' Mem. at 19.[7] NMFS's review also included other very large oil spills cited by Plaintiffs, including a non-blowout pipeline spill in 2017, *see* AR 13990, and an ongoing spill from 2004. *See* AR 5885-86.[8] Consequently, although Plaintiffs allege that NMFS failed to account for this spill data, the record demonstrates that the opposite is true.

Third, Plaintiffs contend that the "record does not show how the very large spill estimates were calculated." Pls.' Mem. at 19. Again, the record shows otherwise. As NMFS explained, its assessment of very large oil spills was informed by BOEM's oil spill risk analysis. *See* AR 13746. BOEM, in turn, discussed at length its review of the historical offshore oil spill data, *see* AR 5880-

---

[6] Plaintiffs appear to suggest that NMFS's analysis of very large oil spills was somehow illusory, alleging that "NMFS never assessed the discrete acute effects of a 100,000 bbl spill." Pls.' Mem. at 18. But Plaintiffs misread NMFS's effects analysis, which focused on oil thickness, rather than just spill sizes, to analyze potential exposures to listed species. *See* AR 13747 (explaining that the exposure analysis requires that, "[f]irst, for any size spill, we characterize oil thickness").

[7] For context, oil spills on the OCS that exceeded ≥1000 bbl accounted for only 1.14% of all spills ≥1 bbl from 1964 to 2009. *See* AR 52900.

[8] Plaintiffs also point to the Ixtoc oil spill in 1979, *see* Pls.' Mem. at 19, but that spill occurred in non-OCS waters in Mexico, *see* AR 13527, and therefore was not part of the OCS-specific data reviewed by NMFS.

84; its calculation of occurrence rates for offshore oil spills, *see* AR 5875-76; *see also* AR 52887-91 (calculating platform and pipeline spill rates for OCS spills ≥10,000 bbl); and its methodology for estimating the number and probability of offshore oil spills, *see* AR 5893-95. Separately, BSEE also provided NMFS with information analyzing the frequency of loss of well control events from 2000-2015, *see* AR 59728-928, in which BSEE estimated the probability of both an oil spill of 5,000-50,000 bbl and an oil spill >50,000 bbl to be "1-2 times in 160 year[s]," AR 59920, which further supported BOEM's projection "that two oil spills greater than or equal to 10,000 bbl may occur over the duration of the proposed action." AR 13746.

Finally, Plaintiffs suggest that the EVT model in the Ji study yields alternate probabilities for very large oil spills—"at least one >195,000-barrel spill and five ≥16,000-barrel spills" over the 50-year period covered by the BiOp. Lubetkin Decl. ¶ 52; *see also* Pls.' Mem. at 18, 20. However, even assuming that Plaintiffs' alternate calculations for very large oil spills are correct (which Defendants do not concede), Plaintiffs "misconstrue[] the primary purpose" of the Ji study. Ji Decl. ¶ 4. As discussed, and as its name indicates, EVT is a statistical modeling approach specifically intended to address extreme and rare events for which "traditional statistical methods" are inapt because, "by definition, extreme events do not have sufficient historical data[.]" AR 67341. Such is the case here, where, for extremely large, catastrophic oil spills above one million barrels on the OCS, there is only a single data point—the Deepwater Horizon Spill. This distinction is key, because it underscores that "an EVT probability analysis is <u>best</u> suited for <u>extremely</u> rare events." Ji Decl. ¶ 5 (emphasis in original). Thus, while an EVT model may be the most appropriate solution to the "unique problem associated with estimating the likelihood and frequency of a rare, catastrophic volume oil spill where there is limited historical data[,]" DuFore Decl. ¶ 4, it is less suited to estimating the probability of smaller oil spill sizes for which historical data are available. *See* AR 67345 (stating that standard statistical methods are "routinely used in calculating the probability of oil spills in OCS areas" and "spill risks can then be given as empirical distribution constructed directly from data"). Here, the historical data for very large oil spills was not lacking, so there was no need to extend "the EVT analysis in Dr. Ji's article . . . [which was] specific to

catastrophic spill events exceeding 1,000,000 barrels[,]" DuFore Decl. ¶ 6, to such spills, and thus Plaintiffs' reliance on the Ji study for that inapt purpose is misplaced.

### C.   NMFS reasonably analyzed oil spill-related effects.

Relatedly, Plaintiffs argue that NMFS "underestimated the exposure and severity" of oil spill-related impacts by "omitting impacts from toxic invisible oil" and also "assum[ing] only 1% of that visible footprint has consequential effects." Pls.' Mem. at 20. Again, however, Plaintiffs oversimplify NMFS's careful and stepwise analysis. As NMFS explained, the task of "[p]redicting the future exposure of listed species to oil is challenging" because of uncertainty as to numerous variables, including "where a spill may occur, differences in oil type, surface thickness, dispersion factors, and the areas that may be affected by spills." AR 13747. NMFS thus followed a three-step approach to assess the exposure of listed species to oil spills that considered "oil thickness" characteristics, "spatial data for oil spill risk and species densities[,]" and the "severity of exposure to the different types of oil[.]" AR 13747-48. Specifically, NMFS conducted a "spatial intersection" by merging oil spill probabilities for defined areas (known as "polygons"), *see* AR 13751 (Figure 83), with "spatial layers on species density[.]" AR 13757. For each listed species, NMFS "multiplied the number of animals per oil spill risk polygon by the associated spill risk in that polygon . . . and summed these across the action area[,]" which thus "provided the estimated number of exposures to oil over the course of the proposed action in a way that accounts for the estimated distribution of oil spills and species[.]" *Id*. Further, because an "exposure to oil needs to be in sufficient quantity to produce adverse effects[,]" AR 13752, NMFS also applied "consequence levels" based on the different oil types to assess the potential severity of effects for each species. AR 13758 (describing categories ("rainbow sheen," "metallic sheen," "transitional dark," and "dark oil") with corresponding consequences from minor to severe).

Plaintiffs take issue with this approach, insisting that the agency should have incorporated subsurface "invisible oil" as part of its analysis for purposes of estimating the "number of individuals from each species that will encounter oil[.]" Pls.' Mem. at 21. But the risk of subsurface oil from the majority of the oil spills included in NMFS's effects analysis, *see* AR 13745-46

(predicting all but seven oil spills will be < 1,000 bbl), was uncertain. *See, e.g.*, AR 10850 (noting that "spills <1,000 bbl will persist a few minutes (<1 bbl), a few hours (<10 bbl), or a few days (10-1,000 bbl) on the open ocean" and "[s]pilled oil would rapidly spread out, evaporate, and weather, and become dispersed into the water column"); 13755. Further, most of the species addressed by the BiOp are "surface-active animals" that breathe or feed at the surface, such as "sea turtles and whales," and therefore "are more susceptible to oiling than benthic animals[,]" AR 13755, supporting the agency's focus on surface oil. *See, e.g.*, AR 13753-54. In any event, recognizing the uncertainties inherent in "[p]redicting the future exposure of listed species to oil[,]" AR 13747, NMFS conservatively assumed that any oil from a spill >1,000 bbl that reaches the surface would result in exposures to all animals within a polygon, irrespective of the actual size of the spill or the size of the polygon, even though doing so had the effect of potentially overestimating the number of affected animals. *Cf. San Luis*, 747 F.3d at 607-08 (holding that agency acted reasonably where it "acknowledged the uncertainty" and "chose a conservative model").

Plaintiffs' related allegation—that NMFS "assumed only 1% of that visible footprint has consequential effects," Pls.' Mem. at 20—is also unpersuasive. To begin with, Plaintiffs misread NMFS's estimated oil slick percentages for estimating the severity of oil spill-related effects. *See* AR 13750 (estimating percentages by oil thickness in Table 116). By NMFS's estimation, 89% of an oil slick is "rainbow sheen," *id.*, which corresponds to "minimal impacts." AR 13758. The remaining 11% of a slick ("metallic," "transitional dark," and "dark" sheens) is expected to result in moderate, high, or severe consequences, as described in NMFS's effects analysis. *Id*. Further, insofar as Plaintiffs dispute the expected harms associated with these consequence levels, *see* Pls.' Mem. at 21, NMFS reasonably followed the "degree of oiling" approach previously used for a post-Deepwater Horizon damage assessment, *see* AR 13757; *see also* AR 39978-41669, and its decision to apply a similar approach in the BiOp is the "sort of 'scientific determination' to which 'a reviewing court must generally be at its most deferential.'" *City of Rockingham, N.C. v. Fed. Energy Regul. Comm'n,* 702 F. App'x 106, 112 (4th Cir. 2017). Plaintiffs also challenge the

agency's estimate that "only 1% of the visible footprint will be the type of dark, thicker oil that causes moderate to heavy oiling[.]" Pls.' Mem. at 21. But due to the considerable uncertainty in predicting such exposure factors as "where a spill may occur, differences in oil type, surface thickness, dispersion factors, and the areas that may be affected by spills[,]" AR 13747, the agency recognized that "assumptions were necessary given the available data[,]" AR 13759, so it was entirely reasonable for NMFS to account for this uncertainty by making certain assumptions in its exposure analysis. *Cf. Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1257 (9th Cir. 2017) ("*DoW II*") (noting the ESA "accepts agency decisions in the face of uncertainty").

> **D.    NMFS reasonably accounted for Deepwater Horizon-related impacts.**

Next, Plaintiffs fault NMFS for using "inaccurate baselines," Pls.' Mem. at 23, alleging that the agency was required to apply a "post-Deepwater Horizon baseline" as part of its jeopardy analysis. *Id*. at 24. Specifically, Plaintiffs assert that the Deepwater Horizon spill "significantly altered the populations of listed species" in the Gulf of Mexico, such that it was error for NMFS to consider "pre-Deepwater Horizon population statuses" in its jeopardy analysis for certain species. *Id*. at 23. Plaintiffs' argument, however, runs headlong into an immovable fact: While NMFS considered post-Deepwater Horizon population estimates for most species, *see, e.g.*, AR 13413 (sperm whales); 13430 (green sea turtles); 13433-34 (Kemp's ridley sea turtles); 13447-48 (leatherback sea turtles); 13453-55 (loggerhead sea turtles); 13494 (giant manta rays), <u>no such data were available</u> for other species.

This lack of availability is important, because the ESA requires that NMFS formulate its opinion as to whether an action is "not likely" to cause jeopardy based on the "best scientific . . . data <u>available</u>," 16 U.S.C. § 1536(a)(2) (emphasis added), "not the best scientific data <u>possible</u>." *Bldg. Indus. Ass'n v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001) (emphasis in original). Therefore, the instruction that NMFS limit its analysis to the best available data does not require the agency to "make decisions on data that does not yet exist." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) (citation omitted). Nor is the agency required to "conduct new studies when evidence is available upon which a determination can properly be

made." *DoW*, 931 F.3d at 345 (citation omitted). Instead, as the Fourth Circuit has explained, an agency need only "consider all <u>existing</u> scientific data relevant to the decision it is tasked with making." *Id.* at 346 (emphasis added). In this case, because no post-Deepwater Horizon abundance estimates were available for certain species at the time of the decision, it was reasonable—indeed, necessary—for NMFS to rely on the existing data. *See* 16 U.S.C. § 1536(a)(2) (requiring the agency to use the "best scientific . . . data available").

The two examples cited by Plaintiffs (Rice's whales and Gulf sturgeon, *see* Pls.' Mem. at 24-27) illustrate this point. As to Rice's whales, NMFS determined that the "best available density estimate" for the species was found in an independent and peer-reviewed study (Roberts, et al. 2016), which generated habitat-based density models for several cetacean species in the Atlantic and Gulf of Mexico. AR 13541; *see also* AR 78998-9009 ("Roberts study"). As to Rice's whales, the Roberts study "incorporated visual survey data from 1992 to 2009"—a time period that predates Deepwater Horizon. AR 13418. Plaintiffs seize upon this point, inferring that NMFS must have "assumed . . . that the population was still at its pre-spill condition." Pls.' Mem. at 25. But NMFS made no such assumption. Instead, NMFS undertook a two-step assessment of baseline conditions. First, it identified the Roberts study—a 2016 study that analyzed 17 years of data for Rice's whales—as the best available data as to the species' abundance, and the mere fact that the study included no post-Deepwater Horizon survey data for the species does not make NMFS's reliance on the study any less reasonable. *See, e.g.*, *Miccosukee Tribe of Indians v. United States*, 566 F.3d 1257, 1265 (11th Cir. 2009) (stating the "general view is that the agency decides which data and studies are the 'best available' because that decision is itself a scientific determination deserving deference"). If anything, the fact that such data were not part of the Roberts study speaks to the considerable difficulties in collecting this data for [Rice]'s whales, which are "sighted very infrequently[.]" AR 79003. Second, because no quantitative post-Deepwater Horizon data were available, NMFS applied a qualitative approach to account for the impacts of Deepwater Horizon on the species. *See, e.g.*, AR 13800 (noting that, "[w]hile there is no information on the population trend [of Rice's whales], they are thought to have recently experienced a decline due to [Deepwater

Horizon]"); 13516 (stating Deepwater Horizon "resulted in adverse effects" on Rice's whales and other species). Plaintiffs take issue with this approach, suggesting that NMFS was required to provide a more detailed "accounting for the population's diminished state[.]" Pls.' Mem. at 25. But "nothing in the statute, regulations, or guidance requires such an express articulation." *Nw. Env't Advocs. v. NMFS*, No. C04-0666RSM, 2005 WL 1427696, at *11 (W.D. Wash. June 15, 2005), *aff'd*, 460 F.3d 1125 (9th Cir. 2006); *cf. Gifford Pinchot*, 378 F.3d at 1067 (stating a "[f]ocus on actual species count is an overly narrow interpretation of what is required under the jeopardy prong"). Hence, "[b]ecause the ESA does not prescribe how the jeopardy prong is to be determined," *id.*, NMFS's chosen analytical approach "is owed substantial deference." *Id.* at 1066.

Plaintiffs' objections to NMFS's assessment of baseline conditions for Gulf sturgeon are equally groundless. To start, Plaintiffs fault NMFS for its analysis as to three (of the seven) Gulf sturgeon populations in the Gulf of Mexico, arguing that the agency erred by using "pre-Deepwater Horizon numbers for . . . the Choctawhatchee, Pearl, and Pascagoula River populations." Pls.' Mem. at 26. But Plaintiffs' argument misframes the applicable standard set forth in ESA Section 7(a)(2), which did not require NMFS to apply the jeopardy standard to particular subpopulations, but instead required the agency to assess whether the proposed action was likely to jeopardize the continued existence of the species "as a whole." *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 913 (9th Cir. 2012). NMFS did so, concluding that the anticipated impacts of the proposed action would have minimal effects on the overall abundance of the species. *See, e.g.*, AR 13837.

Moreover, to the extent that NMFS considered data on specific river subpopulations as part of its assessment of baseline conditions for Gulf sturgeon, it reasonably relied on pre-Deepwater Horizon estimates because more recent abundance data at that level were not available. *See* AR 13471 (listing post-Deepwater Horizon estimates for four populations and pre-Deepwater Horizon estimates for the remaining three populations). Because NMFS cannot "make decisions on data that does not yet exist," *San Luis*, 776 F.3d at 995, it was entirely reasonable for the agency to rely on these existing estimates as the best available data, even if Plaintiffs view the estimates as "imperfect," *Bldg. Indus. Ass'n*, 247 F.3d at 1246. Further, Plaintiffs' related assertion—that

NMFS "failed to consider the possibility that mortality from Deepwater Horizon oil may have pushed [the three populations] into decline," Pls.' Mem. at 27—conflates exposure to oil with mortality from oil. *See* AR 40556 (recognizing sturgeon were "exposed to [Deepwater Horizon] oil" but also noting "a direct kill of Gulf sturgeon from the oil was not observed"); *cf. Oceana v. Pritzker*, 75 F. Supp. 3d 469, 486 (D.D.C. 2014) (stating that NMFS, as the "expert agency charged with administering the ESA, may reasonably conclude that a given agency action, although likely to reduce the likelihood of a species' survival and recovery to some degree, would not be likely to jeopardize the continued existence of the species").

In any event, Plaintiffs identify no "better" abundance estimates in the record for either Rice's whales or Gulf sturgeon that NMFS allegedly ignored. *Sw. Ctr.*, 215 F.3d at 60. Plaintiffs cite to certain reports and studies that describe the impacts of Deepwater Horizon on these two species. *See* Pls.' Mem. at 24-26. However, far from ignoring this information, these reports and studies are cited by NMFS in its BiOp and/or included in the administrative record. *See* AR 13869-944; *see also Miccosukee Tribe*, 566 F.3d at 1266 (rejecting argument that agency failed to consider data where the data "was taken into account by the [agency] when it drafted the opinion"). Further, none of these reports and studies provides the sort of post-Deepwater Horizon abundance estimates that Plaintiffs assert must be part of any assessment of baseline conditions. For example, Plaintiffs cite to a 2017 study regarding Rice's whales by Soldevilla et al. for the proposition that Deepwater Horizon resulted in the "potential for continuing mortalities and reduced fecundity for decades[,]" AR 81520 (emphasis added), cited in Pls.' Mem. at 25, but the recognition of "potential" does not equate to actionable abundance estimates. Likewise, Plaintiffs repeatedly refer to the post-Deepwater Horizon damage assessment report prepared by a consortium of federal and state natural resource trustee agencies in 2016, *see* AR 39978-41669 ("Trustees report"), suggesting that NMFS failed to adequately account for these damage estimates. *See* Pls.' Mem. at 24-27. But NMFS fully considered these estimates, citing to the Trustees report dozens of times in the BiOp. *See, e.g.*, AR 13516-18; 13789-90. Moreover, the stated purpose of the Trustees report was to estimate injuries caused by Deepwater Horizon to "inform the type and amount of

restoration[,]" AR 40020—not to provide abundance estimates. NMFS thus recognized the Trustees report provided context regarding the impacts of Deepwater Horizon, which was then incorporated into NMFS's qualitative assessment of baseline conditions. Because none of the reports and studies cited by Plaintiffs provides better abundance estimates, NMFS's decision as to what constitutes the best available abundance data is entitled to deference. *See Miccosukee Tribe*, 566 F.3d at 1265.

E.     **NMFS reasonably accounted for climate change impacts.**

In a variation on the same theme, Plaintiffs also allege that NMFS's "jeopardy analyses . . . do not incorporate recognized climate effects in any way." Pls.' Mem. at 29. But this argument relies on a cramped reading of the BiOp that cannot be squared with the totality of the agency's analysis, as reflected in the complete decision document and the entire administrative record. *See, e.g., In re Operation of Mo. River Sys. Litig.*, 421 F.3d 618, 634 (8th Cir. 2005) (there is no requirement that every detail of the agency's decision be stated expressly in the biological opinion provided the rationale is in the underlying administrative record).

Significantly, Plaintiffs do not dispute that NMFS addressed "several concrete ways that climate change will affect species during the BiOp's timeframe[.]" Pls.' Mem. at 27-28. Plaintiffs nevertheless fault the agency for "disregard[ing] climate change effects when assessing jeopardy against the species' baselines." *Id*. at 28. But Plaintiffs misread the BiOp as a series of separate and segmented analyses, alleging that NMFS failed to "incorporate [climate change] effects into its jeopardy analysis[.]" *Id*. (emphasis added). For this argument, Plaintiffs cite to portions of the "Integration and Synthesis for Species" ("I&S") section in the BiOp. *See id.* at 29-30. The I&S section represents the "final step in [NMFS's] assessment of the risk posed to species . . . as a result of implementing the proposed action[,]" AR 13791, and includes, *inter alia*, its own discussion of climate change effects. *See, e.g.*, AR 13795-96; 13809; 13815; 13819; 13823; 13827; 13831; 13834-35; 13837. But the I&S section was not meant to be a stand-alone analysis. Rather, the purpose of the I&S section was to "integrate the preceding analyses to summarize the consequences to proposed or ESA-listed species[.]" AR 13262 (emphasis added). Thus, while

NMFS considered a range of climate change data and analyzed such effects in other parts of the BiOp, those analyses were included in—rather than separate from—the synthesis portion of the BiOp cited by Plaintiffs. Underscoring this point, the Fourth Circuit has recognized that climate change "does not fit neatly into just [one] category." *Appalachian Voices*, 25 F.4th at 270-71. It thus follows that the entirety of NMFS's analysis as to climate change effects also need not be shoehorned into one particular portion of the BiOp. *See id.* at 271 (noting that climate change need only "form part of the analysis in some way").

Viewed in the context of NMFS's whole analysis, this is not a case in which NMFS assumed that climate change would have no impact. Instead, the record shows that NMFS considered climate change effects and reasonably determined, based on its review of the best available data, that the impacts of climate change on specific species within the action area were simply too uncertain to yield credible predictions. As to the two whale species, for example, Plaintiffs surmise that the agency must have failed to account for climate change because it is not "mentioned in the [Rice]'s whale or sperm whale jeopardy analysis." Pls.' Mem. at 29. In the proper context of NMFS's wider analysis, however, the record shows that the agency recognized climate change to be a "risk modifier . . . which may enhance risk" from other stressors, AR 13795, and it "integrate[d] this information as part of the baseline" for both whale species. AR 13796. Specifically, the threat posed by climate change to Rice's whales was "relatively low" compared to "more significant and immediate pressures[.]" AR 79503-04. Further, while NMFS recognized that "[Rice]'s whales have little room to shift their distribution northward into cooler waters[,]" AR 85833, it also had "no basis" to find the species endangered "based on possible future range shifts . . . or possible future threats from climate change." AR 85806. For sperm whales, the available data also were "uncertain" as to "the degree of impact" on sperm whales from climate change, AR 74103; *see also* AR 74094, although the available data indicated a likelihood "that sperm whales will be more resilient to climate change than species with a narrow range of habitat preferences" since "the feeding range of sperm whales is likely the greatest of any species on earth[.]" AR 74094.

Similarly, as to the sea turtles addressed in the BiOp, Plaintiffs cite to portions of the synthesis section for the proposition that NMFS predicted climate change effects would "remain at current levels, or possibly decrease." Pls.' Mem. at 29 (quoting AR 13815). NMFS made <u>no</u> such finding. Rather, in the quoted passage, NMFS identified six "major threats to green sea turtles within the action area[,]" including climate change, that will "likely continue over the next 50 years," AR 13815, but it also determined that the "cumulative impact" of these six threats was "expected to either remain at current levels, or possibly decrease with additional research efforts and conservation measures." *Id*. Plaintiffs' incomplete quotation omits this critical context. In any event, the record shows that, while NMFS identified climate change among the "current threats to sea turtles [likely to] increase in the future[,]" AR 13809, it cautioned that "it is difficult to predict the magnitude of these threats in the future or their impact on sea turtle populations." *Id.*

With respect to Gulf sturgeon, Plaintiffs incorrectly assert that NMFS "assume[d] without support that 'future reproduction' will remain unaffected[.]" Pls.' Mem. at 30. In complete context, NMFS recognized that climate change would "lead to accelerated changes in the habitats utilized by Gulf sturgeon[,]" AR 13837, but the agency also projected adequate "future reproduction and recruitment rates to replace any individuals lost through lethal take" since "adults can reproduce more than once, and no juveniles or spawning habitats are likely to be affect[ed] by the Oil and Gas Program activities[.]" *Id*. That is, NMFS was speaking only to its scientific estimation that "future reproduction" and habitat availability would continue to be sufficient such that the effects of the oil and gas program would not jeopardize the species.

In the end, Plaintiffs may prefer different conclusions as to climate change, but the record shows that NMFS reasonably considered the issue and ultimately concluded that climate change effects were either indeterminate or sufficiently limited that, together with the impacts of federal oil and gas activities, they would not jeopardize listed species. *See, e.g.*, *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 740 (9th Cir. 2017) (upholding analysis because, "[o]n the whole, the BiOp demonstrated that the NMFS considered a variety of ways in which climate change may affect the sea turtles, but simply concluded that the data available was too

indeterminate for the agency to evaluate the potential sea-turtle impacts with any certainty"). Plaintiffs may disagree with this outcome, but such assessments of future effects are inherently speculative—exactly the sort of predictive agency judgments to which particular deference is due. *See, e.g.*, *Ctr. for Biological Diversity v. Bernhardt*, 595 F. Supp. 3d 890, 915 (D. Ariz. 2022) (stating that, "[i]n general, the court gives deference to an agency's predictions about the possible effects of climate change").

### F.    NMFS reasonably considered both survival and recovery.

Plaintiffs' remaining objection to the jeopardy analysis—that NMFS "focused solely on survival, completely ignoring recovery[,]" Pls.' Mem. At 30—fares no better. The jeopardy analysis considers whether the proposed action will "reduce appreciably the likelihood of both the survival and recovery" of listed species "by reducing the reproduction, numbers, or distribution of [such] species." 50 C.F.R. § 402.02 (emphasis added). However, Plaintiffs read this provision as requiring NMFS to "independently" assess impacts to species recovery separate and apart from the impacts to species survival. Pls.' Mem. at 31. This is incorrect.

The reference to "both" in 50 C.F.R. § 402.02 is meant to underscore "that, except in exceptional circumstances, injury to recovery alone would not warrant the issuance of a 'jeopardy' biological opinion." 51 Fed. Reg. 19926, 19934 (June 3, 1986)[9]; *id*. ("[t]he 'continued existence' of the species is the key to the jeopardy standard, placing an emphasis on injury to a species' 'survival')*. By their terms, these regulations also make it plain that the agency need not conclude that the proposed action will "boost the [species'] chances of recovery; NMFS must only determine those chances are not 'appreciably' diminished by the [proposed action]." *Salmon Spawning & Recovery All. v. NMFS*, 342 Fed. App'x 336, 338 (9th Cir. 2009).

Additionally, while both survival and recovery must be evaluated in a jeopardy analysis, these concepts represent "intertwined needs" for a species. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 932 (9th Cir. 2008). Hence, an "independent analysis of recovery

---

[9] *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999) ("Although the preamble does not 'control' the meaning of the regulation, it may serve as a source of evidence concerning contemporaneous agency intent.")

is not required . . . in part because it is hard to 'draw clear-cut distinctions' between survival and recovery." *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 76 (2d Cir. 2018) (quoting 51 Fed. Reg. at 19934). Survival and recovery thus "are generally considered <u>together</u> in analyzing effects." 51 Fed. Reg. at 19934 (emphasis added); *see also Rock Creek All. v. U.S. Fish & Wildlife Serv.*, 663 F.3d 439, 443 (9th Cir. 2011) (concluding that agency "adequately considered" recovery and was not required to address recovery in "separate, distinct sections").

So too here, where NMFS considered both survival and recovery in tandem. The agency, for example, examined species' "reproduction, numbers, or distribution," as referenced in 50 C.F.R. § 402.02, in part, "based on parameters considered in documents such as recovery plans . . ." AR 13406.[10] Where appropriate, NMFS also addressed recovery-specific aspects as part of its jeopardy analysis. *See, e.g.*, AR 13806-08 (finding "strong signs of recovery" for sperm whales; also finding the proposed action would not "appreciably reduc[e] the likelihood of the survival and recovery" given "the very small percentage the affected Gulf of Mexico subpopulation makes up of sperm whales globally," "global connectedness of sperm whale populations," and "genetic similarities across subpopulations"); 13827-28 (the proposed action would not "reduce appreciably, the likelihood of both the survival and recovery of the hawksbill sea turtle," in part, because "the proposed action will have only a minor effect on nesting abundance" given the "small proportion of the population that we expect would be killed or seriously injured"); 13814-16 (proposed action would not "reduce appreciably, the likelihood of both the survival and recovery of the green sea turtle North Atlantic DPS[,]" in part, because "the number of green sea turtles within the oil spill footprint [is estimated] to be relatively small compared to the DPS population as a whole" and the "largest nesting subpopulation by far is in Costa Rica, which is a considerable distance from the action area").[11]

---

[10] At the time of the BiOp, no recovery plans had been issued for three of the ten covered species (Rice's whale, giant manta ray, and oceanic whitetip shark). *See* AR 13405.

[11] Plaintiffs' species-specific allegations are more nitpicking than substantive, and, in any event, are insufficient to overcome the "particularly deferential" review standard that applies to predictive judgments. *Trout Unlimited*, 559 F.3d at 959. For example, Plaintiffs allege that NMFS failed to consider "whether the authorization of oil and gas activity in the Western and Central Gulf will contribute to future avoidance and associated curtailment of the [Rice's]

Taken together, this is not a case in which NMFS "sa[id] nothing" regarding recovery, or "entirely failed to consider an important aspect of the problem." *DoW*, 931 F.3d at 354-55. While Plaintiffs may prefer for NMFS to have "independently" addressed recovery, Pls.' Mem. at 31, there is no requirement for the agency to engage in such an issue-by-issue parsing. *See, e.g., Rock Creek All.*, 663 F.3d at 443 (finding a "fair reading" of the BiOp, "coupled with the deference due to the agency, leads to the conclusion that . . . [the agency] adequately considered the impact that the [project] could have on the habitat's value for [species] recovery").

## II.   NMFS's RPA Complies With The ESA.

Because NMFS determined that the proposed action was likely to jeopardize the continued existence of Rice's whales, *see* AR 13847, NMFS proposed an RPA that would avoid that jeopardy. *See* AR 13847-50. As discussed further *infra*, the RPA includes several measures intended to avoid or reduce the risk of impacts to Rice's whales from both vessel strikes and vessel noise by "minimizing traffic in the area where listed [Rice]'s whales are known to be concentrated[.]" AR 13850; *see also* AR 13847-48. These measures, *inter alia*, impose speed, time period, and other restrictions on oil and gas-related vessels transiting "within the area where [Rice]'s whales are primarily found[,]" including a "10 knot daytime speed reduction" and "night time closure" to non-emergency vessel traffic. AR 13850. Provided the measures are implemented, NMFS concluded "the proposed action as revised by this RPA would not likely jeopardize the

---

whale range and impact its recovery." Pls.' Mem. at 32. But NMFS previously described such oil and gas activity as only a "contributing factor" in the species' range curtailment, AR 85831, and only one of several threats to the species. *Id.* Hence, Plaintiffs' argument that NMFS overlooked impacts to recovery "from the very effects that drove the species to its endangered state," Pls.' Mem. at 32, overstates the case considerably. Equally unavailing is Plaintiffs' assertion that NMFS overlooked the potential impacts to recovery for Kemp's ridley sea turtles. *See id.* at 33. For example, NMFS identified "fishery interactions [(*e.g.*, entrapment in equipment)] in the Northern Gulf of Mexico" as an "issue of concern" that "may potentially slow the rate of recovery" for the species, AR 13437, but it ultimately determined that "additional research efforts and conservation measures" would likely mitigate the "cumulative impact of [fisheries bycatch and other] threats[.]" AR 13823. This finding, in addition to the "small proportion of the population that . . . would be killed or seriously injured (*i.e.*, less than 0.4 percent annually)," *id.*, therefore supported NMFS's larger finding that "the proposed action will have only a minor effect on population abundance" and would not "reduce appreciably, the likelihood of both the survival and recovery" of the species. AR 13823-24. Plaintiffs also point to language in the BiOp that suggests Gulf sturgeon "would likely be very slow to recover from additional challenges such as an oil spill." AR 13524. But in the specific context of this proposed action, rather than a hypothetical oil spill, NMFS found that "no juveniles or spawning habitats are likely to be affect[ed] by the Oil and Gas Program activities," such that "future reproduction and recruitment rates" are likely "to replace any individuals lost through lethal take during Program activities." AR 13837.

continued existence of the Gulf of Mexico [Rice]'s whale." *Id.*

Plaintiffs disagree, alleging that the agency failed to "show that the RPA is sufficient to avoid jeopardy to the [Rice]'s whale[,]" Pls.' Mem. at 34, and raise various objections to NMFS's analysis. *Id.* at 35-38. None are persuasive. First, Plaintiffs fault NMFS for developing an RPA that does not require mitigation for all the identified adverse impacts contributing to NMFS's finding of jeopardy. *Id.* at 36. But this argument presumes a requirement where none exists. There is no provision in the ESA or its regulations that requires NMFS to resolve or redress all threats or effects to a species in developing an RPA. While the ESA requires a consulting agency to suggest an RPA that avoids jeopardy and can be taken by the Federal agency or applicant, 16 U.S.C. § 1536(b)(3)(A), the statute does not specify what must be addressed by an RPA. Similarly, the ESA regulations identify various factors that must be considered in developing an RPA, *see* 50 C.F.R. § 402.02, but the regulations say nothing about the substantive contents of an RPA. All that is required is the RPA be sufficient to avoid jeopardy.

Here, NMFS, reviewed the best available data regarding Rice's whales and determined that the risk of vessel strikes posed the primary threat to the species because it was the only stressor associated with the proposed action that was likely to result in lethal injuries to the species. *See* AR 13800.[12] NMFS noted that strike impacts are highly variable, ranging from "death" to "no apparent effects," and dependent on "numerous factors, most notably the speed of the vessel[.]" AR 13594. Several studies identified vessel speed as the key variable in not only the likelihood of a vessel strike occurring, *see id.*, but also the likelihood of resulting lethal or serious injuries. *See* AR 13599. NMFS therefore determined that, for purposes of its jeopardy analysis, the best available data supported "a 10 knot threshold for estimating vessel strikes likely to result in serious injury or mortality of sperm and [Rice]'s whales [as] reasonable[,]" *id.*, even if a 10 knot threshold was conservative and tended to "over estimate[]" the risk of serious or lethal injuries "at speeds

---

[12] In addition, the exposure estimates for the effects of geological and geophysical survey sounds on Rice's whales, as listed in Table 121 and also discussed in the agency's effects analysis, *see* AR 13800-04, "do not account for BOEM's revised action, which removed the [eastern planning] area under the [Gulf of Mexico Energy Security Act] moratorium." AR 13800. In any event, NMFS did not anticipate any lethal injury to Rice's whales related to this stressor. *See id.*

greater than 10 knots." *Id.*; *cf.* AR 79471 (citing studies showing that "ship speed reduction rules have been effective at reducing North Atlantic right whale deaths").

In addition, NMFS observed that "[Rice]'s whales may be at higher risk for strike because they spend much of their time at night on the surface." AR 13596. NMFS described, for example, a 2015 study of a Rice's whale population in New Zealand, which identified nighttime vessel strikes as a "substantial threat . . . when the whales spend an increased amount of time close to the water surface . . . yet cannot be visually observed." *Id.* The agency acknowledged that it "lack[ed] information to estimate the extent to which a nighttime restriction in the mitigation area would effectively minimize vessel strike risk in the proposed mitigation area (i.e., the proportion of strikes occurring at nighttime versus daytime)," creating "some uncertainty in the effectiveness of the approach." AR 13609. Nevertheless, erring on the side of caution, NMFS determined that it would be reasonable to incorporate a "night time closure to traffic other than for emergency purposes" as another measure to reduce the risk of vessel strikes. AR 13850.

While NMFS determined that vessel strike was the primary stressor to Rice's whales, the BiOp and ITS also include several measures to mitigate the effects of other stressors. *See, e.g.*, AR 13575-83 (listing measures to minimize or monitor adverse effects in Table 44); 13338-39 (describing provisions of the protected species stipulation). With respect to sound from geophysical surveys, for example, NMFS incorporated a suite of mitigation measures to minimize any adverse effects to the species from such sound, including the use of "independent, dedicated, trained [species observers]" during all geophysical surveys, equipment requirements, protocols for both visual and acoustic monitoring, the use of exclusion and buffer zones, and the imposition of time-area closures in which "no use of airguns may occur[.]" AR 88144, 88146, 88148-50, 88153; *see also* AR 87974-75 (listing ITS term and condition requiring reporting information on activities "that have sound sources within hearing ranges of ESA-listed species"). Likewise, with respect to marine debris, NMFS examined mitigation measures requiring annual "marine trash and debris awareness training" and detailed signage requirements. AR 13962.

Second, with respect to noise from vessel traffic, Plaintiffs disagree that the proposed RPA

will "reduce adverse effects from vessel traffic sound to [Rice]'s whales." AR 13850. Plaintiffs' objection, however, misses the larger picture. Again, as addressed *supra*, NMFS found that vessel strikes posed the primary threat to Rice's whales given the risk of lethal injury. *See* AR 13800. Inasmuch as NMFS identified vessel noise as a separate stressor to the species, *see* AR 13721 (finding that vessel noise is likely to cause "chronic stress and significant masking"), it also noted that both stressors are related to vessel traffic. *See, e.g.*, AR 13801 ("noise from vessel traffic . . . threaten[s] the subspecies ability to communicate" and "vessel traffic also poses a risk of vessel strike"). This commonality means that measures to limit vessel traffic for the primary purpose of mitigating the risk of vessel strikes would also serve to address the risk of vessel noise. *See, e.g.*, AR 87984 (noting that recommended "speed reduction would reduce risk of lethal vessel strike" and that "[t]here may be co-benefits between reducing speed with reduction of noise"). Further, by "minimizing traffic in the area where listed [Rice]'s whales are known to be concentrated[,]" AR 13850, it follows that these traffic restrictions would also mitigate vessel noise by targeting "sound effects within the area where [Rice]'s whales are primarily found." *Id*. Therefore, it was reasonable for NMFS to conclude that the area-specific "traffic reduction" measures in the RPA would not only address the primary stressor of vessel strikes but would also "reduce adverse effects from vessel traffic sound to [Rice]'s whales." *Id*.

Third, Plaintiffs allege that the proposed RPA did not sufficiently reduce lethal strikes to avoid jeopardy. But Plaintiffs misread NMFS's analysis. Within the core area inhabited by the Rice's whale, which the species is believed to "inhabit year round," AR 13542, NMFS projected that vessel traffic restrictions in the RPA would reduce the risk of vessel strikes resulting in mortalities or serious injuries to "zero." AR 13609 (explaining that "vessel strike risk to [Rice]'s whales due to oil and gas vessel traffic greater than 10 knots in the [Rice]'s whale area is assumed to be zero" because "no such traffic would occur in the proposed mitigation area" with implementation of the RPA). That is, NMFS estimated that implementation of the RPA would result in zero—not twelve—lethal injuries related to vessel strikes within the Rice's whale area.

Insofar as NMFS flagged the possibility of 12 mortalities or serious injuries, even with

implementation of the RPA, *see* AR 13611, NMFS projected that any such mortalities or serious injuries would occur, if at all, <u>outside</u> the Rice's whale area. *See* AR 13801. As NMFS explained, this distinction was significant because of the "relatively high uncertainty in the density model for [Rice]'s whales outside the [Rice]'s whale area[.]" AR 13798; *see also id.* (describing the "uncertainty regarding confirmed observations of [Rice]'s whales outside of the area where this species is primarily found"). At the time, this uncertainty as to the occurrence of the species outside the Rice's whale area was the product of not only the limited sightings data, *see* AR 87895 ("[i]ntensive survey effort in the region has not resulted in any confirmed [Rice]'s whale sightings outside this core habitat area (aside from a single anomalous sighting in the western GOM)"); 13798 (noting only "one confirmed sighting in the western Gulf and unconfirmed observations west of their predominant habitat area"), but also the mistaken observations of other whale species. *Id.* (noting "many of the sightings outside the area are actually observations of baleen whales that were unconfirmed but assumed to be [Rice]'s whales"). The agency thus had "lower confidence in the [species] density estimates" outside the Rice's whale area, such that it reasonably determined that "potential strike events outside the [Rice]'s whale area . . . would not be used for [its] jeopardy analysis." *Id.*; *see also* AR 13801 (citing "uncertainty associated with information regarding confirmed sightings and where these animals are expected to be found outside that area" as the basis for the decision to "not use estimated vessel strike events outside the [Rice]'s whale area towards our jeopardy analysis").

Ultimately, in developing an RPA, NMFS was not required to mitigate every source of adverse impacts, as Plaintiffs suggest. Rather, NMFS "need only have adopted a final RPA which complied with the jeopardy standard and which could be implemented by the agency." *Sw. Ctr. for Biological Diversity*, 143 F.3d 515, 523 (9th Cir. 1998) (upholding RPA based on "a rational connection between the facts found in the [BiOp] and the choice made to adopt the final RPA"). NMFS did so here, and nothing more is required.

**III.    NMFS's ITS Complies With The ESA.**

    **A.    The ITS appropriately excludes oil spill take.**

Not all take must be included in an ITS. *See, e.g.*, *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 530-31 (9th Cir. 2010) (upholding agency decision to "exclude take [of listed trout] associated with" tribal fishing exempted "by treaties and other agreements" from ITS); *cf. Friends of Animals v. Phifer*, 238 F. Supp. 3d 119, 132-33 (D. Me. 2017) (holding agency "had a rational basis to exclude illegally-set traps from the [incidental] take calculation" for an incidental take permit under 16 U.S.C. § 1539(a)(1)). Rather, an ITS need only address "incidental take"—a defined term that "refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." 50 C.F.R. § 402.02.

As relevant here, the specific reference to "lawful activity" in the definition operates as a limit on the scope of an ITS. As NMFS explained, the "Clean Water Act . . . prohibits discharges of harmful quantities of oil . . . into waters of the United States." AR 87966 n.1. For this reason, NMFS determined that it was appropriate to exclude take associated with oil spills from the ITS "because oil spills are not a lawful activity[.]" AR 87966. Because such take does not result from "an otherwise lawful activity," it does not constitute "incidental take" within the meaning of 50 C.F.R. § 402.02, and therefore need not be addressed in an ITS. *Cf. Friends of Animals*, 238 F. Supp. 3d at 132 (rejecting argument that agency was required to include take from illegal traps in an incidental take permit because it was not "'incidental' to that program").[13]

For their part, Plaintiffs appear to sidestep the threshold question of whether take from oil spills qualifies as "incidental take." 50 C.F.R. § 402.02. Instead, Plaintiffs assert that NMFS was required to "specify the amount and extent of take from oil spills" for purposes of establishing a "'trigger' to reinitiate consultation if oil spill takes exceed the numbers estimated in the BiOp." Pls.' Mem. at 42. Plaintiffs' argument, however, paints an incomplete picture. It is true—so far as it goes—that NMFS is required, as part of an ITS, to specify "the amount or extent" of the

---

[13] NMFS excluded take from oil spills in the ITS for its 2007 BiOp for the same reason. *See* AR 73060. This prior ITS was not challenged by Plaintiffs or any other party.

incidental take it addresses, 50 C.F.R. § 402.14(i)(1)(i), and "reinitiate consultation immediately" if the "amount or extent of incidental taking . . . is exceeded." *Id*. § 402.14(i)(4). However, by their terms, these requirements only apply to "[i]ncidental take." *Id*. § 402.14(i)(1). Because the definition of "incidental take" specifically refers to take from "an otherwise lawful activity," *id*. § 402.02, it follows that take from an <u>unlawful</u> activity, *e.g.*, oil spills, falls outside the definition of "incidental take," and thus is not governed by these requirements. *Cf. Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 942 (9th Cir. 2006) (ESA does not require consulting agency to ensure compliance with all other potentially applicable state and Federal laws before issuing an ITS).

Plaintiffs' related assertion—that the absence of a reinitiation trigger based on a specified amount or extent of incidental take would lead to "the absurd result that oil spill takes can continue unabated without any requirement to reinitiate consultation," Pls.' Mem. at 43—is a stretch too far. While it is true that the ITS provides for the reinitiation of consultation when the "amount or extent of taking specified in the [ITS] is exceeded," AR 87985, that provision is not the only route to reinitiation. The ITS, and the regulations, also provide for reinitiation in the event that "[n]ew information reveals effects of the agency action that may affect ESA-listed species or critical habitat in a manner or to an extent not previously considered." *Id.*; *see also* 50 C.F.R. § 402.16(a)(2). Indeed, it was primarily this "new information" provision—rather than the exceedance of a specified take amount—that triggered the reinitiation of consultation after Deepwater Horizon. *See* AR 14385. The BiOp specifies both the amount of oil that may be spilled over the 50-year period of the proposed action, *see* AR 13745-46 (Table 114), and calculated estimated exposures to listed species in the action area from such oil spills over the same period. *See* AR 13774 (Table 119). An oil spill that resulted in an exceedance of <u>either</u> the estimated amount of spilled oil or the estimated number of exposures to species from such oil spills could therefore trigger the reinitiation of consultation.

**B.    The ITS complies with ESA requirements for other anticipated incidental take of whales.**

ESA Section 7(b)(4) sets forth the requirements governing an ITS, which is issued concurrently with a BiOp. *See* 16 U.S.C. § 1536(b)(4). Take covered by an ITS is exempt from liability under ESA Section 9, provided terms and conditions to minimize take of covered species are implemented. *See id.* § 1536(o)(2). Further, ESA Section 7(b)(4)(C) provides for additional provisions "in the case of marine mammals," requiring that take of marine mammals can only be included and exempted to the extent that such take is separately authorized under MMPA Section 101(a)(5). *See id.* § 1536(b)(4); *id.* § 1371(a)(5). NMFS complied with these provisions here. The agency anticipated take of marine mammals (*i.e.*, whales), as well as take of non-marine mammal species (*e.g.*, sea turtles). At the 2020 date of the BiOp's issuance, NMFS also expected that some, but not all, of the anticipated marine mammal take would soon be authorized pursuant to a separately issued five-year rule for seismic survey-related take under MMPA Section 101(a)(5)(A). Accordingly, NMFS issued an ITS covering non-marine mammal take, and also explained that the ITS included "no exemptions for take for pile driving, vessel interaction, or marine debris effects to marine mammals because there is no authorization for those takes under section 101(a)(5) of the MMPA." AR 13853. The agency, however, also noted that the ITS could be amended upon completion of the pending MMPA rulemaking to authorize seismic survey take. *See* AR 13945-46. Such authorization for seismic survey-related take and amendment of the programmatic BiOp's ITS followed in 2021. *See* AR 87962-86.

Plaintiffs object, although the specific grounds for their objection are unclear. There is no dispute that ESA Section 7(b)(4)(C) prohibits issuance of an ITS that exempts *marine mammal* take from ESA Section 9 take liability unless or until such take is authorized under MMPA Section 101(a)(5). But Plaintiffs appear to allege that absent an MMPA authorization, NMFS is barred from issuing an ITS at all—*i.e.*, for any non-marine mammal species or for any activity causing take—unless <u>all</u> anticipated marine mammal take is first authorized by the MMPA. *See* Pls.' Mem. at 41 (arguing that the ESA required NMFS to "comply with the MMPA 'before even being

permitted to produce an ITS'"). Elsewhere, Plaintiffs appear to suggest that NMFS is barred from issuing an ITS covering any take of marine mammals, unless all forms and sources of marine mammal take are covered. *See id.* at 40.

Neither argument is supported by the ESA's statutory scheme, its legislative history, or any binding case law. Nothing in the statutory text suggests, for example, that NMFS cannot issue an ITS with respect to anticipated take of sea turtles if some stressor may cause anticipated take of a whale without MMPA authorization. Nor does the statute indicate that an ESA ITS for take of whales related to one set of activities that have received MMPA authorization, such as seismic surveys here, cannot issue simply because the take of whales may occur in relation to completely different activities that have not received an MMPA authorization. Rather, ESA Section 7(b)(4) was solely meant "to clarify" that "in order to authorize the incidental take of an endangered or threatened marine mammal, the Secretary must confirm that the taking has been authorized under amended section 101(a)(5) of the MMPA and specify those measures that are necessary to comply with the MMPA authorization." 132 Cong. Rec. H10453-02, 1986 WL 789325, at *8 (Rep. Jones). Where, as here, the requirements in ESA Section 7(b)(4)(A)-(B) have been met for non-marine mammal species, NMFS "shall provide" an ITS for the incidental take of such species. 16 U.S.C. § 1536(b)(4). Likewise, once the requirements of ESA Section 7(b)(4)(C) have been met for marine mammal species, NMFS may amend an ITS to include such incidental take, as it did for seismic survey-related take here. *See* 54 Fed. Reg. 40338, 40346 (Sept. 29, 1989) (the "legislative history [of MMPA Section 101(a)(5)(A)] offers options on how to handle the timing discrepancies between" the ESA and MMPA, including the possibility an ITS could be "amended or added, as appropriate," after "the [MMPA] section 101(a)(5) process is completed"). Hence, even without MMPA authorization, "the Secretary is expected to proceed with issuance of the biological opinion and section 7(b)(4) incidental take statement in a timely manner as required by section 7(b)(1) of the ESA [establishing ESA consultation timelines]." 132 Cong. Rec. H10453-02, 1986 WL 789325, at *8 (Rep. Jones). For marine mammal take not yet authorized, it is permissible that "findings and conditions applicable to affected marine mammals are subject to final completion of

the MMPA section 101(a)(5) process and that the [ITS] would subsequently be revised to reflect the outcome of that review." *Id.*; *see also* 53 Fed. Reg. 8473, 8476 (Mar. 15, 1988) (noting an ITS may be issued before MMPA authorizations are completed, and the ITS may be "subsequently revised to reflect the outcome of the MMPA section 101(a)(5) process"); *Defs. of Wildlife v. U.S. Dep't of Navy*, 733 F.3d 1106, 1123 (11th Cir. 2013) (upholding BiOp, including the decision "to postpone the process of obtaining the MMPA take authorization and the resulting incidental take statement" until later reinitiation of consultation).

Underscoring this interpretation, two of the same Plaintiffs (Sierra Club and Center for Biological Diversity) in a previous related case (*Gulf Restoration Network v. NMFS*, No. 8:18-cv-01504-JDW (M.D. Fla.) ("*GRN*")) opposed NMFS's request for an extension for the BiOp at issue pending the completion of incidental take regulations ("ITRs") for authorized seismic survey-related take, arguing that NMFS's "refusal to issue the BiOp before finalizing the ITRs is <u>merely a discretionary choice</u>" such that "[n]othing precludes [NMFS] from issuing a BiOp" prior to the issuance of the MMPA authorization for anticipated seismic take. *GRN*, ECF No. 77 at 10 (Feb. 6, 2020) (emphasis added). These Plaintiffs further argued that no extension was necessary because NMFS could simply follow the "common practice of issuing a supplemental BiOp" after the MMPA authorizations were later obtained, *id.* at 11, and the court agreed, holding that "final approval of the [MMPA] ITRs is not a reason to further delay the BiOp, especially since . . . NMFS is not prevented from supplementing or revising the BiOp." *GRN*, ECF No. 78 at 4 (Feb. 20, 2020).

Insofar as Plaintiffs now take the opposite view, their argument is not only at odds with their prior interpretation of the statutory scheme, but fails to account for the practical reality that any authorization under MMPA Section 101(a)(5)(A) is limited to a five-year period, *see* 16 U.S.C. § 1371(a)(5)(A), and thus there is no MMPA provision that could authorize incidental take over the entire 50-year period covered by the BiOp. This is significant when, as here, NMFS undertakes a jeopardy analysis covering an expansive time period that anticipates take of marine mammals occurring beyond the temporal reach of any present-day MMPA authorization. *See Intertribal Sinkyone Wilderness Council v. NMFS*, 970 F. Supp. 2d 988, 1007 (N.D. Cal. 2013) (recognizing

that "the decision making [for take authorization/exemption] under the two statutes may not be completely integrated in a particular case"). Plaintiffs also disregard the practical reality that authorization under MMPA Section 101(a)(5)(A) may be granted only "upon request therefore by citizens of the United States who engage in a specified activity (other than commercial fishing) within a specified geographical region." 16 U.S.C. § 1371(a)(5)(A) (emphasis added). Here, no party has sought MMPA authorizations for stressors like vessel strikes, marine debris, or pile driving, and NMFS lacks the power to compel any party to do so.[14]

### C.    NMFS's selected surrogate for vessel strike take is reasonable.

Finally, Plaintiffs assert that NMFS's chosen surrogate for incidental take related to vessel strikes—vessel activity level—is flawed, citing a purported "inconsistency in how the BiOp estimates vessel strike take and how the ITS monitors vessel traffic[.]" Pls.' Mem. at 45. Plaintiffs thus contend that "[t]here is no rational connection between the surrogate [for] and takings" from vessel strikes. *Id.* at 44. But Plaintiffs conflate the effects estimates generated as part of NMFS's jeopardy analysis with the estimated take presented in the ITS and represented by a monitorable surrogate. Moreover, with respect to the monitorable surrogate in the ITS, Plaintiffs infer requirements for a surrogate that are not found in the ESA or its regulations.

There are good reasons that these purported requirements are found nowhere in the ESA or its regulations. A surrogate serves a fundamentally different purpose than an effects analysis. An effects analysis uses the best available information to make a precautionary, predictive analysis of effects in order to ensure against jeopardy. A surrogate, by contrast, is a means of monitoring take as it actually occurs during the implementation of the action. *See* 50 C.F.R. § 402.14(i)(1)(i).

---

[14] Plaintiffs assert that NMFS's "justification has been held legally inadequate" by another district court. Pls.' Mem. at 41 (citing *Ctr. for Biological Diversity v. Ross*, 613 F. Supp. 3d 336, 340 (D.D.C. 2020)) ("*Ross*"). But *Ross* and another related decision (*Ctr. for Biological Diversity v. Raimondo*, 610 F. Supp. 3d 252 (D.D.C. 2022) ("*Raimondo*")) are dissimilar because those cases involved a different provision, MMPA Section 101(a)(5)(E), which applies only in the context of commercial fisheries. This distinction is important because federal commercial fisheries are managed by NMFS, *see* 16 U.S.C. §§ 1387(a)(2), (c)(3)(D), whereas NMFS has no such authority to manage or permit vessel traffic, marine debris, or entanglement in connection with oil and gas activities, and no ability to issue MMPA authorizations for take resulting from such activities absent some request by parties seeking such authorizations. In any event, both *Ross* and *Raimondo* are out-of-circuit decisions that are non-binding on the Court. *See McBurney v. Young*, 667 F.3d 454, 465 (4th Cir. 2012).

If surrogates and effects quantifications were intended to operate equivalently, as Plaintiffs suggest, then that would imply that NMFS can only include measurable, monitorable effects in its effects analysis, which would no doubt hamstring NMFS's ability to use all of its best methods, such as predictive models, to estimate future effects (which is what NMFS did in its vessel strike analysis, using not only metrics of vessel traffic but a predictive model of species densities).

The ESA regulations address surrogates to meet specific needs to both monitor the take levels exempted by the ITS as the action is implemented, and to trigger reinitiation of consultation when the expected levels are exceeded, according to observable metrics. Thus, where, as here, "it is not practical to express the amount or extent of anticipated take or to monitor take-related impacts in terms of individuals," the applicable regulations expressly provide for the use of a surrogate as a proxy for incidental take. *Id.* § 402.14(i)(1)(i). As the Fourth Circuit has recognized, under the regulations, a surrogate may be used if the agency "(1) describes 'the causal link between the surrogate and take of the listed species'; (2) explains 'why it is not practical to express the amount or extent of anticipated take or to monitor take-related impacts in terms of individuals of the listed species'; and (3) 'sets a clear standard for determining when the level of anticipated take has been exceeded.'" *Appalachian Voices,* 25 F.4th at 281 (quoting 50 C.F.R. § 402.14(i)(1)(i)).

In this case, NMFS complied with all requirements for a surrogate. Because "[f]easible monitoring techniques for directly detecting the full extent of take (either lethal or nonlethal) of these species resulting from vessel strike do not exist[,]" AR 87972, the agency chose to supplement the direct reporting of vessel strikes with a surrogate: the "level of vessel activity, expressed as reported vessel track kilometers." *Id.* As NMFS explained, "[v]essel level activity is causally linked to the take of listed species because an animal may be located within the track line of a vessel and at risk of vessel strike." *Id.* NMFS also described how an exceedance of take would be determined, explaining that (1) vessel activity will be measured using Automatic Identification System ("AIS") data, which provide "vessel traffic information" with sufficient "temporal and spatial resolution" to include "not only trips, but also . . . information about the routes taken by tracked ships, the distances traveled, and their speeds[,]" AR 13586; and, (2) if the AIS data

indicate "total reported annual vessel activity (averaged over three years) exceeds the projected average levels of annual vessel activity . . . this would constitute exceedance of take." AR 87972. Taken together, there is thus "a rational connection between" NMFS's chosen surrogate "and the taking of the species." *Wild Fish Conservancy*, 628 F.3d at 531 (citation omitted); *see also Appalachian Voices*, 25 F.4th at 281-82 (surrogate appropriate where "an individual-based limit was impractical" and there was "a 'clear' mechanism for assessing responsibility for an exceedance").

Plaintiffs disagree, arguing that this surrogate is "inconsistent with the BiOp's standard for estimating vessel strike take as a function of vessel traffic location," and fails to "monitor whether the vessel traffic spatial patterns change in a way that alters strike risk." Pls.' Mem. at 44. But there is no requirement for NMFS to select a surrogate for the ITS based on the same take estimation methodology as its jeopardy analysis. Instead, the regulations impose requirements specific to a take surrogate, *see* 50 C.F.R. § 402.14(i)(1)(i). Plaintiffs' suggestion that NMFS was obligated to adopt a surrogate that addressed take in the same manner as its jeopardy analysis is <u>not</u> one of these requirements.

This does not mean, however, that NMFS disregarded "vessel traffic spatial patterns" in its choice of surrogate, as Plaintiffs allege. Pls.' Mem. at 44. To the contrary, this surrogate is based on AIS or vessel track data specifically because such data "provide vessel traffic information at a finer temporal and spatial resolution than [prior] data[.]" AR 13586 (explaining that AIS data includes information on "the routes taken by tracked ships, the distances traveled, and their speeds"). Plaintiffs' related assertion—that NMFS did not adequately consider the risk that "vessel traffic spatial patterns [may] change in a way that alters strike risk[,]" Pls.' Mem. at 44—is equally unfounded. NMFS found "no information to suggest vessel traffic patterns will be significantly different in the future," AR 13593, but nevertheless took the "conservative" approach of applying "the maximum percent vessel strike risk to estimate exposure[.]" *Id.* Further, recognizing the possibility that traffic patterns <u>might</u> change, NMFS specifically cautioned that the reinitiation of

consultation may be necessary "if vessel traffic does change significantly in ways that would alter vessel strike risk[.]" AR 13593-94; *see also* AR 87985.[15]

## IV.    **Remedy**[16]

Plaintiffs have not demonstrated that the BiOp is arbitrary, capricious, or otherwise not in accordance with law and therefore Plaintiffs are not entitled to any relief. However, if the Court finds a violation, it should reject Plaintiffs' request to vacate either the BiOp or its ITS,[17] *see* ECF No. 121 at 48-49.[18] This is especially true where, as here, the potential consequences of vacatur— *i.e.*, a halt to a substantial swath of oil and gas operations in the Gulf of Mexico—would be highly

---

[15]  Moreover, this vessel activity surrogate is not the only means by which NMFS may monitor for a potential take exceedance. As NMFS explained, "[o]ther sources of information . . . will also be used as appropriate to evaluate potential exceedance of anticipated levels of vessel strike take[,]" including direct reports of vessel strikes and stranding reports. AR 87972. For example, "if incidents of vessel strikes in strandings data increase beyond" anticipated levels, then "that could also constitute new information that could trigger reinitiation." AR 13594.

[16] In light of the Court's revised scheduling order, ECF No. 165, NMFS also provides herein argument on the scope of the appropriate remedy, if any. However, the discussion at this time necessarily cannot account for any eventual holding of the Court. Thus, if after its review on the merits the Court is inclined to vacate the BiOp and/or ITS, NMFS respectfully requests that the parties be given an opportunity to file supplemental briefs on remedy. This will allow remedy briefing tailored to the Court's eventual findings since the appropriate scope of any remedy will invariably turn on the precise nature of any deficiencies that the Court identifies.  Moreover, as the BiOp, extensive administrative record, and briefing make clear, the issues involved are highly technical, and the consequences of any vacatur could be far-reaching and highly disruptive to entire swaths of activities in the Gulf of Mexico. The parties should have the opportunity to ensure that the Court is fully informed of these consequences in light of the Court's decision before it issues any final remedy.

[17] Plaintiffs' request for relief represents a moving target. In their supplemental complaint, ECF No. 65-2 at 39, Plaintiffs asked, in relevant part, that the Court (1) declare that the challenged BiOp and ITS violate the ESA and APA; (2) vacate the BiOp; and (3) remand the matter to NMFS with an order to prepare a "sufficiently protective [BiOp] within six months." Similarly, in their summary judgment motion, Plaintiffs asserted that they are "entitled to summary judgment in their favor and vacatur of the BiOp and ITS." Pls.' Mem. at 45. Yet more recently, in their response to Defendants' motion for voluntary remand without vacatur, Plaintiffs revised their previous position: "Conservation Groups request vacatur of *only* the ITS's authorization of take, specifically its authorization of the 'Amount or Extent of Take' specified" (emphasis added). ECF No. 121 at 38. They add that they "do *not*" seek vacatur of the RPAs for Rice's whale or the reasonable and prudent measures and their implementing terms and conditions in the ITS, which would be the effect of vacatur of the BiOp as a whole. *Id.* at 38-39 (emphasis in original). NMFS holds Plaintiffs to their revised request for relief—as should the Court—and assumes that they no longer seek wholesale vacatur of the 2020 BiOp.

[18] To the extent the courts have held that vacatur is the presumed remedy because Section 706 of the APA provides that "reviewing court[s] shall" "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706, it is the position of the United States that vacatur is not authorized by Section 706. See *United States v. Texas*, No. 22-58 (S. Ct.). Section 703 of the APA addresses judicial remedies and refers to traditional remedies such as "actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus," with no reference to vacatur. The Court need not engage with the question of authority, however, because even assuming the APA authorizes vacatur, it is inappropriate here.

disruptive. *See Allied–Signal v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (vacatur depends, in part, on "the disruptive consequences of an interim change that may itself be changed"). By contrast, Plaintiffs have not shown that any significant harm to listed species will occur in the narrow window of time before a new BiOp will issue, which NMFS currently expects will be by late 2024 or early 2025.

### A.   The only appropriate remedy should be remand of the BiOp and ITS, without vacatur.

Because the Court denied Defendants' motion for voluntary remand, it did not reach the issue of whether vacatur was appropriate. If the Court were to find that the challenged BiOp or its ITS is flawed, the Court should remand the matter to NMFS for further consideration consistent with the Court's opinion and it should leave the BiOp and ITS in place during the pendency of that remand.[19] The Fourth Circuit has not definitively adopted a standard for courts to apply in considering whether to vacate an agency action. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 655 (4th Cir. 2018). The Circuit nonetheless has applied the framework adopted by the D.C. Circuit (and several other circuits) in *Allied–Signal*, 988 F.2d at 150–51. *Sierra Club*, 909 F.3d at 655. The Circuit has noted that the *Allied-Signal* test is particularly relevant where, as here, the challenge is that an agency has an inadequately supported rule as opposed to a claim that an agency lacked authority to take action. *Id*. Under *Allied-Signal*, in considering whether to vacate an agency action, courts examine (1) "the disruptive consequences of an interim change that may itself be changed" as well as (2) "the seriousness of the [challenged action's] deficiencies." *Allied-Signal*, 988 F.2d at 150-51. Neither factor weighs in favor of vacatur in this case.

Should the Court nevertheless find that vacatur is warranted, it should only exercise that remedy on a deferred basis. The challenged BiOp is sweeping in both scope and detail, and covers

---

[19] NMFS recognizes that the Court recently denied its motion for voluntary remand without vacatur. Because the Court denied NMFS' motion for voluntary remand, it did not reach the issue of whether vacatur was appropriate. Instead, the Court's order rested on several prudential concerns, including its hesitation about granting NMFS' motion for voluntary remand before it had a chance to consider the merits of Plaintiffs' claims. Accordingly, if the Court were now to find error after a ruling on the merits, it is appropriate to consider whether vacatur is warranted under the applicable standard.

an extensive range of oil and gas program activities—from pre-lease cradle to decommissioned grave—over a 50-year period. For four years, industry operators have relied on the analyses and measures outlined in the BiOp to inform their operations across the Gulf. Not only would vacatur risk halting, or seriously impeding, the development of critical national energy production, but it would also risk a halt to equally important work in the form of well-decommissioning, safety inspections, and remediation efforts—all categories of work also covered by the 2020 BiOp. In the event the Court finds that the 2020 BiOp is deficient in any respect, equity warrants a decision to allow the BiOp and its ITS to remain in force while NMFS corrects the identified errors. Accordingly, the Court may order that vacatur be deferred for a period of one year from the date of a final order on the pending motions for summary judgment, allowing NMFS the time and resources necessary to issue a revised BiOp consistent with the Court's findings. *See, e.g.*, *Mont. Env't Info. Ctr. v. Haaland*, 2022 WL 4592071, at *13-14 (D. Mont. Sept. 30, 2022) (declining to vacate an environmental impact statement ("EIS") in the first instance and ordering the government to prepare an updated EIS within 19 months or the existing EIS would be vacated).

### 1.    Vacatur would be enormously disruptive.

The highly disruptive consequences of vacating the 2020 BiOp or the ITS cannot be overstated.[20] *Cf. Sierra Club v. NMFS*, No. 20-cv-3060-PX, 2021 WL 4704842, at *6 (D. Md. May 24, 2021) (denying transfer, in part, since "[i]t is no understatement . . . that the impact of Plaintiffs' requested relief—to vacate the 2020 biological opinion as arbitrary and capricious—

---

[20] The disruptive consequences of vacating just the ITS are no different and Plaintiffs' arguments to the contrary misapprehend the statutory scheme. The suggestion that the Court vacate only the "take authorization" of the ITS, while preserving those measures in the ITS (and BiOp) that are protective of listed species, makes no sense because an ITS contains no "take authorization." *See* 16 U.S.C. § 1536(b)(4). Thus, in our briefing, Defendants do not distinguish between the effects of Plaintiffs' original request to vacate the BiOp and the ITS versus their current muddled request to only selectively vacate portions of the ITS. Vacating, or partially vacating, the ITS take authorization would effectively remove the ESA's liability exemption. As the Supreme Court has cautioned, without a take exemption, an action agency (and regulated parties) may "technically . . . proceed with [the] proposed action, but it does so at its own peril (and that of its employees), for 'any person' who knowingly 'takes' an endangered or threatened species is subject to substantial civil and criminal penalties, including imprisonment." *Bennett v. Spear*, 520 U.S. 154, 170 (1997) (citing 16 U.S.C. § 1540(a) and (b)); *see also Nat. Res. Def. Council v. Kempthorne*, No. 1:05-cv-1207 OWW GSA, 2007 WL 4462391, at *1 (E.D. Cal. Dec. 14, 2007) (remanding without vacatur "[t]o avoid the potentially draconian consequences of operating the [water projects] without incidental take authority").

stretches far beyond the local economic interests" in the Gulf of Mexico region). For example, vacatur of the 2020 BiOp "could delay or inhibit many oil and gas industry activities in the GOM," including those related to safety, Second Declaration of Walter D. Cruickshank ("2d. Cruickshank Decl.") at ¶¶ 4, 7; *see also id.* ¶¶ 8-10, and "would likely make it more difficult to coordinate [and] address the effects of the myriad oil and gas development activities [on ESA-listed species] holistically and consistently." Third Declaration of Samuel D. Rauch, III ("3d. Rauch Decl.") ¶ 22. The 2020 BiOp covers a vast array of oil and gas activities in the Gulf of Mexico that yield a significant portion of the Nation's domestic energy output and generate billions of dollars for the U.S. Treasury. 2d. Cruickshank Decl. ¶¶ 2, 5-7. The activities covered by the 2020 BiOp include not just the drilling of new wells, but also many oil spill response activities, existing well maintenance, and the required decommissioning and removal of wells, pipelines and other equipment no longer being used for production. *See, e.g.*, AR 13252, 13275, 13279, 13282, 13331, 13334, 13768, 13394-95. Vacatur of the ITS would remove operators' ESA take coverage for all these activities, potentially preventing them from moving forward until a new programmatic BiOp is issued and "crippl[ing] the Bureaus' capacity to manage their affairs—including preservation of human safety—in the normal course."[21] 2d. Cruickshank Decl. ¶¶ 4, 10.

Reverting to a "case-by-case" consultation approach for the Bureaus' approval of each project or activity as proposed by Plaintiffs would be entirely "unworkable." 2d. Cruikshank Decl. ¶ 6. Given the "sheer number" of approval requests the Bureaus receive and review in a given year, "vacatur would leave the Bureaus unable to timely complete ESA consultations for each approval individually (including those approvals needed to maintain safe operations and avoid potentially serious accidents, *e.g.*, approvals for well workovers, platform and infrastructure updates, and plan updates for safety equipment and pollution control." *Id.* ¶ 7 (noting that BOEM approvals for plans and permits in the GOM totaled 236 for 2020, 223 for 2021, 177 for 2022, and 189 for 2023, while

---

[21] For this reason, there is considerable uncertainty as to the governing regulatory scheme if the 2020 BiOp were vacated, as well as the potential implications of such regulatory uncertainty for ongoing oil and gas operations in the Gulf of Mexico. It is unclear at this juncture whether all oil and gas activities would cease altogether, whether some level of activity could proceed, and what regime would control in the interim. As discussed *infra*, this regulatory uncertainty itself would be highly disruptive and strongly counsels against vacatur of the 2020 BiOp.

BSEE approves over 5,000 drilling and other permits per year); *see also id.* ¶¶ 6, 9-10; *see also* 3d. Rauch Decl. ¶ 19. Such highly disruptive consequences to both regulated parties and regulating agencies tip heavily against vacatur. *Cf. PCFFA v. Raimondo*, No. 1:20-cv-00431, 2022 WL 789122, at *15 (E.D. Cal. Mar. 11, 2022) (noting that "courts have found remand without vacatur to be appropriate" in cases involving the "vacatur of biological opinions addressing complex, ongoing water projects" (citation omitted)).

Importantly, vacatur would obligate NMFS to completely reissue all elements of its decisionmaking process for the BiOp and revisit a series of analyses that the Court may not find require revision or update. Such a result "would likely disrupt the efficiency and predictability of ESA regulatory processes, and also likely undermine the conservation measures provided in the BiOp for ESA-listed species and habitats." 3d. Rauch Decl. ¶ 13. This would occur by, among other things, eliminating "terms and conditions that set out programmatic, standardized mitigation measures," "[i]mpairing the efficiency of ESA implementation by undermining an efficient process with a process more demanding of agency resources," "[u]ndermining the ability to evaluate effects of the program holistically across the entire area and all activities," eliminating terms and conditions that set out programmatic monitoring and reporting measures and adaptive management procedures "that have already led to the creation of additional conservation measures . . . and improvements in mitigation effectiveness," and "[d]isrupting" the programmatic processes that provide for review, mitigation, and monitoring for geophysical and geological surveys in the Gulf of Mexico, which are covered under an Incidental Take Regulation issued by NMFS under the Marine Mammal Protection Act, a rule that was also considered as part of the 2020 BiOp and its Incidental Take Statement. *Id.* ¶¶ 13-22. In short, replacement of the 2020 programmatic BiOp with project-specific consultations as proposed by Plaintiffs would "diminish the pace and efficiency of coordination, learning, and improvement of mitigation and management of ESA implementation." *Id.* ¶ 19; *see also id.* ¶ 22 ("[c]onservation efforts could become more fragmented and difficult to integrate into a coherent effort"). These disruptive and damaging consequences to listed species and habitat weigh strongly against vacatur. *See, e.g., Nat'l Wildlife Fed'n v. NMFS*,

184 F. Supp. 3d 861, 949 (D. Or. 2016) (declining to vacate BiOp, in part, because it "provides some protection for the listed species"); *Nat'l Wildlife Fed'n v. NMFS*, 839 F. Supp. 2d 1117, 1129 (D. Or. 2011) (finding "vacatur is inappropriate," in part, because vacating the BiOp "would remove beneficial measures which . . . provide some protection for the species").

Taken together, vacatur of the 2020 BiOp would be enormously disruptive—for regulated parties, regulating agencies, and listed species alike—and these disruptive consequences strongly militate against vacatur. *See, e.g.*, *PCFFA*, 2022 WL 789122, at \*16 (remanding BiOps without vacatur because "[v]acating the highly complex regulatory regime that has been in place for the past few years would be enormously disruptive" and also finding "disruption to be the dispositive factor"); *Nat'l Wildlife Fed'n*, 184 F. Supp. 3d at 949 (finding vacatur of BiOp to be "inappropriate" because "vacatur could result in the cessation of [hydroelectric dam] operations"); *Nat. Res. Def. Council*, 2007 WL 4462391, at \*1 (remanding BiOp without vacatur "[t]o avoid the potentially draconian consequences of operating the [water projects] without incidental take authority"); *Neighbors Against Bison Slaughter v. Nat'l Park Serv.*, CV 19-128-BLG-SPW, 2021 WL 717094 (D. Mont. Feb. 5, 2021) (declining to vacate plan where serious disruption to wildlife management would occur).

## 2. There is a significant possibility that NMFS will be able to substantiate its decision on remand.

To the extent that the Court determines there are any deficiencies in NMFS's analysis or explanation, there is a significant possibility that NMFS will be able to substantiate its decision on remand after further consideration of the issues identified by the Court and provide additional explanation in the new BiOp. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (stating that "[t]he 'seriousness' of a deficiency . . . is determined at least in part by whether there is 'a significant possibility that the [agency] may find an adequate explanation for its actions' on remand") (citation omitted). Courts have "looked at whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same rule on remand, or whether such fundamental flaws in the agency's

decision make it unlikely that the same rule would be adopted on remand." *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (citations omitted); *see also W. Watersheds Project v. Bernhardt*, 543 F. Supp. 3d 958, 996 (D. Idaho 2021) (stating that, "[w]hen an agency likely can come to the same conclusion on remand, the 'seriousness of the agency's errors' weighs in favor of remand without vacatur" (citations omitted)).

To conduct its new analyses, NMFS's revised BiOp will be based on a re-examination of the best available information on specific topics, such as oil spill risk and other updated information, including the recently proposed rule for the designation of Rice's whale critical habitat, which is anticipated to be finalized during the consultation period. *See* 3d. Rauch Decl. ¶ 4. In addition, NMFS has confirmed that it is aware of the issues that have been raised by Plaintiffs in their complaint and their summary judgment brief. And it will consider each of the issues that have been raised and will address them as part of the reinitiated consultation as appropriate. Of course, NMFS cannot make any commitment as to the merits of how any particular issue will be resolved. At bottom, the 2020 BiOp contains extensive valuable information and analysis and with the opportunity for further clarification, there is a "significant possibility that the agency may find an adequate explanation" on remand that will address most, if not all, of Plaintiffs' concerns. *Standing Rock Sioux Tribe*, 985 F.3d at 1051 (citation omitted). Accordingly, absent good reason to conclude that (i) the 2020 BiOp is in fact significantly deficient, and (ii) NMFS cannot substantiate its analysis on remand, "[this] *Allied-Signal* factor 'does not weigh in favor of vacatur.'" *Friends of Animals v. Williams*, 628 F. Supp. 3d 71, 82 (D.D.C. 2022) (citation omitted).

**B.      Plaintiffs have not shown that remand without vacatur, for a limited period, will cause significant harm to them or listed species.**

Plaintiffs also have not shown that any significant harm to listed species will likely occur before a new programmatic BiOp is issued. To start, and as this Court noted in its recent order lifting the stay, insofar as Plaintiffs continue to assert that continued implementation of the 2020 programmatic BiOp would result in irreparable harm to listed species, they could have sought a preliminary injunction from the outset of this case. Order at 22-23. But after three and a half years

since filing their initial complaint, they have not done so, undercutting any assertions of imminent harm. *Cf. Makhteshim Agan of N. Am. v. NMFS*, No. PWG-18-cv-961, 2019 WL5964526, at *4 (D. Md. Oct. 18, 2019) (rejecting argument that a remand without vacatur would cause prejudice because, "[a]lthough it is true that a remand without vacatur will preserve the status quo . . . [p]laintiffs have not sought preliminary injunctive relief in this case").

In addition, Plaintiffs' arguments about potential injury from the 2020 BiOp lack a basis in the administrative record. Even as to the small subset of projected "take" of listed species from the proposed actions that constitutes actual injury or mortality rather than "disturbance" harassment, these mortality and injury estimates represent an "extremely small" or a "relatively small" proportion of most of these species' populations. *See* AR 13814 (<0.1% of North Atlantic DPS green sea turtles); 13818 (<0.1% of South Atlantic DPS green sea turtles); 13823 (<0.4% of Kemp's ridley sea turtles), 13827 (<0.05% of hawksbill sea turtles); 13831 (<0.2% of Northwest Atlantic loggerhead sea turtles), 13834 (<0.1% of leatherback sea turtles); 13837 (0.14% of Gulf sturgeon). As to the Rice's whale, Plaintiffs allege harms from vessel strikes outside of the whale's core area, but the BiOp discounted the likelihood of such strikes based on the uncertainty of the sparse whale occurrence data available. Even if such uncertainty had been disregarded, these strikes were assessed relative to a *50-year period*—not over the next 12 months. AR 13609-10, 13798, 13801. Plaintiffs' core allegations regarding the risk of very large oil spills similarly do not present any likely imminent harm to listed species. Setting aside the respects in which BOEM's projections of very large spills are conservative as discussed above, Plaintiffs do not dispute that a catastrophic spill over one million barrels on average would be expected to occur once in 165 years. AR 13746-47.

The lack of palpable harm is further reinforced by the fact that any remand would be for a finite period. As the Court is aware, the agencies are well underway in their reinitiation of consultation and thus the BiOp is already under reconsideration. *See* 3d. Rauch Decl. ¶ 10. Recently, on December 22, 2023, following a request from NMFS, the Bureaus transmitted an updated Biological Assessment, which included additional data and analyses. 3d. Rauch Decl. ¶ 9.

And on January 29, 2024, NMFS responded, confirming that it considered the Biological Assessment package to be sufficient.

In short, Plaintiffs have not come close to showing that any imminent, significant harm to listed species or their designated critical habitat is likely before the 2020 BiOp is replaced, or that any of the speculative and long-term harms they allege would justify losing the many current protections of the BiOp for listed species and their habitats, let alone inflicting massive disruption and uncertainty on domestic energy production.

### C.   To the extent the Court considers setting a timeline for completion of the reinitiated consultation, it should adopt NMFS's schedule.

Plaintiffs have asked that the Court order NMFS to issue a new BiOp within six months of a Court order. ECF No. 65-2 at 39. Under general administrative law principles, if the Court finds error with an agency action, the proper course is to remand to the agency so that it "can exercise its administrative discretion in deciding how, in light of internal organizational considerations, it may best proceed." *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976). A reviewing court generally is not empowered to and should not dictate to the agency "the methods, procedures, and *time dimension* of the needed inquiry[.]" *Id*. at 333 (emphasis added). Accordingly, the Court should decline to enter any deadline here especially given the agencies' representations regarding the ongoing process.

However, if the Court disagrees, in considering any timeline for remand and the ongoing reinitiated consultation, the only appropriate deadline is the one NMFS has stated it can meet given its resource constraints and its goal of issuing a legally and scientifically sound analysis. *See* 3d. Rauch Decl. ¶¶ 7-10. Plaintiffs have asked that the Court order NMFS to issue a new BiOp within six months of a Court order. ECF No. 65-2 at 39. As other courts have recognized, artificial deadlines and timetables can constrain any agency's ability to conduct a proper, thorough analysis. *See, e.g.*, *San Luis*, 747 F.3d at 606 ("We wonder whether anyone was ultimately well-served by the imposition of tight deadlines in a matter of such consequence. Deadlines become a substantive constraint on what an agency can reasonably do."); *see also Ctr. for Biological Diversity v. EPA*,

861 F.3d 174, 189 n.12 (D.C. Cir. 2017) (declining to retain jurisdiction and oversee deadlines).

The Rauch declaration explains the complexities of this consultation as well as the agencies' considerable resource constraints. Based on this assessment, NMFS is well-positioned to gauge the time needed to finalize the new BiOp in a manner that is legally sufficient and supported by the record. Imposing a more accelerated timeline based only Plaintiffs' guesswork does a disservice to regulated parties, regulating agencies, and listed species alike. The Court should defer to NMFS's judgment on this score.

## CONCLUSION

For all these reasons, this Court should deny Plaintiffs' Motion for Summary Judgment and grant Defendants' Cross-Motion for Summary Judgment.

Dated: February 6, 2024

Respectfully submitted,

TODD KIM, Assistant Attorney General
S. JAY GOVINDAN, Section Chief
BRIDGET K. McNEIL, Assistant Section Chief

*/s/ Davis A. Backer*
DAVIS A. BACKER, Trial Attorney
CLIFFORD E. STEVENS, Jr., Senior Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Tel: (303) 844-1898 (Backer)
Tel: (202) 353-7548 (Stevens)
Fax: (202) 305-0275
Email: davis.backer@usdoj.gov
Email: cliff.stevens@usdoj.gov

*Attorneys for Federal Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 6, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record.

/s/ *Davis Backer*
DAVIS A. BACKER,
Trial Attorney (CO Bar No. 53502)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Tel: (303) 844-1898
Fax: (303) 844-1350
Email: davis.backer@usdoj.gov

*Attorney for Federal Defendants*