## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| SIERRA CLUB, et al., | No. 8:20-cv-03060-DLB |
| Plaintiffs, | |
| v. | |
| NATIONAL MARINE FISHERIES SERVICE, et al., | |
| Defendants, | |
| and | |
| AMERICAN PETROLEUM INSTITUTE, et al., | |
| Intervenor-Defendants. | |

**PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS' AND INTERVENORS' CROSS-MOTIONS FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................ 2

    I.     NMFS Made Several Distinct Errors When Assessing Expected Oil Spills
          that Each Contributed to an Underestimate of the Animals Killed and
          Harmed from Spills.................................................................................... 2

        A.    NMFS Unlawfully and Arbitrarily Disregarded the Likelihood of a >1
            Million Barrel Oil Spill Occurring at Any Point in the Next 50 Years. ...........2

             1.    The BiOp Unlawfully Sets Forth Interior's Opinion on the
                    Effects of a >1 Million Barrel Oil Spill, Not NMFS's. .......................3

             2.    The Conclusion that a >1 Million Barrel Spill Is Too
                    Improbable Runs Counter to NMFS's Own Analysis and
                      Findings. ......................................................................................5

             3.    The Conclusion that a >1 Million Barrel Spill Is Too
                      Improbable Was Based on a Flawed Interpretation of the Ji
                      Study that Failed to Consider the Study's Actual Implications
                      for Spill Probability. ............................................................7

        B.    NMFS Failed to Consider the Effects of a <1 Million Barrel
            Catastrophic Oil Spill. ................................................................12

        C.    The BiOp's Quantitative Estimates of Expected Very Large Spills
            (>10,000 bbl) Are Based on an Incorrect Assumption and Are
            Otherwise Unsupported by the Record..........................................14

        D.    NMFS Arbitrarily Assumed the Overwhelming Majority of Oil
            Exposure Is Completely Harmless to Animals, Contrary to the
            Record..........................................................................................16

    II.    NMFS's Jeopardy Analyses Violate the ESA and Its Implementing
          Regulations. ........................................................................................ 18

        A.    The Jeopardy Analyses Employ Inaccurate Population Baselines that
            Fail to Account for Post-Deepwater Horizon Populations Changes in
            Any Way..........................................................................................19

        B.    The Jeopardy Analyses Use an Inaccurate Environmental Context that
            Assumes Climate Change Will Have No Effect on Species..........................25

    C.   The Jeopardy Determinations Do Not Assess Impacts to the Recovery of Any Species. ................................................................................28

III.   NMFS Failed to Ensure that Remaining Harm after Implementing the Reasonable and Prudent Alternative Will Not Jeopardize the Rice's Whale. ........................................................................................ 31

IV.   The Incidental Take Statement Does Not Comply with the ESA's Requirements. ............................................................................ 34

    A.   The ITS Unlawfully Omits Incidental Take of Whales that the BiOp Determined Will Result from the Action........................................34

    B.   The ITS Unlawfully Omits Incidental Take from Oil Spills that the BiOp Determined Will Result from Lawful Oil and Gas Activities. .............40

    C.   The ITS's Surrogate for Monitoring Vessel Strike Take Fails to Account for a Determinative Factor for How Much Incidental Take Is Occurring. ........................................................................42

V.   Partial Vacatur of the ITS Is the Appropriate Remedy. ........................................ 43

    A.   Partial Vacatur Would Protect Species and Minimize Disruptions. ...............44

    B.   The *Allied-Signal* Factors Do Not Preclude Partial Vacatur. .........................46

        1.   Vacatur Is the Appropriate Remedy Under Fourth Circuit Precedent.................................................................................47

        2.   Vacatur Is the Appropriate Remedy Under the *Allied-Signal* Factors.................................................................................48

            a.   The BiOp's Errors Are Serious and There Is No Serious Possibility NMFS Will Be Able to Substantiate the BiOp................................49

            b.   Project-Specific ESA Processes for New and Supplemental Approvals Would Not Be Unduly Disruptive. ................................52

            c.   *Allied-Signal* Does Not Require a Plaintiff to Demonstrate Harm for the APA's Standard Vacatur Remedy to Apply. ............55

    C.   The Court Should Impose a Deadline to Complete a New BiOp. .................57

VI.   Conservation Groups Have Standing to Challenge a BiOp Covering Activities the BiOp Concludes Will Kill and Harm Rice's Whales, Which the Groups' Members Seek to View in Their Habitat. ........................................ 58

CONCLUSION.................................................................................... 64

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*Alaska Ctr. for Env't v. Browner*,
 20 F.3d 981 (9th Cir. 1994) ...................................................................................57

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*,
 988 F.2d 146 (D.C. Cir. 1993) ..................................................................... *passim*

*Allina Health Servs. v. Sebelius*,
 746 F.3d 1102 (D.C. Cir. 2014) ..............................................................................46

*Am. Great Lakes Ports Ass'n v. Schultz*,
 962 F.3d 510 (D.C. Cir. 2020) ................................................................................46

*\*Appalachian Voices v. U.S. Dep't of Interior*,
 25 F.4th 259 (4th Cir. 2022) ........................................................................ *passim*

*AquAlliance v. U.S. Bureau of Reclamation*,
 312 F. Supp. 3d 878 (E.D. Cal. 2018)......................................................................53

*Cmtys. Against Runway Expansion, Inc. v. FAA*,
 355 F.3d 678 (D.C. Cir. 2004) ................................................................................59

*Coal. to Prot. Puget Sound Habitat v. U.S. Army Corps of Eng'rs*,
 466 F. Supp. 3d 1217 (W.D. Wash. 2020)...............................................................46

*Cobell v. Norton*,
 240 F.3d 1081 (D.C. Cir. 2001)...............................................................................58

*Cooling Water Intake Structure Coalition v. EPA*,
 905 F.3d 49 (2d Cir. 2018)......................................................................................29

*Ctr. for Biological Diversity v. Bernhardt*,
 595 F. Supp. 3d 890 (D. Ariz. 2022) .......................................................................25

*Ctr. for Biological Diversity v. EPA*,
 861 F.3d 174 (D.C. Cir. 2017)..........................................................................55, 61

*Ctr. for Biological Diversity v. NOAA Fisheries*,
 644 F. Supp. 3d 574 (N.D. Cal. 2022) ..............................................................35, 36

*Ctr. for Biological Diversity v. Raimondo*,
 610 F. Supp. 3d 252 (D.D.C. 2022).............................................................35, 36, 37

*Ctr. for Biological Diversity v. Regan*,
 Civ. A. No. 21-119 (RDM), 2024 WL 655368 (D.D.C. Feb. 15, 2024)....................29, 42, 43

\* *Authorities upon which we chiefly rely are marked with an asterisk*

*Ctr. for Biological Diversity v. Ross* (*Ross I*),
    613 F. Supp. 3d 336 (D.D.C. 2020) ....................................................35, 36, 37

*Ctr. for Biological Diversity v. Ross* (*Ross II*),
    480 F. Supp. 3d 236 (D.D.C. 2020) .................................................................49

*Ctr. for Biological Diversity v. Salazar*,
    695 F.3d 893 (9th Cir. 2012) .............................................35, 36, 37, 41

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
    698 F.3d 1101 (9th Cir. 2012) ........................................................................44

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
    No. CV 22-114-M-DWM, 2023 WL 5310633 (D. Mont. Aug. 17, 2023) .............................22

*Ctr. for Biological Diversity v. Zinke*,
    900 F.3d 1053 (9th Cir. 2018) ...............................................................17, 27

*\*Defs. of Wildlife v. U.S. Dep't of Interior*,
    931 F.3d 339 (4th Cir. 2019) ......................................................... *passim*

*Defs. of Wildlife v. U.S. Dep't of Navy*,
    733 F.3d 1106 (11th Cir. 2013) .................................................................36, 39

*Dist. Hosp. Partners, L.P. v. Burwell*,
    786 F.3d 46 (D.C. Cir. 2015) .........................................................................15

*Dow AgroSciences LLC v. NMFS*,
    707 F.3d 462 (4th Cir. 2013) ...................................................18, 22, 23, 47

*Env't Def. Fund v. FERC*,
    2 F.4th 953 (D.C. Cir. 2021) ...........................................................................51

*Flyers Rts. Educ. Fund, Inc. v. Fed. Aviation Admin.*,
    864 F.3d 738 (D.C. Cir. 2017) ........................................................................15

*Food Mktg. Inst. v. Argus Leader Media*,
    139 S. Ct. 2356 (2019)....................................................................................38

*Friends of Animals v. Phifer*,
    238 F. Supp. 3d 119 (D. Me. 2017) ................................................................41

*Friends of the Earth v. Haaland*,
    583 F. Supp. 3d 113 (D.D.C. 2022).................................................................53

*Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000).........................................................................................61

*Gerber v. Norton*,
294 F.3d 173 (D.C. Cir. 2002) ................................................................................4

*Getty v. Fed. Sav. & Loan Ins.*,
805 F.2d 1050 (D.C. Cir. 1986) ..............................................................................30

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
378 F.3d 1059 (9th Cir. 2004) ..............................................................................21

*Greater Yellowstone Coal., Inc. v. Servheen*,
665 F.3d 1015 (9th Cir. 2011) ..............................................................................33

*Greater Yellowstone Coal. v. Flowers*,
321 F.3d 1250 (10th Cir. 2003) ............................................................................10

*Green v. U.S. Postal Service*,
589 F. Supp. 2d 58 (D.D.C. 2008) ......................................................................8, 9

*Ground Zero Ctr. for Non-Violent Action v. U.S. Dept. of the Navy*,
383 F.3d 1082 (9th Cir. 2004) ...........................................................................9, 39

*Gulf Restoration Network v. Haaland*,
47 F.4th 795 (D.C. Cir. 2022) ..............................................................................39

*Hill v. Coggins*,
867 F.3d 499 (4th Cir. 2017) ................................................................................59

*Intertribal Sinkyone Wilderness Council v. NMFS*,
No. 1:12-cv-00420 NJV, 2013 WL 8374150 (N.D. Cal. Nov. 26, 2013)................51

*Japan Whaling Ass'n v. Am. Cetacean Soc.*,
478 U.S. 221 (1986).............................................................................................62

*Klamath-Siskiyou Wildlands Ctr. v. NMFS*,
109 F. Supp. 3d 1238 (N.D. Cal. 2015) ...............................................................55

*Liu v. Mayorkas*,
588 F. Supp. 3d 43 (D.D.C. 2022)........................................................................23

*Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*,
148 F.3d 1231 (11th Cir. 1998) ............................................................................40

*Louisiana v. Haaland*,
86 F.4th 663 (5th Cir. 2023) .................................................................................63

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992).............................................................................................59

*Maine Lobstermen's Association v. NMFS*,
  70 F.4th 582 (D.C. Cir. 2023) ...........................................................................11

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ...........................................................................................46

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
  463 U.S. 29 (1983) ...........................................................................6, 8, 10, 16

*\*N. Plains Res. Council v. U.S. Army Corps of Eng'rs*,
  460 F. Supp. 3d 1030 (D. Mont. 2020) ........................................... *passim*

*Nat. Res. Def. Council v. EPA*,
  489 F.3d 1364 (D.C. Cir. 2007) .........................................................................50

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
  551 U.S. 644 (2007) ...........................................................................................12

*Nat'l Fam. Farm Coal. v. EPA*,
  966 F.3d 893 (9th Cir. 2020) ...........................................................................58

*Nat'l Parks Conservation Ass'n v. EPA*,
  788 F.3d 1134 (9th Cir. 2015) ............................................................................7

*Nat'l Parks Conservation Ass'n v. Semonite*,
  422 F. Supp. 3d 92 (D.D.C. 2019) .........................................................48, 52, 56

*Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*,
  23 F.3d 1508 (9th Cir. 1994) ...........................................................................56

*Nat'l Wildlife Fed'n v. NMFS*,
  839 F. Supp. 2d 1117 (D. Or. 2011) .................................................................55

*Nat'l Wildlife Fed'n v. NMFS*,
  886 F.3d 803 (9th Cir. 2018) ...........................................................................56

*Nat'l Wildlife Fed'n v. NMFS* (*NWF 2008*),
  524 F.3d 917 (9th Cir. 2008) ...........................................................30, 31, 49, 57

*Nat'l Wildlife Fed'n v. NMFS* (*NWF 2016*),
  184 F. Supp. 3d 861 (D. Or. 2016) ................................................... *passim*

*Oceana, Inc. v. Pritzker*,
  125 F. Supp. 3d 232 (D.D.C. 2015) ..................................................................63

*Oceana, Inc. v. Ross*,
  2020 WL 5995125 (D.D.C. Oct. 9, 2020) ...............................................25, 27, 42

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
426 F.3d 1082 (9th Cir. 2005) ...............................................................23, 31, 32, 34

*Pub. Emps. for Env't Resp. v. Beaudreau*,
25 F. Supp. 3d 67 (D.D.C. 2014) ...................................................................3, 4, 5

*Pub. Emps. for Env't Resp. v. FWS*,
189 F. Supp. 3d 1 (D.D.C. 2016) ........................................................................53

*S. Yuba River Citizens League v. NMFS*,
723 F. Supp. 2d 1247 (E.D. Cal. 2010)...........................................................20, 32

*SecurityPoint Holdings, Inc. v. TSA*,
867 F.3d 180 (D.C. Cir. 2017) ............................................................................51

*Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*,
992 F.3d 1071 (D.C. Cir. 2021) ............................................................................4

*Sierra Club v. U.S. Army Corps of Eng'rs*,
909 F.3d 635 (4th Cir. 2018) ...................................................................47, 48, 50

**Sierra Club v. U.S. Dep't of Interior*,
899 F.3d 260 (4th Cir. 2018) ..................................................................... *passim*

*Sierra Club v. Van Antwerp*,
719 F. Supp. 2d 77 (D.D.C. 2010)........................................................................46

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
282 F. Supp. 3d 91 (D.D.C. 2017)........................................................................54

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
985 F.3d 1032 (D.C. Cir. 2021) .....................................................................11, 17

*Turtle Island Restoration Network v. U.S. Dep't of Comm.*,
878 F.3d 725 (9th Cir. 2017) ..............................................................................27

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019) ..........................................................................48

*Wild Fish Conservancy v. Irving*,
221 F. Supp. 3d 1224 (E.D. Wash. 2016) .......................................................25, 27

*Wild Fish Conservancy v. Salazar*,
628 F.3d 513 (9th Cir. 2010) .......................................................................24, 35, 43

*Wishtoyo Found. v. United Water Conservation Dist.*,
CV 16-3869-DOC, 2017 WL 6940510 (C.D. Cal. Dec. 1, 2017) ...........................61

**Statutes**

5 U.S.C. § 706 ........................................................................................................46, 56

16 U.S.C. § 1536 ........................................................................................................ *passim*

16 U.S.C. § 1543 ........................................................................................................37

**Regulations**

30 C.F.R. § 250.172 ...................................................................................................54

50 C.F.R. § 402.02 ...............................................................................................37, 40, 41

50 C.F.R. § 402.14 ..................................................................................... *passim*

50 C.F.R. § 402.16 ...................................................................................................42

50 C.F.R. § 402.17 .....................................................................................................4

**Federal Register**

53 Fed. Reg. 8473 (Mar. 15, 1988) ...........................................................................38

54 Fed. Reg. 40,338 (Sept. 29, 1989) ........................................................................38

84 Fed. Reg. 44,976 (Aug. 27, 2019) ..........................................................................8

**Other Authorities**

88 Geo. Wash. L. Rev. 1121, 1138 (2020) .................................................................56

132 Cong. Rec. H10453-02, 1986 WL 789325 (Rep. Jones) ........................................38

H.R. Rep. No. 96-697 (1979) .....................................................................................12

## INTRODUCTION

The National Marine Fisheries Service (NMFS) made legal errors, employed incorrect assumptions, and failed to consider important factors when producing a biological opinion (BiOp) that fails to protect the Gulf's most vulnerable wildlife from the widespread, serious harm caused by oil and gas development. The errors show up in three primary areas: where NMFS arbitrarily discounted the degree to which oil spills will kill and harm animals, where NMFS used the wrong standards to determine whether the effects of oil and gas development will jeopardize the continued existence of species, and when NMFS failed to address anticipated incidental take in the incidental take statement (ITS). These are not mere nitpicks or Conservation Groups' preferences, as NMFS characterizes them. They are violations of the Endangered Species Act's (ESA) requirements. And they skewed the agency's analysis and made it impossible for the agency to draw a rational conclusion that the actions will not jeopardize the survival and recovery of the Gulf's threatened and endangered wildlife.

NMFS responds largely by attacking strawmen, championing portions of the BiOp that Conservation Groups do not challenge, offering post hoc explanations for its decisions, and doubling down on the very errors of law and logic that underpin the BiOp's conclusions. A BiOp may not need to be "perfect," but it does need to comply with the ESA. *Contra* Mem. Supp. Defs.' X-Mot. Summ. J. 1, ECF No. 175-1 [hereinafter NMFS Mem.]. NMFS cannot simply claim deference to shield against "a 'searching and careful' review." *Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 269 (4th Cir. 2022) (citation omitted).

The BiOp's pervasive legal deficiencies require partial vacatur of the ITS's take authorization as it applies to new oil and gas approvals. This remedy would help mitigate harm from expanded oil and gas operations, while minimizing disruptive consequences to NMFS and Intervenors. The other parties' exaggerated allegations about disruptions to the very activities

that harm species are unfounded. Conservation Groups seek only to compel the government to do what the ESA requires: ensure that extensive federally authorized oil and gas program activities will not jeopardize the survival or recovery of imperiled species. NMFS's preference for a business-as-usual approach cannot override its statutory mandate to protect species.

## ARGUMENT

I.      **NMFS Made Several Distinct Errors When Assessing Expected Oil Spills that Each Contributed to an Underestimate of the Animals Killed and Harmed from Spills.**

NMFS made four straightforward, consequential errors when assessing the action's oil spill effects that each reduced the number of animals the BiOp ultimately projects will be killed and harmed by spills. First, the BiOp unlawfully and arbitrarily excludes an "extremely large" (i.e., over 1 million barrels (bbl)) oil spill from the action's effects. Second, NMFS did not even consider whether a spill between 100,000 bbl and 1 million bbl would be an effect of the action. The BiOp therefore does not include the devastating effects from either of those two spill ranges on species. Third, the quantitative estimates of "very large" spills *up to* 100,000 bbl that NMFS did include as an effect of the action are based on an incorrect assumption and are otherwise unsupported by the record. Because NMFS used those quantitative estimates to calculate how many animals will be exposed to oil spills, it underestimated the number of exposures. Fourth, NMFS incorrectly assumed that 99% of the animals that *are* exposed to oil will not experience serious harm or death. Any one of the errors makes the BiOp's assessment of oil spill effects unlawful. Taken together, they significantly underestimate the degree to which oil spills will harm species and, consequently, led NMFS to reach arbitrary jeopardy determinations that fail to account for the true effects of oil spills on the Gulf's imperiled species.

### A.      NMFS Unlawfully and Arbitrarily Disregarded the Likelihood of a >1 Million Barrel Oil Spill Occurring at Any Point in the Next 50 Years.

The BiOp excludes an extremely large spill as an effect of the action at the direction of

the Bureau of Ocean Energy Management (BOEM) (collectively with the Bureau of Safety and Environmental Enforcement (BSEE), "Interior") because BOEM claimed that "the probability is so low that it is not reasonably certain to occur within the time period covered by" the BiOp (50 years). AR13746. There are three separate problems with that exclusion. First, the ESA mandates that a BiOp provide NMFS's opinion on how an action affects species, but the BiOp instead uses Interior's opinion that an extremely large spill will not affect species. Second, Interior's opinion runs counter to NMFS's own assessment of the best available information and findings that the probability of such a spill is not so low as Interior asserts. Third, even if NMFS had independently reached the same conclusion as Interior and even if that conclusion were not counter to NMFS's own findings, it would still be arbitrary because Interior misinterpreted the sole study on which it relies (the Ji study) without considering important implications of the study's results for the probability of such a spill. Despite NMFS's repeated contention that an extremely large spill needed to be evaluated in this BiOp, that spill category was omitted from the BiOp based on a set of unlawful and arbitrary choices. *See* Mem. Support Pls.' Mot. Summ. J. 11–13, ECF No. 93-3 [hereinafter Pls.' Mem.]. Following Interior's opinion to exclude the spill led to a far different and highly inaccurate analysis of how species are affected by the action than if the BiOp had used NMFS's findings.

### 1. The BiOp Unlawfully Sets Forth Interior's Opinion on the Effects of a >1 Million Barrel Oil Spill, Not NMFS's.

The ESA requires that a biological opinion "set[] forth the *Secretary's* [i.e., NMFS's] opinion . . . detailing how the agency action affects" listed species. 16 U.S.C. § 1536(b)(3)(A) (emphasis added). That imposes an "unequivocal duty" on NMFS to make an "independent determination" of an action's effects in a BiOp. *Pub. Emps. for Env't Resp. v. Beaudreau*, 25 F. Supp. 3d 67, 107–08 (D.D.C. 2014) (citing 16 U.S.C. § 1536(b)(3)). However, the BiOp plainly

states it is employing Interior's opinion—not NMFS's—on the effects of an extremely large

spill: "BOEM has concluded that an extremely large [oil spill] should not be considered an effect

of the action." AR13746; *see* Pls.' Mem. 11–13.

NMFS tries to evade that problem by conflating the consultation *process* with the

biological *opinion* that is produced "after conclusion of [the] consultation" process. 16 U.S.C. §

1536(b)(3)(A). The question here is which agency's opinion must be in the BiOp. But NMFS

instead discusses the agencies' roles in the consultation process. NMFS Mem. 9–10 (citing 50

C.F.R. § 402.14 (c)(1)(i), (d), (f)); *see also* API Mem. Opp'n Pls.' Mot. Summ. J. 7–8, ECF No.

182-1 [hereinafter API Mem.] (citing 50 C.F.R. §§ 402.12(a), .14(g)(1), (3), .17(c) and citing

inapposite cases concerning the scope of the action agency's basis for not formally consulting

with NMFS, where NMFS did not produce a BiOp at all). While that process is a collaborative

one, it does not mean the action agency gets to ultimately decide what the action's effects are in

the BiOp. Rather, the statute and regulations place sole responsibility in NMFS's hands to make

that decision. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(3). NMFS of course will

consider Interior's assessment, but when it comes time to provide its biological opinion, NMFS

must make an "independent determination" of the action's effects "to the exclusion of any other

entities." *Beaudreau*, 25 F. Supp. 3d at 107–10; *cf. Shafer & Freeman Lakes Env't Conservation

Corp. v. FERC*, 992 F.3d 1071, 1090 (D.C. Cir. 2021) (finding "*the Service's* scientific

conclusions" deserving of deference, with no reference to action agency (emphasis added)), cited

by NMFS Mem. 10.

There is "no evidence in the record that the *Service* ever made" an independent

determination that a >1 million bbl spill is too improbable to be an effect. *Gerber v. Norton*, 294

F.3d 173, 185 (D.C. Cir. 2002); *see Beaudreau*, 25 F. Supp. 3d at 109 (stating "Court cannot

infer that [an independent] determination ultimately factored into" FWS's decision). NMFS

effectively concedes as much in its brief, stating it "undertook its own assessment *but . . .*

'defer[red] to the BOEM and BSEE analysis'" instead. NMFS Mem. 8 (emphasis added)

(quoting AR14000). That it deferred after conducting its own assessment is irrelevant. As the

*Beaudreau* court explained, "While it might be true that the FWS grappled with the issues raised

by the BOEM, it is not clear from [the BiOp] that its ultimate decision was based on its

independent determination, or whether the FWS merely deferred to determinations made by the

BOEM and Cape Wind." 25 F. Supp. 3d at 109.[1] Here, by contrast, the BiOp expressly states

NMFS did merely defer to the determination made by Interior. NMFS allowed Interior to make

the final call about the action's effects in spite of NMFS's own independent review, not based on

it. NMFS's failure to make an independent determination about the action's effects in the BiOp

violates the ESA's mandate. Such a statutory violation receives no deference. *Contra* NMFS

Mem. 11.

> **2.     The Conclusion that a >1 Million Barrel Spill Is Too Improbable
>             Runs Counter to NMFS's Own Analysis and Findings.**

NMFS's own findings and assessment of the best available evidence indicate that a >1

million bbl spill is not as unlikely as Interior concluded. *See* Pls.' Mem. 13–14. Interior's

contrary conclusion that such a spill *is* so improbable that it is not an effect of the action runs

counter to NMFS's analysis and findings. *See Defs. of Wildlife v. U.S. Dep't of Interior* (*Defs.*),

931 F.3d 339, 351 (4th Cir. 2019).

NMFS analyzed Interior's data and determined that one "Deepwater Disastrous

---

[1] API tries to distinguish *Beaudreau* because it involved a different type of finding under the
ESA, API Mem. 8 n.3, but the court rejected the same argument because what matters is if the
applicable ESA provision places the duty with the Secretary (i.e., NMFS or FWS) to make the
relevant finding, 25 F. Supp. 3d at 108.

Blowout[] resulting in [an] uncontrolled release of oil" is expected "as a Result of the Proposed Action." AR13996–97. That finding directly contradicts Interior's conclusion "that an extremely large blowout and uncontrolled release of oil . . . is *not* an anticipated result of the proposed action." AR13997 (emphasis added). In addition to that number of spills, NMFS determined that "a median spill volume of 1.1 million" is "a reasonable estimate of the largest spill size possible" during the BiOp's timeframe *after* accounting for recent safety measures. AR14000. NMFS tries to downplay the volume finding because it does not provide the "probability of such a spill actually occurring." NMFS Mem. 11 n.5. Regardless of the precise probability, Appendix G explains that NMFS was projecting the volume that could occur "over the timeframe of the opinion." AR13986; *see also* AR13994, 14000. Interior's assertion that such a spill is not possible over the BiOp's timeframe runs counter to those findings. *See also* Pls.' Mem. 13–14 (citing other inconsistent evidence). Yet the BiOp adopts Interior's conclusion without any acknowledgement or explanation of the inconsistency. *See Defs.*, 931 F.3d at 351–352 (finding BiOp arbitrary when FWS "fail[ed] to explain why this evidence [it adopted] is the best available" when it was inconsistent with FWS's own evidence); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 48 (1983) (stating "agency must cogently explain why it has exercised its discretion in a given manner"). NMFS did the same thing in the 2007 BiOp before the Deepwater Horizon spill when it disregarded its correct projection that an extremely large oil spill would occur every 40 years and instead accepted Interior's overly optimistic claim that it would not. AR13987. This BiOp was intended to correct that error, not repeat it.

Not every part of the BiOp uses Interior's effects determination, however. NMFS determined that an extremely large spill *is* an effect of the action for some species and critical

habitats but not the rest. *See* Pls.' Mem. 14. NMFS claims that including such a spill as an effect

for those species does not mean it is reasonably certain to occur. NMFS Mem. 11 n.5. That is

illogical given NMFS's argument elsewhere that it may not include something as an effect unless

it *is* reasonably certain to occur. *Id.* at 14 (quoting 50 C.F.R. § 402.02). An extremely large spill

either is or is not an effect of the action. Saying such a spill will occur for some species but not

others is "the hallmark of arbitrary action." *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d

1134, 1145 (9th Cir. 2015) (citation omitted).

### 3. The Conclusion that a >1 Million Barrel Spill Is Too Improbable Was Based on a Flawed Interpretation of the Ji Study that Failed to Consider the Study's Actual Implications for Spill Probability.

Even putting aside the above reasons why the BiOp's use of Interior's conclusion is

unlawful, Interior's conclusion was based on a flawed interpretation of the Ji study. *See* Pls.'

Mem. 14–16. Interior (in making the conclusion) and NMFS (in deferring to Interior) "failed to

consider [two] important aspect[s] of the problem"—the probability and the confidence

interval—that show the probability of >1 million bbl spill cannot be dismissed to the extent

Interior asserted. *See* Mem. Op. 29–31, ECF No. 164 (Jan. 9, 2024) [hereinafter Stay Op.]

(quoting *Appalachian Voices*, 25 F.4th at 269).

In response, NMFS offers impermissible and unpersuasive post hoc rationalizations for

why it now does not think either statistical implication matters. NMFS Mem. 13–15; *see*

*Appalachian Voices*, 25 F.4th at 274. NMFS does not, however, attempt to argue that the

agencies ever considered the implications in the first place.

First, Interior interpreted the 165-year return period for a >1 million bbl spill to establish

that the "*probability* is so low," AR13746 (emphasis added), but never considered what that

return period's probability is: a 26.2% likelihood of at least one such spill occurring during the

BiOp's 50-year timeframe, *see* Pls.' Mem. 16.[2] It simply did not "examine the relevant data"—the probability—before making a conclusion about the probability. *State Farm*, 463 U.S. at 43.

NMFS tries to sidestep that failure by claiming "Plaintiffs must show a reasonable certainty that such a spill will occur." NMFS Mem. 14–15. That is not the standard of review. Administrative Procedure Act (APA) review evaluates whether the agency's decision was arbitrary and capricious. Stay Op. 29 (quoting *Appalachian Voices*, 25 F.4th at 269). Conservation Groups have met their burden under the APA to show the agencies failed to consider an important aspect of the problem when they made the decision. NMFS is improperly asking the Court to instead "weigh the scientific evidence" and determine whether a 26.2% probability makes an effect reasonably certain. *Id.* at 28–29. NMFS never considered that question and never reached a conclusion on it that the Court can review. That is precisely the problem. The ESA charges NMFS—not a plaintiff—with determining what is reasonably certain based on its interpretation of all "the best scientific and commercial data available . . . , in light of the relevant factors." *See* 84 Fed. Reg. 44,976, 44,992 (Aug. 27, 2019); 50 C.F.R. § 402.14(g)(3). Even if it were up to the Court to determine what is reasonably certain in the first instance, the question is not so simple as asking whether a 26.2% probability equates to a reasonable certainty. A 26.2% probability is not dispositive, and other information in addition to the Ji study is relevant to determining what is reasonably certain. *See* 84 Fed. Reg. at 44,993 (rejecting suggestion that "reasonably certain" should mean "is 'probable' or 'likely' rather than merely 'possible'" and explaining "[t]his term is not intended to require a certain numerical amount of data"); *contra* API Mem. 6–7.[3] It is not possible to speculate how NMFS might weigh

---

[2] No party argues Dr. Lubetkin's calculation of that probability is incorrect.

[3] API's citation to *Green v. U.S. Postal Service* is thus inapposite because, unlike the ESA's

the relevant information with a proper interpretation of the Ji study when it has not yet done so.

An estimated one in four chance is at least high enough to call into question Interior's assertion

that the probability is "so low" that it cannot be "anticipated" to occur, given other evidence.

Indeed, NMFS is currently revisiting the oil spill analysis to address "substantial and legitimate

concerns" with how the BiOp assessed the risk. ECF No. 125, at 3; *see also* ECF No. 175-3, at

26 (January 29, 2024 letter from NMFS stating "we continue to have concerns . . . with the oil

spill risk information" from Interior). The issue presented here, though, is that the agencies failed

to consider the probability factor in *this* BiOp when it concluded the probability of an extremely

large spill is so low.

Second, Interior failed to consider the implications of the Ji study's confidence interval

when interpreting the 165-year median point estimate as determinative. The confidence interval's

broad range (41 to over 500 years) means there is high uncertainty around that point estimate

and, accordingly, high uncertainty that the risk is as low as that estimate suggests. *See* Pls.'

Mem. 15; Lubetkin Decl. ¶¶ 38–41, ECF No. 93-4 (showing 9.5–70.9% probability range for

that confidence interval). In addition, the confidence interval presents the values the Ji study

could not reject as too unlikely. *See* Pls.' Mem. 15 (citing cases and Lubetkin Decl. ¶ 17); 2d

Decl. of Susan Lubetkin ¶¶ 3–8, attached herewith. Yet Interior did what Ji et al. could not and

rejected the possibility that the return period falls within the BiOp's 50-year timeframe.

NMFS skips over these implications and instead argues it was not required to *adopt* the

---

regulatory definition, *Green* involved the "reasonably certain" legal standard specific to recovery
of future damages in tort actions that the caselaw had defined to require evidentiary proof of a
greater than 50% chance. 589 F. Supp. 2d 58, 69 (D.D.C. 2008). And *Ground Zero Center for
Non-Violent Action v. U.S. Department of the Navy* found a missile explosion did not need to be
considered an effect because "the calculated risk is infinitesimal," which is very different from
the level of risk here. 383 F.3d 1082, 1092 (9th Cir. 2004).

41-year lower bound (a 70.9% probability) as the basis for the BiOp's analysis. NMFS Mem. 13. Conservation Groups do not argue that it must, but rather that the agencies needed to at least consider what the confidence interval meant for Interior's conclusion. Just as the agencies never considered that the Ji study's 165-year return period translates to a 26.2% probability of an extremely large oil spill, they also never considered that the Ji study's confidence intervals mean that true probability of such a spill could fall anywhere along a spectrum from 9.5% to as high as 70.9%. The point is not that NMFS had to pick one particular probability on this spectrum as the "right answer." And it is not that NMFS was required to assume a worst-case scenario and pick the highest probability.[4] NMFS is not required to "give the benefit of the doubt to the species" to consider the objective implications of a statistical result. On the contrary, failing to "examine the[se] relevant data" is arbitrary and capricious. *State Farm*, 463 U.S. at 43.

Confronted with that failure, NMFS and Intervenors offer post hoc reasons trying to justify Interior's conclusion. NMFS Mem. 13–14; API Mem. 9–11; *but see* Chevron's Mem. Supp. X-Mot. Summ. J. 10–11, ECF No. 179-1 [hereinafter Chevron Mem.] (challenging Ji study's method for estimating spill risk). The record contains no evidence that Interior's extremely large spill conclusion was based partly on safety reforms rather than the Ji study, as API alleges, or that Interior interpreted the study's estimate to be conservative, as NMFS's

---

[4] NMFS also overlooks that "worst case" can have different meanings. Conservation Groups quoted a study using "this worst case" in the statistical sense to describe the "worst" value that could not be excluded. Pls.' Mem. 15 (quoting AR61860); *cf. Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1260 (10th Cir. 2003) (citing expert testimony describing a loss of eagle nesting sites as both "a worst-case scenario" and "likely"). A worst-case conceivable, as NMFS and Intervenors use the term, is not a 41-year return period, but a 1-year return period. *See* 2d Lubetkin Decl. ¶ 8. It is not a 1 million bbl spill, as the Ji study and, subsequently, the BiOp and API term it, *see* AR13746, but an objectively worse 7.2 million bbl spill the BiOp says "could be released," *see* AR13986. A 41-year return period is the worst of the values that could not be statistically rejected. 2d Lubetkin Decl. ¶ 8.

counsel now implies.[5] Even if it did either, that would not cure the agencies' failure to properly interpret the study's results in the first place. Moreover, the study also has limitations that underestimate risk. *Cf. Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1049 (D.C. Cir. 2021) (finding no evidence agency's "conservative assumption accurately counterbalances" underestimate of risk). The Ji study does not account for how deeper water drilling and climate-fueled hurricanes will increase future risk. Pls.' Mem. 17. NMFS does not argue it considered either issue, only that it noted the study's *other* "limitations" and that Conservation Groups did not identify "better" evidence. NMFS Mem. 15–16. The issue is not that NMFS needed to use a better study, just that NMFS account for the limits of the study that was used.

API tries to make its own case for why an extremely large spill was not considered an effect of the action, relying heavily on *Maine Lobstermen's Association v. NMFS*. API Mem. 3–12 (citing 70 F.4th 582 (D.C. Cir. 2023)). That case—and API's argument—is irrelevant to the merits because no party argues that the agencies ran afoul of its conclusions or misapplied presumptions in the absence of information. *Maine Lobstermen* stands for the unremarkable proposition that NMFS must base its decisions on "the best available scientific data" rather than "presuming that unavailable data . . . would weigh against the agency action." 70 F.4th at 599 (finding NMFS "relied upon worst-case modeling that is 'very likely' wrong, based upon

---

[5] NMFS and Intervenors note that the Ji study analyzed spill risk for the entire Outer Continental Shelf rather than just the Gulf but offer no evidence that makes a significant difference. *But see* AR14000 (stating Interior interpreted Ji study to predict return period "in the Gulf of Mexico"). Record evidence indicates that any difference would be minimal: the Ji model "mainly consists of data from the Gulf of Mexico," AR13994, spill risk has been substantially similar in the Gulf and other regions, and removing the Santa Barbara spill does not appear to substantially change the relative fit of the data for the Ji model, *see* 2d Lubetkin Decl. ¶¶ 9–16.

assumptions the Service concededly does not believe are accurate").[6] The court recognized that NMFS "must strive to resolve or characterize the uncertainty through accepted scientific techniques." *Id.* at 600. That is what NMFS failed to do here: make an independent and scientifically defensible decision as to whether an extremely large spill is an effect of the action based on a proper interpretation of all of the best available information it *did* have.

Insofar as API is trying to cabin NMFS's future conclusion about whether an extremely large spill is reasonably certain, *Maine Lobstermen* prohibits such a predetermination before NMFS acts based on the best (and newly developed) information. If API wishes to invoke this Court's jurisdiction to challenge NMFS's effects determination in a new BiOp, it may do so then. The effects conclusion in this BiOp, however, is arbitrary because it failed to consider important implications of the Ji study on which it was based.

### B.    NMFS Failed to Consider the Effects of a <1 Million Barrel Catastrophic Oil Spill.

The BiOp did not evaluate the possibility that a 100,000 bbl to 1 million bbl could be an effect of the action. *See* Pls.' Mem. 18–19. The BiOp considered an oil spill of over 1 million bbl too unlikely to be an effect. AR13746. And it considered a spill of 100,000 bbl likely enough to be an effect. *Id.* But it says nothing about whether a spill between those two volumes is or is not

---

[6] While not necessary to the disposition of this case, the Court should not embrace the principles from *Maine Lobstermen* that Intervenors attempt to extend here. Importantly, the court did not address the meaning of "insure" in 16 U.S.C. § 1536(a)(2), which the Supreme Court has explained "means '[t]o make certain, to secure, to guarantee (some thing, event, etc.).'" *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 667 (2007) (citation omitted). That is, the ESA requires NMFS to guarantee the action is not likely to cause jeopardy. Nor did the court address the legislative history explaining that the addition of "likely" to the "insure" clause "would continue to place the burden on the action agency to demonstrate to the consulting agency that its action will not violate Section 7(a)(2)." H.R. Rep. No. 96-697, at 12 (1979) (Conf. Rep.), *reprinted in* 1979 U.S.C.C.A.N. 2572, 2576. Insofar as *Maine Lobstermen* suggests NMFS must apply a presumption that effects risking jeopardy are *not* likely to occur, it is contrary to the plain meaning of "insure."

likely enough to be an effect. NMFS "entirely failed to consider" the probability that a

catastrophic spill in this range might result from the action. *Defs*, 931 F.3d at 345.

NMFS tries to evade this problem by pointing to its "very large spill" estimates. NMFS

Mem. 16–17. However, NMFS acknowledges those estimates are limited to a spill *up to*

100,0000 bbl. *Id.* While NMFS says it based the estimates on an unspecified "range of predicted

spill sizes," it cites nothing in the record demonstrating that it or Interior evaluated the likelihood

of any spill size *between* 100,000 and 1 million bbl; every one of its citations includes only spill

sizes outside that interval. *Id.*

Failing to consider whether oil spills in that 900,000 bbl interval are an effect is arbitrary

on its own, but it also represents an unexplained inconsistency with the Ji study. Dr. Ji states his

"article indicates that within a 50-year period a spill of 188,000 barrels can be reasonably

expected." Decl. of Zhen-Gang Ji ¶ 7, ECF No. 175-5; *see* Pls.' Mem. 18–19; p. 16, *infra*

(rebutting NMFS's assertion that Ji study is inapt for this spill size). At the very least, the Ji

study should have alerted the agencies that a spill in that ballpark should be considered. Nowhere

in the record did the agencies do so.

NMFS also did not analyze how the 100,000 bbl spill the BiOp concludes is an effect will

have uniquely catastrophic effects on species. *See* Pls.' Mem. 18. Catastrophic spills cause

severe impacts to species and the environment in a short period of time. Such shocks can alter

population trajectories, *e.g.*, AR61431 ("[L]oss of whole clutches of embryos and larvae can

have catastrophic consequences for population dynamics over long time periods"); AR69708–20

(describing how Exxon Valdez spill altered killer whale populations), or even cause a population

collapse by inflicting harm beyond a tipping point, a particular concern for the Rice's whale, *e.g.*,

AR80784 ("[A] single catastrophic oil spill might serve as the synergistic 'tipping point' that

could prove devastating to externally stressed populations."); AR85801 ("[A] single catastrophic event . . . could drive the [Rice's whale] to near extinction (*i.e.*, ≤ 50 mature individuals) in a very short time."); *Nat'l Wildlife Fed'n v. NMFS* (*NWF 2016*), 184 F. Supp. 3d 861, 923 (D. Or. 2016) (explaining "a catastrophic event . . . can quickly imperil the listed species"). The effects to species and the environment from such a "discrete, particular extreme spill" (which the BiOp says it did not evaluate, AR13746) therefore are different in kind from the effects of non-catastrophic spills the BiOp did evaluate. NMFS's footnote on this issue is unclear, but it does not cite any part of the BiOp evaluating how populations might be affected by acute, widespread exposure to a 100,000 bbl spill. NMFS Mem. 17 n.6. The BiOp estimated the total number of exposures "over 50 years," which effectively smooths the otherwise severe impacts of a 100,000 bbl spill over a longer timeframe. AR13774. That approach fails to account for the serious population-level harm from an expected 100,000 bbl spill.

C.    **The BiOp's Quantitative Estimates of Expected Very Large Spills (>10,000 bbl) Are Based on an Incorrect Assumption and Are Otherwise Unsupported by the Record.**

The BiOp projects that two "very large" spills (>10,000 bbl) and additional smaller spills will result from the action. AR13745–46 (tbl. 114). It then uses those estimates in Table 114 to quantify how many animals will be exposed to oil and, in turn, harmed or killed. *See* AR13747. There are three separate problems with estimates in Table 114: they are based on an incorrect assumption that underestimates the number of spills, the methodology is not in the record so is not reviewable, and they are inconsistent with the Ji study's results. *See* Pls.' Mem. 19–20.

While the BiOp states the projections were calculated using historical spill data, it provides no explanation for how calculations were done, *other than* that they employed one demonstrably false assumption: "that the only spill greater than 10,000 bbl to occur in the last 20 years was the [Deepwater Horizon]." AR13745. The record describes at least two other oil spills

14

over 10,000 bbl that occurred in the last 20 years: a 16,152 bbl pipeline spill in 2017, AR13990, and the ongoing Taylor Energy spill of at least 24,000 bbl that began in 2004, AR21696, 59824–25, 59829. Incorrectly assuming the Deepwater Horizon was the only such spill skews the estimates and makes them arbitrary.

NMFS does not deny that the projections in Table 114 were based on that incorrect assumption. Instead of addressing the accuracy of those quantitative estimates (and thus the accuracy of its quantitative oil exposure estimates), NMFS discusses a separate review of spill information. NMFS Mem. 17. Regardless of whether NMFS listed accurate information elsewhere, the data it used to quantify the effects to species is not accurate. *See Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56–57 (D.C. Cir. 2015) ("[A]gencies do *not* have free rein to use inaccurate data."). If Table 114 is incorrect, then the quantified oil exposure estimates are incorrect, and, accordingly, the assessment of how those exposures affect species is incorrect.

In addition, there is also no way to know whether Interior used other inaccurate inputs or flawed methodology for the projections in Table 114 because the record does not reveal how the values were calculated. NMFS cites pages describing only a general approach, but not the methodology for calculating the "Number and Size of Spills" in Table 114. NMFS Mem. 17–18. The pages it says are Interior's "methodology" estimated the number of spills "for a single proposed lease sale," AR5893–95, not for Table 114's scope of *all* "Leases Awarded through 2027," AR13745. The estimates in Table 114 are a black box, with no way to know whether they were appropriately based on the best available science. *See Flyers Rts. Educ. Fund, Inc. v. Fed. Aviation Admin.*, 864 F.3d 738, 746 (D.C. Cir. 2017) ("[W]hen the data relied on by an agency in reaching its decision is not included in the administrative record and is not disclosed to the court, we cannot determine whether the final agency decision reflects the rational outcome of the

agency's consideration of all relevant factors." (cleaned up)).

Finally, the agencies failed to recognize the BiOp's estimate of just two >10,000 bbl spills conflicts with the Ji study's estimate of five >16,000 bbl spills over 50 years. *See* Pls.' Mem. 20. NMFS only offers a post hoc assertion that the Ji study was "inapt" for estimating very large spills, NMFS Mem. 18–19, but neglects that the Ji study itself presented the 16,000 bbl estimates, AR67360. Indeed, Dr. Ji does not say his methodology was inapt for the results he presented, only litigation counsel makes that assertion. *Cf.* Ji Decl. ¶ 5 (explaining other statistical tools can be used for "oil spills with sizes *less than* 10,000 barrels" (emphasis added)). Moreover, NMFS apparently *did* use the Ji study as the basis for the largest "very large" spill size in Table 114, but misinterpreted the study as expecting only a 100,000 bbl spill within the 50-year period when it instead indicates that a 188,000 bbl spill is expected. *Compare* AR13986, 13992, 14000, *with* Ji Decl. ¶ 7. The 100,000 bbl estimate thus runs counter to the evidence on which it is based. *See State Farm*, 463 U.S. at 43. It is the Ji study's own presented results, not "Plaintiffs' alternate calculations," that conflict with the BiOp's very large spill estimates. *Contra* NMFS Mem. 18. NMFS misinterpreted the information before it causing it to underestimate the number and size of the very large oil spills over the BiOp's 50-year term and, consequently, the harm to species from those spills.

### D.      NMFS Arbitrarily Assumed the Overwhelming Majority of Oil Exposure Is Completely Harmless to Animals, Contrary to the Record.

Even if NMFS's quantitative estimates of anticipated oil spills (in Table 114) were correct, NMFS made two errors when calculating the degree to which those spills will harm species. First, it omitted exposures to subsurface oil, which can spread far beyond the extent of surface oil and be equally toxic to animals. Pls.' Mem. 20–21. Second, it assumed that only 1% of exposures to surface oil will have consequences for animals' fitness when the study it relied

on demonstrates even minimal oiling causes mortality and reproductive failure. *Id.* at 21–22.

NMFS emphasizes various aspects of what it calls a "careful and stepwise analysis" in its response, NMFS Mem. 19, but the question here is simply whether either of two discrete, determinative elements of that analysis are erroneous. As to the first, NMFS admits that it did not include subsurface oil in its exposure analysis. *Id.* It just claims the omission is inconsequential for several "impermissible and unpersuasive" post hoc reasons. *Appalachian Voices*, 25 F.4th at 275. First, NMFS says "the risk of subsurface oil . . . was uncertain." NMFS Mem. 19–20. It is unclear what NMFS means by this because none of its citations mention subsurface or invisible oil. Even if the degree of risk was somehow uncertain, that does not permit NMFS to omit the risk altogether. *See Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1072 (9th Cir. 2018). Second, NMFS suggests subsurface oil is irrelevant because "most of the species" breathe or feed at the surface. NMFS Mem. 20. This is nonsensical, as it just means those species are doubly exposed to oil both at the surface and below the surface, not that subsurface oil is harmless. Finally, NMFS claims its "polygon" approach to estimating exposure to surface oil "potentially overestimat[ed] the number of affected animals" because it used a "conservative[]" assumption. *Id.* It cites no record support for the theory that it was an overestimate—the BiOp instead says the approach "accounts for the estimated distribution of oil spills and species." AR13757. Nor does it show how an allegedly conservative surface exposure analysis is sufficient to "counterbalance[]" wholly omitting toxic exposures to subsurface oil from the action's effects. *Standing Rock Sioux*, 985 F.3d at 1049.

As to NMFS's assumption that only 1% of visible (surface) oil causes significant harm or death, NMFS simply claims it should receive deference without addressing the errors raised by Conservation Groups. NMFS Mem. 20–21. The problem is not that NMFS chose to follow the

degree of oiling "approach" used for the Trustees' post-Deepwater Horizon assessment, *id.* at 20, but that the *values* NMFS used for mortality under each degree of oiling are wholly unsupported and counter to that assessment. NMFS does not dispute that it assumed consequences for minor and moderate oiling (0% mortality) that are drastically lower than the consequences for those degrees of oiling used in the Trustees assessment (*e.g.*, 25–80% mortality for sea turtles). *See* Pls.' Mem. 21–22.[7] Nor does NMFS cite any support for the assumed consequences the BiOps used. *See Dow AgroSciences LLC v. NMFS*, 707 F.3d 462, 471 (4th Cir. 2013) (requiring NMFS to explain rational connection between BiOp's assumptions and field conditions).

The BiOp's assumption that 99% of exposures to surface oil will not have fitness consequences runs counter to the record and drastically underestimates how the action's oil spills affect species. Consequently, the jeopardy determinations are arbitrary. *Defs.*, 931 F.3d at 354.

## II.    NMFS's Jeopardy Analyses Violate the ESA and Its Implementing Regulations.

It is necessary to revisit the "three primary steps" the ESA requires NMFS to follow to "formulate its biological opinion" because NMFS conflates them in its brief to confuse whether it actually did what is required to assess jeopardy. *Appalachian Voices*, 25 F.4th at 269. *After* NMFS 1) "review[s] *all* relevant information" and *after* it 2) "evaluate[s]" the current status of listed species, the environmental baseline, and the effects of the action, *then* it 3) "must '*add* the effects of the action . . . to the environmental baseline and, *in light of* the status of the species and critical habitat, formulate its opinion as to whether the action is likely to jeopardize the continued existence of the listed species.'" *Id.* at 269–271 (cleaned up) (quoting 50 C.F.R. § 402.14(g)(1)–(4)). The problems described below lie in the third step. Regardless of whether NMFS reviewed

---

[7] NMFS claims the BiOp expects 11% of the visible footprint to be consequential, not 1%. NMFS Mem. 20. Ten of those eleven percentage points are "metallic" sheen, which the BiOp assumes will cause only "moderate irritation," not health consequences. AR13750, 13758.

or evaluated effects from the Deepwater Horizon spill or climate change somewhere in the BiOp, it did not *incorporate* those effects into the baseline or status of the species to which it added the action's effects to determine jeopardy. NMFS's (and Chevron's) fundamental argument is that it is enough to satisfy the first two steps. But NMFS's duty is to actually *use* the information, not just disclose it: "for obvious reasons, simply reciting the activities and impacts that constitute the baseline . . . and then separately addressing only the impacts of the particular agency action in isolation is not sufficient." *Id.* at 278 (cleaned up). NMFS must properly "*incorporate* its environmental-baseline . . . findings *into* its jeopardy determinations." *Id.* (emphasis added). It did not do so here. It used an environmental baseline for its jeopardy analyses that was different from the one it described earlier in the BiOp. Just as it is not enough to list the necessary ingredients needed to bake a cake if one neglects to add the flour to the batter, it is not enough for a BiOp to list Deepwater Horizon impacts or climate change effects as relevant to a baseline but fail to incorporate them when it ultimately analyzes jeopardy. In addition, NMFS's jeopardy determinations are half-baked because they assess only one of the two required components— survival—without analyzing whether the action is likely to jeopardize the recovery of any species, as required under the law. In short, the jeopardy determinations are arbitrary and capricious and contrary to the ESA.

## A.    The Jeopardy Analyses Employ Inaccurate Population Baselines that Fail to Account for Post-Deepwater Horizon Populations Changes in Any Way.

The BiOp's initial review of the relevant information describes how the Deepwater Horizon spill caused population-level changes to several ESA-listed species. *See* Pls.' Mem. 23–27. The BiOp's jeopardy determinations for the Rice's whale and Gulf sturgeon, however, use a pre-Deepwater Horizon population status without *any* attempt to incorporate the information about the population changes, effectively assuming that those populations were unaffected by the

spill. *See id*. Accordingly, this is not a situation where those population estimates are merely "imperfect," as NMFS portrays it, NMFS Mem. 23, but one where "significant evidence . . . undermines the reasonableness of [those] estimates." *Defs.*, 931 F.3d at 351.

NMFS argues the agency did account for Deepwater Horizon population impacts by citing relevant reports in other sections of the BiOp and including them in the administrative record. NMFS Mem. 22–25; *see also* Chevron Mem. 3–4 & n.4. As just discussed, that conflates the *review* of the environmental baseline (steps one and two) with actually *incorporating* the baseline into the jeopardy determination (step three).[8] NMFS cites no evidence that it incorporated Deepwater Horizon impacts into species statuses used for the Rice's whale or Gulf sturgeon jeopardy determinations. *See* NMFS Mem. 21 (stating NMFS "considered post-Deepwater Horizon population estimates for most species," with no reference to Rice's whales or Gulf sturgeon). And that's the rub: NMFS "recit[ed]" information showing the Deepwater Horizon had impacts relevant to the "Status of Species" presented in the BiOp, but then completely ignored those impacts in the species' statuses it actually used to assess jeopardy. *Appalachian Voices*, 25 F.4th at 278.

The failure to account for those impacts when adding the effects of the action at the final jeopardy analysis step meant NMFS did not accurately evaluate "the populations' ability to tolerate th[e] impact [from an action]" so could not rationally articulate "the reason why any decline will not reduce the overall likelihood of survival or recovery." *S. Yuba River Citizens League v. NMFS*, 723 F. Supp. 2d 1247, 1267 (E.D. Cal. 2010); *see Appalachian Voices*, 25

---

[8] Chevron misleadingly implies *Appalachian Voices* called these steps a "distinction without a difference," when the court was instead talking about where it looked for the agency's initial evaluation (step two) of the environmental baseline. Chevron Mem. 4 n.4 (quoting 25 F.4th at 271 n.9). As discussed below, the court went on to explain that there is an additional duty after the initial evaluation to use an accurate baseline for the jeopardy determination. *See* p. 26, *infra*.

F.4th at 278 (explaining using proper baseline at this step "is critical to ensure that the action is not analyzed 'in a vacuum'" (citation omitted)). A population that begins with fewer individuals or a lower reproductive capacity will be less able to tolerate harm from the action. An action that kills, say, 10 animals from a vulnerable small population of, say, 50 animals (killing 20% of the population) has far different and more severe biological consequences than if the same 10 deaths occurred in a larger starting population of, say, 200 animals (killing 5% of the population). In addition, harm to small populations can cause them to cross a tipping point towards extinction, which is less of a concern if the population is larger. *See, e.g.*, *Defs*., 931 F.3d at 353–54; AR43149, 85800–01. Reviewing the right baseline in the background does not answer whether an action is likely to jeopardize survival or recovery in light of an accurate status of the species.

NMFS argues it could not possibly have incorporated Deepwater Horizon population impacts into the jeopardy analyses because no post-Deepwater Horizon quantitative population estimates "were available." NMFS Mem. 21. This post hoc rationalization does not appear in the BiOp, which does not even acknowledge that its jeopardy analyses use pre-Deepwater Horizon population estimates. *See Appalachian Voices*, 25 F.4th at 277. It also fails on the merits because it ignores that quantitative estimates are not the only relevant type of information. NMFS's "[f]ocus on actual species count is an overly narrow interpretation of what is required under the jeopardy prong." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1067 (9th Cir. 2004), cited by NMFS Mem. 23. It also ignores that reproductive failure and sublethal harms that do not show up in raw population counts are crucially important to evaluating the population's trajectory. *See* Pls.' Mem. 25 (citing cases). The "best-available-data standard" requires the agency to "consider all existing scientific data relevant to the decision," which includes qualitative information and other types of quantitative information like those presented

in the NMFS-led Trustees report and elsewhere in the BiOp. *Defs.*, 931 F.3d at 346; *see* Pls.'

Mem. 24–26 (citing evidence).

NMFS had many options for incorporating that information qualitatively or quantitatively

into the jeopardy analyses, but the one option it did *not* have was assuming pre-spill population

data remain 100% accurate when its earlier findings and evidence show they are not. *Defs.*, 931

F.3d at 351; *Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. CV 22-114-M-DWM, 2023

WL 5310633, at *4–5 (D. Mont. Aug. 17, 2023) (holding agency violated best available science

requirement by relying solely on quantitative population counts that did not account for

"information indicating an increase in grizzly bear mortality"). NMFS was required to both

recognize that shortcoming with the estimates it was using *and* account for it in the jeopardy

analyses in some way. *Dow AgroSciences*, 707 F.3d at 472 ("But acknowledging a model's

limitations does not go to explaining why it was chosen and the rationality of its relationship to

real-world conditions."); *NWF 2016*, 184 F. Supp. 3d at 920–22 (concluding NMFS failed to

apply relevant new information to its jeopardy analysis).

A new quantitative "abundance estimate" is not a prerequisite to accounting for those

known shortcomings, and Conservation Groups are not asking for one. *Contra* NMFS Mem. 21–

22, 24–25; Chevron Mem. 3, 6. NMFS simply needed to apply the information it had. For Rice's

whales for example, NMFS should have recognized that the Trustees' 17% mortality estimate for

the species likely means that some number less than the 44 whales from its pre-spill estimate

remained after the spill, even if NMFS could not adjust that number precisely. AR40755, 40768–

69; *contra* Chevron Mem. 4–5 (speculating why NMFS "chose not to apply the Trustees'

numerical estimates of decline" when BiOp gives no reasons). With a population this small, the

effects from the death of even one animal from the action are far more pronounced if the

population is several animals smaller than the BiOp's estimate of 44. *See* Pls. Mem. 25–26, 35. Accounting for the Trustees study and others (qualitatively or quantitatively) would affect the degree of relative population decline caused by the action (*e.g.*, the death of one whale is not "approximately 2.3 percent of the population" but some higher percentage, AR13803), and, in turn, whether the Reasonable and Prudent Alternative (RPA) is sufficient to compensate for that proportion of population harmed to prevent jeopardy. If NMFS meant to disregard the Deepwater Horizon effects, then at a minimum it "was required to cogently explain why it had exercised its discretion in relying on" pre-Deepwater Horizon population estimates for its jeopardy determinations despite the Trustees' findings. *Dow AgroSciences*, 707 F.3d at 473 (cleaned up). No such explanation appears in the BiOp.

NMFS makes three arguments for why its Rice's whale jeopardy analysis is nonetheless lawful. First, it argues the Roberts study was the best available data. NMFS Mem. 22. That information is not irrelevant, but, as discussed, it is not the only relevant data and NMFS had to account for its shortcoming as a pre-Deepwater Horizon estimate.[9] Second, NMFS claims it "applied a qualitative approach to account for the impacts of Deepwater Horizon," *id.* at 22–23; *accord* Chevron Mem. 4 & n.4, but the BiOp contains no evidence it did so in its jeopardy analysis, *see Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1091 (9th Cir. 2005) (rejecting notion that NMFS could "implicitly" consider a relevant

---

[9] Chevron's footnote criticizing some of Conservation Groups' comments on the use of a different population estimate (Rosel et al.) in the decision to list the Rice's whale as endangered cites a host of inadmissible extra-record evidence (without any motion for its admission) and should be stricken on that basis. Chevron Mem. 5 n.6; *see Liu v. Mayorkas*, 588 F. Supp. 3d 43, 49 n.5 (D.D.C. 2022). Chevron's point is also irrelevant because there is a difference between citing a study that potentially overestimates the population to conclude the population is low enough to be listed as endangered and using the same study to conclude the population is high enough that it is not at risk of jeopardy.

factor because court can "rely only 'on what the agency *actually said*' in the BiOp" (citation omitted)). The jeopardy analysis simply acknowledges the obvious fact that Deepwater Horizon caused a population "decline" but then adds the action's effects to a baseline that ignored that decline, AR13800; which is clearly demonstrated where it assesses the impact of the action's predicted mortalities as a percentage of the pre-Deepwater Horizon population, AR13803. Finally, NMFS appears to claim it was not required to "account[] for the population's diminished state" in its jeopardy analysis. NMFS Mem. 23. But that is exactly what the ESA requires: a jeopardy analysis must first and foremost ensure that the action will not "tip a species from a state of precarious survival into a state of likely extinction." *Defs*., 931 F.3d at 353 (citation omitted).

NMFS's defense of its Gulf sturgeon jeopardy analysis fares no better. It argues that the ESA does not require it to assess jeopardy on a subpopulation level. NMFS Mem. 23. However, the BiOp's jeopardy determination for the *species* was expressly based on its arbitrary assumptions about the conditions of the subpopulations. Pls.' Mem. 26–27; *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 528–29 (9th Cir. 2010) (finding no-jeopardy determination for bull trout "recovery unit" arbitrary because it failed to consider potential loss of subpopulation it said was important to the recovery unit). NMFS and Chevron next claim the agency did not need to consider the spill's effects on the population because no one directly "observed" an individual sturgeon die. NMFS Mem. 23–24; Chevron Mem. 5–6. This ignores that the Trustees expressly concluded that recovery of the population from oil exposure "could take several decades or more." AR40555–56. NMFS cannot ignore the Trustees' findings about the diminished population baseline.

While NMFS may not have been required to obtain new population abundance values, it

was required to use the best available information on post-Deepwater Horizon population impacts in its jeopardy analysis in some way. Instead, NMFS ignored that information and wrongly assumed populations were entirely unaffected by the catastrophic spill.

**B.     The Jeopardy Analyses Use an Inaccurate Environmental Context that Assumes Climate Change Will Have No Effect on Species.**

The BiOp's jeopardy determinations also fail to incorporate climate change effects. The BiOp's background and other record evidence describe consequential effects to ESA-listed species from climate change during the BiOp's timeline. *See* Pls.' Mem. 28–29. That environmental context affects how the species will respond to the action's effects. *Id.*; *see* NMFS Mem. 26 (acknowledging climate change is a "risk modifier" (quoting AR13795)). The BiOp's jeopardy determinations, however, "assume[] constant environmental conditions," thereby "fail[ing] to account for the one thing we know about climate change: that it will get worse over time." *Appalachian Voices*, 25 F.4th at 277.

NMFS's primary argument once again is that it is enough to describe climate impacts somewhere in "the entire administrative record" or the BiOp, and the agency need not incorporate those effects in the jeopardy analysis. NMFS Mem. 25–26; *see also* Chevron Mem. 6–8. As discussed, the Fourth Circuit and other courts—including NMFS's only case for deferring to its approach here—repeatedly reject that proposition "for obvious reasons." *Appalachian Voices*, 25 F.4th at 278; *Ctr. for Biological Diversity v. Bernhardt*, 595 F. Supp. 3d 890, 915 (D. Ariz. 2022) ("However, an agency cannot simply summarize the effects of climate change and then analyze the proposed action under the assumption that climate change will have no effect."), cited by NMFS Mem. 28; *see also Oceana, Inc. v. Ross*, 2020 WL 5995125, at *15–16 (D.D.C. Oct. 9, 2020) (finding failure to incorporate climate into jeopardy analysis arbitrary even though BiOp contained detailed discussion of climate effects elsewhere); *Wild Fish*

*Conservancy v. Irving*, 221 F. Supp. 3d 1224, 1233–34 (E.D. Wash. 2016) (finding BiOp failed to consider climate change "*in connection with* its analysis of the effects of the [action] on listed salmonids," even though it contained a "detailed discussion of the effects of climate change" elsewhere); *NWF 2016*, 184 F. Supp. 3d at 917–22 (rejecting BiOp where NMFS "merely recited or ignored all the new information [on climate change] and did not apply any of it" in jeopardy analysis).

NMFS and Chevron take a quote from *Appalachian Voices* out of context to suggest the court instead endorsed their position that climate effects do not need to be included in a jeopardy determination because they do "not fit neatly into just [one] category." NMFS Mem. 26 (quoting *Appalachian Voices*, 25 F.4th at 270–271) (alteration is NMFS's); Chevron Mem. 6. However, the court was discussing in which of the categories evaluated in step two—cumulative impacts ("this category" in the original quote) or environmental baseline—climate change should be discussed, not whether NMFS could discuss climate effects only at step two and omit them from step three. *Appalachian Voices*, 25 F.4th at 270–271. The court went on to explain that the environmental baseline and cumulative effects findings must be incorporated into its jeopardy determination. *Id.* at 271; *see also id.* at 278 (finding jeopardy conclusions "necessarily arbitrary" because they folded in a baseline that omitted climate change effects (citing 50 C.F.R. § 402.14(g)(4))). That is, NMFS must evaluate climate change in at least one of the categories in step two *and*, regardless of which category it chose, incorporate climate effects in step three. Whether NMFS folds in a baseline evaluation that did not consider climate change or fails to fold in an environmental baseline that did discuss climate change (as here), the result is the same: the baseline used for the jeopardy determination does not include climate effects and violates the ESA. *Contra* Chevron Mem. 6–7 (attempting to distinguish cases on this basis).

Second, NMFS claims it *did* integrate the climate effects from the background into the jeopardy analyses. NMFS Mem. 25–26. But it cites nothing from the record demonstrating it evaluated the effects of the action in the context of climate change effects. While NMFS says the "purpose of the I&S section was to 'integrate'" the background section, *id.* at 25 (quoting AR13262), the problem is that it did not actually do so with respect to climate effects, *see Oceana*, 2020 WL 5995125, at *16 (explaining similar sentence at beginning of BiOp's jeopardy section "does not do all the work of analyzing the known effects from climate change on sea turtles in the jeopardy analysis"). None of the jeopardy analyses for any species even mention how climate change modifies the risk.

Third, NMFS makes the contrary argument that it *did not* actually integrate climate effects into the jeopardy analyses because it allegedly "concluded that climate change effects were either indeterminate or sufficiently limited." NMFS Mem. 26–27. That post hoc conclusion appears nowhere in the BiOp. Even if it did, the fact that information on climate impacts may be imperfect "does not permit the agency to ignore this factor" altogether. *Irving*, 221 F. Supp. 3d at 1233; *see also Zinke*, 900 F.3d at 1072 (stating "it is 'not enough for [the agency] to simply invoke 'scientific uncertainty'" (citation omitted)). Its jeopardy determinations must account for the evidence on climate effects in some way, whether "quantitatively or qualitatively." *NWF 2016*, 184 F. Supp. 3d at 918; *see Turtle Island Restoration Network v. U.S. Dep't of Comm.*, 878 F.3d 725, 736–39 (9th Cir. 2017) (holding no-jeopardy conclusion for loggerhead sea turtle arbitrary for failing to "incorporate" findings of "climate-based model"), cited by NMFS Mem. 27–28.

Finally, NMFS quibbles with Conservation Groups' characterization of the jeopardy analyses for certain species, but it still provides no evidence it accounted for climate change in

27

those analyses. NMFS Mem. 26–27. For whales, it cites documents evaluating whether climate change is an independent threat entirely outside the context of the action analyzed in the BiOp and points to one place the BiOp acknowledges climate change as a "risk modifier" but then fails to ever account for it when analyzing jeopardy. NMFS Mem. 26; *see also* Chevron Mem. 8. For sea turtles, NMFS says it did not necessarily find climate change on its own would remain stable or decrease, but that does not mean it accounted for *increasing* climate change. NMFS Mem. 27. And for Gulf sturgeon, NMFS cites its presumption that "future reproduction and recruitment rates" will be sufficient to compensate for mortalities to avoid jeopardy, *id.* (quoting AR13837), but that still does not account for climate change effects to the habitat where the fish spawn that can inhibit future reproduction and recruitment rates, *see* Pls.' Mem. 30.

Conservation Groups do not "prefer different conclusions as to climate change," as NMFS alleges, only that NMFS account for the reality that climate change is occurring in its jeopardy determinations. NMFS Mem. 27. Its failure to do so makes it jeopardy determinations arbitrary and contrary to the best available science. *Appalachian Voices*, 25 F.4th at 277–78.

C.     **The Jeopardy Determinations Do Not Assess Impacts to the Recovery of Any Species.**

The ESA requires a BiOp to assess the risk of jeopardy not only to a species' survival— whether the action will risk extinction—but also to a species' recovery—whether the action will prevent the species' condition from improving. *E.g.*, *Defs.*, 931 F.3d at 355. The BiOp never assessed or answered the second question. *See* Pls.' Mem. 30–34.

NMFS first appears to argue that it is not actually required to assess recovery in a BiOp. NMFS Mem. 28–29; *but see id.* at 28 (recognizing it "must" determine whether the "chances of recovery" are "diminished" by the action (quoting *Salmon Spawning & Recovery All. v. NMFS*,

342 Fed. App'x 336, 338 (9th Cir. 2009)).[10] The Fourth Circuit rejected that premise in

*Defenders*, holding that a BiOp must "address the impacts of [the action] on the species'

recovery," even if that discussion does not need to be placed in its own "separate and distinct"

section of the BiOp. *Defs*, 931 F.3d at 355, 357–58 ("[T]he concepts of survival and recovery are

also distinct and must each be evaluated."); *see also* Pls.' Mem. 31 (citing other cases holding

the same). The issue here is not that NMFS did not dedicate a separate BiOp section to recovery,

but that it did not analyze impacts to recovery at all. *Cf. Defs*, 931 F.3d at 355 (distinguishing

*Rock Creek All. v. U.S. Fish & Wildlife Serv.* (relied on by NMFS at 29–30) because BiOp in that

case did assess impacts on "the rate of recovery" (quoting 663 F.3d 439, 443 (9th Cir. 2011)).

NMFS and Chevron overstate the Second Circuit's holding in *Cooling Water Intake*

*Structure Coalition v. EPA* to suggest that "an independent analysis of recovery is not required"

at all. NMFS Mem. 28–29 (quoting 905 F.3d 49, 76 (2d Cir. 2018)); Chevron Mem. 9. Rather,

the court explained "the Services *were* required to consider the Rule's impact on species

recovery, *in addition to* species survival," but that that assessment did not need to occur in the

particular type of programmatic BiOp in that case because recovery would "be assessed on a

site-specific basis" before the actions occur. *Cooling Water*, 905 F.3d at 76 (emphasis added);

*see* Pls.' Mem. 31 n.8. As another court recently explained when discussing *Cooling Water*,

"What matters is that adequate consultation occur *at some point*; the ESA does not permit an

agency to bypass the Section 7 consultative process." *Ctr. for Biological Diversity v. Regan*, Civ.

A. No. 21-119 (RDM), 2024 WL 655368, at *30 (D.D.C. Feb. 15, 2024) (faulting *Cooling Water*

for failing to consider whether the site-specific process would comply with Section 7

---

[10] No one is arguing NMFS must "conclude that the proposed action will 'boost'" the chances of
recovery. *Contra* NMFS Mem. at 28 (citation omitted).

requirements in practice). Here, recovery will not be assessed at *any* point because no additional

site-specific ESA-process will occur for nearly all of the actions covered by the BiOp. *See* Pls.'

Mem. 31 n.8; *cf.* NMFS Mem. 46–47 (arguing against being obligated to do site-specific

process). Because this BiOp is the one and only opportunity to assess recovery before the

covered actions occur, it is imperative that NMFS satisfy the ESA's mandate to assess recovery

in this BiOp. It did not.

NMFS makes a conclusory assertion that it implicitly considered recovery "in tandem"

with survival, but points to nothing in the record where it analyzed how recovery might be

affected by the action. NMFS Mem. 28–29; *see Nat'l Wildlife Fed'n v. NMFS* (*NWF 2008*), 524

F.3d 917, 932 n.10 (9th Cir. 2008) (rejecting assertion that NMFS "'implicitly' analyzed

recovery" with survival because court "may not consider this post hoc justification, or infer 'an

analysis that is not shown in the record'" (citation omitted)). The use of the phrase "survival and

recovery" does not mean the BiOp actually assessed jeopardy to recovery. *See Defs.*, 931 F.3d at

344, 354–55 (finding no evidence BiOp assessed recovery even though it "concluded that the

[action] will not jeopardize the survival and recovery" of the species). "Stating that [recovery]

was considered . . . is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins.*, 805

F.2d 1050, 1055 (D.C. Cir. 1986). NMFS points to where it drew information from recovery

plans and other documents to describe species' baselines; but obtaining baseline information

from a document with "recovery" in the title does not analyze how the action's effects may

jeopardize recovery. *See* NMFS Mem. 29 (quoting AR13406). NMFS also points to the BiOp's

findings that only a small percentage of certain populations will be lost, but that addresses only

how much closer to extinction the species will be and says nothing of whether recovery is

jeopardized. *See id.* Moreover, NMFS cherry-picks species with the largest populations for this

argument, conspicuously ignoring the Rice's whale and Kemp's ridley sea turtle—the two species in most dire need of a reduction of impacts if they are to recover and move back from the brink of extinction. *See* Pls.' Mem. 32–33; *NWF 2008*, 524 F.3d at 933 ("[T]he highly precarious status of the listed fishes at issue raises a substantial possibility that considering recovery impacts could change the jeopardy analysis."). A singular focus on those two species' survival allows oil and gas activity to confine them to their precarious states.

Finally, NMFS offers post hoc quibbles about *how much* the recovery of certain species would be affected by the action but does not deny that the record contains evidence that oil and gas activity is likely to affect recovery. NMFS Mem. 29–30 n.11.[11] At a minimum, this demonstrates there was at least a question about the degree to which the action could jeopardize recovery that needed to be answered in the BiOp. The BiOp's "omission of any discussion of the impact on the species'[] recovery" from the action violates the ESA. *Defs.*, 931 F.3d at 355.

## III.   NMFS Failed to Ensure that Remaining Harm after Implementing the Reasonable and Prudent Alternative Will Not Jeopardize the Rice's Whale.

The ESA requires NMFS to ensure that an RPA provides "sufficient protection against jeopardy." *Bureau of Reclamation*, 426 F.3d at 1092. The BiOp demonstrates that even after the RPA is implemented, the action will still inflict a substantial amount of harm on Rice's whales. Nonetheless, NMFS made a conclusory assertion that the RPA is sufficient to avoid jeopardy without any supporting analysis or explanation for "why" the remaining level of harm "does not

---

[11] NMFS's footnote does not support its contention that Conservation Groups failed to identify substantive recovery concerns. For the Rice's whale, it concedes that curtailment of the species' range from oil and gas activity *is* a "contributing factor" to its endangered status and *is* "one of several threats" to the species. For the Gulf sturgeon, it focuses on survival (replacement of "any individuals lost") rather than recovery (whether the population could increase). And for the Kemp's ridley sea turtle, it oddly discusses whether fishing activity impedes recovery. *See also* Chevron Mem. 9–10 & n.8 (citing only reduced impacts of commercial whaling and demand for hawksbill shells as proof that BiOp addresses recovery).

endanger" the Rice's whale's survival or recovery. *Defs.*, 931 F.3d at 352; *see* Pls.' Mem. 34–38.

Conservation Groups explained several ways NMFS failed to support its no-jeopardy conclusion. First, multiple types of harms remain after the RPA's implementation: the residual harm from vessel strikes and vessel noise after implementation of the RPA, plus the harms caused by marine debris, oil spills and dispersants, and seismic survey noise that are not mitigated at all by the RPA but that contributed to the pre-RPA jeopardy finding.[12] Pls.' Mem. 35–38. While the RPA partially reduces the risk from the "primary threat" of vessel strikes in a limited geographic area, NMFS Mem. 31–32, the action "will continue to impose stressors on listed species," so NMFS needed to "explain[] why these stressors will not jeopardize the species," *S. Yuba River*, 723 F. Supp. 2d at 1267; *contra* NMFS Mem. 31 (misconstruing Conservation Groups' argument as claiming RPA must mitigate all five stressors); Chevron Mem. 11. It did not. That analysis is important because if the remaining harm *would* still cause jeopardy, then the RPA is insufficient and further mitigation is needed. *See Bureau of Reclamation*, 426 F.3d at 1092 (requiring NMFS to show RPA provides "sufficient protection against jeopardy").

Second, it is unclear how much harm remains from vessel noise after implementing the RPA because NMFS did not consider that question. *See* Pls.' Mem. 37. NMFS does not address this issue in its brief, instead misstating Conservation Groups' argument as claiming the RPA would not reduce vessel noise at all. NMFS Mem. 32–33. Of course the RPA may reduce vessel noise. But NMFS needed to at least qualitatively—not necessarily quantitatively, *contra* Chevron Mem. 12—assess whether it does so to a "sufficient" degree to avoid jeopardy, in the context of

---

[12] The non-RPA mitigation measures cited by NMFS and Chevron, NMFS Mem. 32; Chevron Mem. 11–12, are irrelevant because the BiOp had already accounted for them before concluding those stressors would still jeopardize the species, *see* AR13803–04.

all remaining harms. Pls.' Mem. 37 (citing *Bureau of Reclamation*, 426 F.3d at 1092). That assessment is particularly needed to know whether unabated and pervasive vessel noise outside the whale's core area will prevent the species' range from expanding to allow for recovery. *See* ECF No. 93-3, at 32.

Third, the BiOp estimates that vessel strikes alone will still kill and harm a significant portion of the Rice's whale population even *with* implementation of the RPA: 12 deaths and 4 serious injuries over 50 years. *See* Pls.' Mem. 37–38. NMFS admits it did not consider whether those deaths are low enough to avoid jeopardy because, it says, those deaths would occur outside the Rice's whale core area. NMFS Mem. 33–34. There are multiple problems with this argument. For one, it does not matter where a Rice's whale is struck: a dead whale is a dead whale that poses the same threat to the survival and recovery of the population. Next, because the BiOp concluded that vessel strikes outside the core area are an "effect" of the action, omitting them from the jeopardy determination violates the legal mandate to "[a]dd the effects of the action" to the baseline to determine jeopardy. 50 C.F.R. § 402.14(g)(4); *see* AR13612–13 (concluding "there will be a total of 17 (rounded up) vessel strikes . . . as a result of the proposed action" after accounting for proposed RPA restrictions in core area). It is also arbitrary for NMFS to disregard its own well-reasoned, science-based estimates of vessel strikes outside the core area and instead assume no vessel strikes will occur at all. *See Defs.*, 931 F.3d at 351; *see also* AR13610 (map showing vessel strike risk with RPA). Even if there was uncertainty about the "density" of Rice's whales outside the core area, NMFS Mem. 34, and, accordingly, whether precisely 12 whales will be killed, that does not allow NMFS to instead assume the number of deaths is zero for the jeopardy determination, *see Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1028–30 (9th Cir. 2011) (holding agency could not disregard threat to species just because impact was

"uncertain"). The BiOp demonstrates that at least some amount of harm and mortality from vessel strikes will still occur after the RPA's implementation, yet NMFS arbitrarily disregarded that harm entirely for jeopardy purposes.

NMFS never analyzed whether the significant harm to Rice's whales from multiple stressors after the RPA's implementation is likely to jeopardize the species. Instead, it "simply assert[ed] that its decisions were protective and so withstand all scrutiny." *Bureau of Reclamation*, 426 F.3d at 1092. That is "insufficient" to meet its duty to ensure the RPA will avoid jeopardy, *id.*, especially when even a small amount of harm could send the Rice's whale towards extinction, *see* Pls.' Mem. 38; *Appalachian Voices*, 25 F.4th 279 (explaining when a species is on the brink, "an agency may not take action that *deepens* the jeopardy by causing additional harm" (citation omitted)).

## IV.     The Incidental Take Statement Does Not Comply with the ESA's Requirements.

### A.     The ITS Unlawfully Omits Incidental Take of Whales that the BiOp Determined Will Result from the Action.

The ESA and its implementing regulations plainly require an ITS to include all take incidental to the agency action that is reasonably certain to occur. The BiOp concludes that, aside from seismic (G&G) noise, the action with the RPA is expected to kill 12 and harm 9 Rice's whales, AR13613 (12 lethal and 4 sublethal vessel strikes with RPA), 13800 (5 other sublethal injuries), and kill 17 and harm 9 sperm whales, AR13804. The ITS omits that anticipated incidental take, in violation of the ESA's mandate. *See* Pls.' Mem. 39–42. This means the ITS imposes no measures to minimize that take, to monitor that take and reinitiate consultation when it is exceeded, or to prevent that take from exceeding negligible levels defined by the Marine Mammal Protection Act (MMPA). *See* 16 U.S.C. § 1536(b)(4)(C); 50 C.F.R. § 402.14(i)(1).

NMFS argues that the ESA creates a carveout allowing the agency to omit anticipated

marine mammal take from an ITS. NMFS Mem. 37–39. But the ESA provides no exception to addressing all reasonably certain take. *E.g.*, *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 910–11 (9th Cir. 2012) (holding FWS was required to issue ITS for reasonably certain polar bear take); *Ctr. for Biological Diversity v. NOAA Fisherie*s, 644 F. Supp. 3d 574, 588 (N.D. Cal. 2022) (holding NMFS violated ESA by failing to produce ITS for "reasonably certain" whale and sea turtle take); *but see Wild Fish Conservancy*, 628 F.3d at 531 (holding ITS did not need to include take by tribal anglers because it was expressly "exempt from the ESA" by law), cited by NMFS Mem. 35. The agency has litigated and lost its exact same argument in other cases. *Ctr. for Biological Diversity v. Raimondo*, 610 F. Supp. 3d 252, 267–71 (D.D.C. 2022), *vacated as moot*, 2024 WL 324103 (D.D.C. Jan 29, 2024); *Ctr. for Biological Diversity v. Ross* (*Ross I*), 613 F. Supp. 3d 336, 346–47 (D.D.C. 2020).[13]

"The text of the ESA is crystal clear." *Ross I*, 613 F. Supp. 3d at 346. Section 7(b)(4) allows NMFS to "provide" a federal agency with an ITS only "[i]f after consultation" NMFS makes three findings: that (A) "the agency action" will not jeopardize the continued existence of the species, (B) "the taking of an endangered species or a threatened species incidental to the agency action will not" jeopardize the continued existence of the species, and (C) "if an endangered species or threatened species of a marine mammal is involved, the taking is authorized pursuant to" § 101(a)(5) of the MMPA. 16 U.S.C. § 1536(b)(4).

There are three important elements in that text. First, the Secretary "shall provide" the ITS "*[i]f after* consultation" she "concludes" all three things (with the conjunctive "and");

---

[13] NMFS tries to distinguish these cases because they dealt with incidental take from a fishery. NMFS Mem. 40 n.14. The factual context was not relevant to the court's well-reasoned and thorough explanations of what the ESA's plain language requires for an ITS, which is no different for fishery authorizations than any other federal action. *See* 16 U.S.C. § 1536(b)(4).

meaning all three findings are a prerequisite to "even being permitted to produce an ITS" at all. *Ross I*, 613 F. Supp. 3d at 339–40. Second, the statute plainly mandates including *all* taking from the full scope of the agency action in the ITS, referring to "*the* taking" "incidental to *the agency action*," not just *some* of the taking (of just a subset of species) or taking from just a portion of the action (from a subset of stressors), as NMFS claims. *Contra* NMFS Mem. 38 ("Nothing in the statutory text suggests . . . NMFS cannot issue an ITS" for just a subset of take.). The ESA regulations reinforce that requirement: if incidental take "is reasonably certain to occur," to marine mammals or any other species, it may not legally be omitted from the ITS. 50 C.F.R. § 402.14(g)(7); *CBD v. Salazar*, 695 F.3d at 910; *NOAA Fisherie*s, 644 F. Supp. 3d at 588; *Ross I*, 613 F. Supp. 3d at 340; *cf. Raimondo*, 610 F. Supp. 3d at 270–71 (explaining NMFS cannot set ITS take level at zero when anticipated take is greater than zero). Third, the requirement to ensure MMPA compliance is triggered "if" an ESA-listed marine mammal "is involved"; and it requires that "*the* taking" of marine mammals—meaning the full amount anticipated—must comply with the MMPA. Of course, if no taking of marine mammals is involved, then no MMPA authorization is necessary. *Defs. of Wildlife v. U.S. Dep't of Navy*, 733 F.3d 1106, 1113, 1123–24 (11th Cir. 2013) (explaining no ITS required for right whales "where no take" was expected). "[T]he ESA and accompanying regulations plainly require an ITS, and they require that the ITS find that any take resulting from the proposed agency action will neither jeopardize the continued existence of the listed species nor run afoul of § 101(a)(5) of the MMPA." *Ross I*, 613 F. Supp. 3d at 347.

That means the ESA prohibits NMFS from issuing an ITS *at all* unless the ITS includes *all* anticipated take from the full scope of the agency action. If any of the anticipated take is to marine mammals, NMFS may not issue an ITS unless 1) that take has been authorized under the

MMPA, and 2) the ITS includes provisions to ensure the take is no more than negligible under

the MMPA. *See id.* ("The fact that the alternative is to 'decline to issue a BiOp entirely,' does

not change the requirements of the ESA." (citation omitted)); Pls.' Mem. 39–41. "If the action

under review could not be authorized under the MMPA, then [an] agency [is] obligated to revise

its action to ensure any anticipated take" of marine mammals is no more than negligible.

*Raimondo*, 610 F. Supp. 3d at 269 (quotation marks omitted). That simply reflects the statutory

scheme to incorporate the MMPA's "more conservative" protections into the ESA Section 7

process for marine mammals. *See CBD v. Salazar*, 695 F.3d at 913; 16 U.S.C. § 1543

(stipulating ESA provisions shall not "take precedence over any more restrictive" provision of

the MMPA).

  NMFS's practical concerns with meeting ESA's the MMPA requirements cannot excuse

compliance with the statute and, in any event, are not the impediment NMFS claims. NMFS

Mem. 39–40. First, the five-year limit on MMPA authorizations does not require NMFS to limit

the duration of effects considered in the BiOp. *See* 50 C.F.R. § 402.02 ("Effects of the action

may occur later in time . . . ."); AR13267–68 (explaining BiOp considers 50 years of effects

from just 10 years of lease sales). And NMFS can revise the BiOp and ITS as necessary when

authorizations are renewed. Second, NMFS's inability to compel a party to seek an MMPA

authorization just means a party must do so on its own before NMFS can provide a BiOp and

ITS. Indeed, an agency may not lawfully proceed with an action unless it complies with the

MMPA. When NMFS provides an ITS where required MMPA authorizations have not been

obtained, it endorses noncompliance with the MMPA.

  Rather than defend its position using the ESA's plain text, NMFS relies on extratextual

evidence to support its position. NMFS Mem. 38–39. These sources cannot override the ESA's

plain text. *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019). They are also unpersuasive. The cited legislative history and Federal Register entries do not support NMFS's position that it has no obligation to include marine mammal take in an ITS at all. Rather, they discuss how to address a limited "potential" timing problem if the ESA's default 90-day timeframe to complete consultation is too short to also complete the MMPA process. 132 Cong. Rec. H10453-02, 1986 WL 789325, at *8 (Rep. Jones); *accord* 54 Fed. Reg. 40,338, 40,346 (Sept. 29, 1989); 53 Fed. Reg. 8473, 8475 (Mar. 15, 1988). The question was when to include marine mammal take, not *if*. The sources all list the same three options available *if* the 90-day timing is an issue for a particular consultation.

First, NMFS can begin the MMPA process sooner to complete it before the ESA deadline. 54 Fed. Reg. at 40,346. Second, NMFS can extend the consultation process beyond 90 days and allow time for the MMPA process to finish. *Id.* Extending the process is now standard practice—while far too long, NMFS touts that this BiOp took ten years, NMFS Mem. 1—which provides ample time to concurrently complete the MMPA process, *see also id.* at 51 (asking Court for more than 90 days to complete reinitiated consultation). The third option, which NMFS seizes on, is to use an "early consultation" process under 16 U.S.C. § 1536(a)(3) and issue a "preliminary biological opinion" that could be amended once the MMPA authorization is issued. 54 Fed. Reg. at 40,346. That amendment option does not apply to final BiOps like the one issued here pursuant to 16 U.S.C. § 1536(a)(2). Indeed, NMFS would not be able to amend a final BiOp and ITS to add marine mammal take if it later discovers the take cannot be authorized under the MMPA because it is more than negligible. *See* Pls.' Mem. 41. The BiOp here already shows anticipated take of Rice's whales cannot rationally be deemed negligible. That is in part why the ESA requires NMFS to complete the MMPA process before issuing a final BiOp and ITS.

Insofar as NMFS or Intervenors argue that non-statutory sources create a carveout for marine mammal take, that is inconsistent with the ESA's plain text. *See* API Mem. 14–15 (citing ESA Consultation Handbook).[14]

NMFS cites no case where a court affirmed an ITS's omission of reasonably certain marine mammal take. The lone case it cites undermines its position. The court in *Department of the Navy* held a BiOp for construction of a training range did not need to include an ITS for whales because no take was anticipated in that phase, but explained the Navy *would* have to "obtain[] the MMPA take authorization and the resulting incidental take statement . . . prior to authorizing training" at the operations phase, when incidental take of whales was anticipated. 733 F.3d at 1122–25.

NMFS's position is fundamentally that the MMPA consistency provision prevents it from addressing marine mammal take in an ITS, which means it cannot minimize or monitor that take as it is required to do for all other species. *See* 50 C.F.R. § 402.14(i)(1). That cannot be squared with Congress's decision to impose the MMPA's more conservative incidental take standard for ITSs, not a weaker one. NMFS's position also means that it effectively sanctions violations of

---

[14] NMFS takes arguments by plaintiffs in *Gulf Restoration Network v. NMFS* out of context to imply they supported NMFS's position here. NMFS Mem. 39. That is inaccurate. The plaintiffs were opposing NMFS's argument that a settlement deadline should be extended because NMFS wanted to add an additional "proposed action" ("Incidental Take Regulations" for seismic surveys) to the scope of consultation for the sake of efficiency. *Gulf Restoration Network*, No. 8:18-cv-1504-T-27AEP, 2020 WL 836516, at *1 (M.D. Fla. Feb. 20, 2020). NMFS had not invoked any legal authority for its preferred approach, so the plaintiffs' argument was about NMFS's practical abilities, not statutory limitations. *See id.* at *2. It is also important to note that the issue did not involve an MMPA authorization for take from the oil leasing and drilling operations already covered in the BiOp, as NMFS implies; it involved whether to add a separate "agency action" regarding seismic activity. *See id.* While no party addressed the legal issues, supplementing the ITS once the seismic regulations became final is consistent with Conservation Groups' argument here because the regulations would not have resulted in incidental take before that point. *Cf. Dep't of Navy*, 733 F.3d at 1122–25 (explaining NMFS could supplement BiOp before operations expected to cause take to commence).

the MMPA and ESA by greenlighting agency actions under ESA Section 7 that it knows will result in take of marine mammals that is not permitted under either statute. *See* NMFS Mem. 37–38. That approach means Interior is in violation of Section 9 of the ESA by authorizing activities that the BiOp concludes cause take, but that is unpermitted. *See Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 148 F.3d 1231, 1251–53 (11th Cir. 1998). Oil and gas operators also are currently subject to legal liability for unpermitted take of whales, which Chevron and API say is untenable. API Mem. 22–23; Chevron Mem. 19–20, 23.[15]

The ESA plainly requires all reasonably certain take be included in the ITS, and it plainly requires marine mammal take be first authorized under the MMPA and mitigated by terms and conditions in the ITS to keep the impact at a negligible level. The ITS fails to do any of those things.

> **B.     The ITS Unlawfully Omits Incidental Take from Oil Spills that the BiOp Determined Will Result from Lawful Oil and Gas Activities.**

The ITS also omits oil spill take that the BiOp determined will result from the action, in violation of the ESA. *See* Pls.' Mem. 42–43. NMFS defends that omission solely on the ground that oil spill take is not "*incidental* take" as the term is defined by regulation. NMFS Mem. 35–36. It does not deny that the ITS would need to include oil spill take if it *is* incidental take.

Incidental take is any "takings that result from, but are not the purpose of, carrying out an otherwise lawful activity." 50 C.F.R. § 402.02. NMFS cannot dispute that the oil and gas activity covered in the BiOp is "otherwise lawful." According to the regulation, then, incidental take is

---

[15] Chevron takes a position that compliance with the terms and conditions of an ITS provides safe harbor from legal liability for *any* incidental take, even if the take is not included in an ITS. Chevron Mem. 13–14, 23. However, the ESA only provides safe harbor for the incidental take "which is subject to" an ITS. 50 C.F.R. § 402.14(i)(5); *cf.* API Mem. 17 (arguing oil spill take is not exempt from liability because it was not included in the ITS). Accepting Chevron's position would mean the ITS has authorized all incidental take of marine mammals without meeting the MMPA compliance requirements, which NMFS concedes it may not do. NMFS Mem. 37.

any takings that "result from" that oil and gas activity.

Oil spills certainly "result from" oil and gas activity. The BiOp's discussion of oil spills and their harm to species as an "effect" of the action makes that plain: "oil spills do regularly result from oil and gas activities in the Gulf of Mexico and their effects, therefore, are considered in this opinion." AR13271; *see also* AR13743 (stating oil spills "are a direct consequence of oil and gas development and production" in the Gulf). Oil spill take is not from some independent intended or unlawful activity, but the inevitable and *expected* result of lawful oil and gas activity. *See* AR13755–74 (calculating exposure of animals to oil spills that "result from the proposed action"); *cf. Friends of Animals v. Phifer*, 238 F. Supp. 3d 119, 132–33 (D. Me. 2017) (explaining take from illegal traps not incidental if "trappers' conduct" was "an independent intervening cause that breaks the chain of causation"), cited by NMFS Mem. 35. NMFS's indefensible position is that (per the BiOp) oil spill harm is an effect of the action but (per the ITS and its brief) does not result from the action. Because the regulations define an effect as anything "caused by" the action, 50 C.F.R. § 402.02, NMFS's absurd interpretation is that oil spill take is "caused by" the action but does not "result from" the action.

NMFS's position is also inconsistent with its inclusion of incidental take from marine debris in the ITS, even though the discharge of marine debris is also "prohibited" under the Clean Water Act (CWA) and other laws. *E.g.*, AR3628, 3630 (CWA permit prohibits trash discharge); AR13733 (citing 33 C.F.R. §§ 151.51–77). The omission of oil spill take is both arbitrary and contrary to the ESA and its implementing regulations.

The omission also means the ITS is not capable of monitoring oil spill take to "serve[] as a check on the agency's original decision" that take from oil spills and other stressors will not cause jeopardy. *CBD v. Salazar*, 695 F.3d at 911. NMFS argues it *could* choose to reinitiate

consultation under 50 C.F.R. § 402.16(a)(2) if undefined new information indicates there are more spills. NMFS Mem. 36. That "hopelessly noncommittal" assertion is no substitute for an ITS take limit that would automatically trigger a duty to reinitiation consultation once it is exceeded. *Regan*, 2024 WL 655368, at *35; *see also Oceana*, 2020 WL 5995125, at *14.[16]

As with the omission of marine mammal take, NMFS is facilitating Interior's violation of ESA Section 9 when it authorizes activities the BiOp determined cause thousands of unpermitted oil spill takes. Ultimately, however, the ITS itself violates the ESA because it omits oil spill take that the BiOp says will result from the agency action.

### C.    The ITS's Surrogate for Monitoring Vessel Strike Take Fails to Account for a Determinative Factor for How Much Incidental Take Is Occurring.

A take surrogate must have a "causal link" to the amount of take of listed species, which requires accounting for the factors that influence the amount of take. *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 271 (4th Cir. 2018). The BiOp explains two factors are important to estimating how many animals are struck by vessels: total vessel kilometers traveled and where the travel is occurring. *See* Pls.' Mem. 44. The ITS's surrogate for vessel strike take monitors only former. Without a spatial component, the surrogate lacks a causal link to the overlap of vessel traffic and species density that ultimately determines the level of take occurring.

NMFS argues Conservation Groups improperly conflate monitoring authorized take with monitoring estimated effects. NMFS Mem. 40. That is only because the authorized take and estimated effects in the BiOp are one and the same: the authorized take equals the estimated effects. *Compare* AR13625–31 (tbls. 55, 56, 58, 59 estimating vessel strike effects to sea turtles),

---

[16] API's "common sense" argument ignores this vital function of the ITS. API Mem. 17. It also is a red herring because it would still be unlawful to spill oil in the Gulf of Mexico even if take were not subject to Section 9 liability. API provides no support for the proposition it is not possible to obtain MMPA authorization for incidental oil spill take, and even if that were the case, it just means Interior and operators need to sufficiently reduce oil spill risk to avoid take.

*with* AR87967 (tbl. 132 authorized vessel strike take of sea turtles). Therefore, factors that were important to estimate the number of vessel strikes expected to result from the action are the same factors that are important to estimating (and monitoring) the number of vessel strikes that do result from the action.

NMFS next argues it is not required to monitor spatial distribution. NMFS Mem. 42. Without doing so, however, it cannot monitor whether vessels are traveling through areas where a species is found in higher densities and more likely to be struck, so there is not "a rational connection between the [kilometer-only] surrogate and the taking of the species." *Wild Fish Conservancy*, 628 F.3d at 531. NMFS then claims it did not actually disregard the spatial factor because the vessel track data it collects include a spatial element. NMFS Mem. 42. The problem is not with the raw data but that NMFS ignores the spatial element when monitoring the take surrogate. Finally, NMFS claims the BiOp did not expect spatial traffic patterns to change. *Id.* While there is evidence patterns *are* likely to change, AR13584, NMFS completely misses the point of a surrogate: to *monitor* whether vessel activity causing take remains "consistent with" the BiOp's assumption that vessel patterns will not change. *Sierra Club*, 899 F.3d at 272.

Regardless of whether NMFS could choose to reinitiate consultation based on other information, NMFS Mem. 42–43, the ITS must include an enforceable trigger that has a rational connection to vessel strike take, *Regan*, 2024 WL 655368, at *35. It did not do so here.

## V.     Partial Vacatur of the ITS Is the Appropriate Remedy.

The default remedy under the APA for the violations here is vacatur, and the Fourth Circuit has uniformly concluded that unlawful BiOps must be vacated. However, recognizing that the Court may tailor vacatur in some circumstances, Conservation Groups seek only partial vacatur of the ITS to protect imperiled Gulf wildlife during a remand to fix the BiOp's serious errors, while minimizing any alleged disruption to NMFS and Intervenors. The assertions by

NMFS and Intervenors that remand without vacatur is warranted are based on a misapplication of the law and exaggerated claims about consequences of partial vacatur. They have not met their burden to demonstrate that the Court should depart from the standard vacatur remedy.

### A.      Partial Vacatur Would Protect Species and Minimize Disruptions.

Conservation Groups request partial vacatur of the ITS narrowly tailored to prevent harm to imperiled species during remand.[17] Specifically, the Groups ask the Court to prospectively vacate, from the date of the Court's order, the "Amount or Extent of Take" specified in the ITS (Table 132), AR87965–68, as it applies *only* to agency actions offering or selling new leases and to agency approvals of the following authorizations for new oil and gas development: initial and supplemental exploration plans, new and supplemental development operations coordination documents (DOCDs), and rights-of-way pipeline applications. *See* AR13273–74, 13278–82. Plans and permits approved before the date of the Court's order and activities taken pursuant to them would be unaffected. Accordingly, partial vacatur will not implicate the overwhelming majority of activities that Intervenors claim would be unduly disrupted. This tailored remedy would instead be exactly like "the common situation involving vacatur of a permit for a project that has not been constructed or a federal activity that has yet to begin." API Mem. 22.

Partial vacatur would prevent Interior from relying solely on the unlawful BiOp and ITS for new and supplemental approvals because they would lack incidental take coverage. *See Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1127–28 (9th Cir. 2012) (stating "an agency cannot meet its section 7 obligations by relying on a Biological Opinion that is legally flawed"). However, Interior could still approve new plans and permits using an interim,

---

[17] While NMFS' complains of a "moving target" on remedy, Conservation Groups are simply trying to limit their request to address NMFS's and Intervenors' previously expressed concerns.

project-specific ESA process to evaluate the action and impose any necessary mitigation.[18] A similar project-specific process (step-down review) is already required for certain activities under the BiOp to address situations where an action's effects were not accurately evaluated in the BiOp. AR13367–68; *see* 3d Decl. of Samuel D. Rauch ¶ 11, ECF No. 175-3 (explaining step-down process "allows for adaptive management by application of additional conservation measures, as necessary, for certain activities"). The BiOp's errors mean that essentially every action's effects were inadequately evaluated. Interim project-specific review would require the agencies to address those errors for the specified new and supplemental actions rather than ignoring them. That review could still tier to the BiOp's analyses that have not been found invalid, so additional consultation would be limited. In addition, that review will allow Interior to obtain coverage for any incidental take anticipated from a project. *Cf.* AR13368 (explaining step-down process allows for the same); *contra* Chevron Mem. 9, 19–23 (raising specter of liability if it cannot receive take coverage).

Partial vacatur would not halt new oil and gas activities, much less ongoing activities. *See N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, 460 F. Supp. 3d 1030, 1040 (D. Mont. 2020) (finding disruptive consequences insignificant where "[p]artial vacatur does not block any projects"). It would not eliminate any of the BiOp's protective measures—the RPAs, the Reasonable and Prudent Measures, and the ITS's terms and conditions would remain.[19] *Contra* API Mem. 20–21; NMFS Mem. 47–48. And it would not affect decommissioning activities. *Contra* NMFS Mem. 45–46; API Mem. 21–22; Chevron Mem. 22. Partial vacatur would simply

---

[18] As just one example, Interior could impose vessel restrictions for projects where vessels would travel through recently identified Rice's whale habitat.

[19] Chevron is wrong that the terms and conditions must be vacated to lift the ITS's safe harbor protection. Chevron Mem. 14. Vacating the "Amount or Extent of Take" would mean no taking is "subject to" the ITS so no taking has safe harbor. 50 C.F.R. § 402.14(i)(5); *see* note 15, *supra*.

provide greater scrutiny in the permitting process to address the flaws in the BiOp and ITS and provide for necessary mitigation of new activities.

The Court has authority to order partial vacatur under the APA. The APA directs courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Accordingly, "vacatur is the normal remedy." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). Courts have broad authority to tailor a remedy and "may exercise that discretion where appropriate to order partial, rather than complete, vacatur." *N. Plains Res. Council*, 460 F. Supp. 3d at 1037, 1039–40 (granting "Plaintiffs' proposed partial vacatur" that focused on new activities posing greatest threats to species); *see Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010) (describing partial vacatur as a "less drastic" remedy); *e.g.*, *Coal. to Prot. Puget Sound Habitat v. U.S. Army Corps of Eng'rs,* 466 F. Supp. 3d 1217, 1226–27 (W.D. Wash. 2020) (limiting vacatur of programmatic permit to allow some activities to proceed under project-specific process), *aff'd* 843 F. App'x 77, 80 (9th Cir. 2021); *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 80 (D.D.C. 2010). The Court has ample authority to vacate just the portion of the ITS that authorizes take while leaving beneficial aspects of the BiOp in place.

**B.      The *Allied-Signal* Factors Do Not Preclude Partial Vacatur.**

NMFS and Intervenors argue that the Court should depart from the standard vacatur remedy and remand without vacatur under the factors from *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146 (D.C. Cir. 1993). As an initial matter, that would produce the same outcome as voluntary remand without vacatur, which this Court recently denied. A remand without vacatur *after* a ruling on the merits that the BiOp violates the law would still allow for unmitigated harm to species during a remand and "invite[] agency indifference" to the BiOp's flaws. *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020)

46

(citation omitted); *see N. Plains Res. Council*, 460 F. Supp. 3d at 1039–40 ("To allow the Corps to continue to authorize new oil and gas pipeline construction [during remand] could seriously injure protected species and critical habitats—the very danger that the ESA aims to prevent." (cleaned up)). Such a business as-usual-approach is contrary to the ESA's requirement to ensure against jeopardy.[20]

As a legal matter, there are four problems with NMFS's and Intervenors' arguments: 1) they largely ignore the Fourth Circuit's approach to vacatur, 2) the majority of the BiOp's errors are legal deficiencies that cannot possibly be substantiated on remand (the first *Allied-Signal* factor), 3) they overstate the disruptive consequences of partial vacatur (the second factor), and 4) NMFS asserts the wrong legal standard by claiming a plaintiff must establish harm absent vacatur.

### 1. Vacatur Is the Appropriate Remedy Under Fourth Circuit Precedent.

The Fourth Circuit "has never formally embraced the *Allied-Signal* remand-without-vacatur approach." *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 655 (4th Cir. 2018). While the court noted *Allied-Signal* may be relevant where a court finds an action is only "inadequately supported," it is inapplicable when the action is found to be "legally deficient." *Id.* The Fourth Circuit "will vacate agency action if it is not based on a consideration of the relevant factors or where there has been a clear error of judgment." *Defs.*, 931 F.3d at 345 (cleaned up). Indeed, the Fourth Circuit has uniformly concluded that unlawful biological opinions must be vacated. *Appalachian Voices*, 25 F.4th at 283; *Defs.*, 931 F.3d at 366; *Sierra Club*, 899 F.3d at 295; *Dow AgroSciences*, 707 F.3d at 475.

---

[20] NMFS's request to defer partial vacatur for a year is functionally the same as a remand without vacatur and should also be denied.

NMFS attempts to get around this issue by wrongly claiming the Fourth Circuit's *Army Corps* decision "applied" the *Allied-Signal* test and found that test "particularly relevant" unless the agency "lacked authority to take action." NMFS Mem. 44; *see also* Chevron Mem. 14 n.11. That case says nothing of the sort. The Fourth Circuit concluded *Allied-Signal* was *not* applicable at all because the decision was "legally deficient." *Army Corps*, 909 F.3d at 655. While action was legally deficient *because* it exceeded the agency's statutory authority, the court did not imply that is the only type of legal deficiency. *Id.* Rather, it used "legally deficient" in describing violations that are not simply an "inadequately supported" rule. *Id.* Finally, the court did not find that *Allied-Signal* was "particularly relevant" in the latter situation as NMFS suggests; it indicated only that "even if [the Fourth Circuit] were to follow *Allied-Signal*," it would *only* apply where an agency issued an "inadequately supported" rule. *Id.* As discussed below, the BiOp's errors are primarily of the legal deficiency type where the Fourth Circuit has said *Allied-Signal* does not apply. *See Sierra Club*, 899 F.3d at 295 (describing ITS violation as a "contravention of . . . statutory requirements"). They require NMFS to reach new findings and conclusions, not simply provide additional explanations for its previous conclusions. The Court should apply the normal vacatur remedy without resorting to a test the Fourth Circuit has not adopted.

### 2. Vacatur Is the Appropriate Remedy Under the *Allied-Signal* Factors.

Even if *Allied-Signal* applied, NMFS and Intervenors have not established this is a "rare case[]" where remand without vacatur is warranted. *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019). NMFS and Intervenors "bear the burden to prove that vacatur is unnecessary." *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 99 (D.D.C. 2019). Whether to remand without vacatur under *Allied-Signal* depends on two factors: (1) the seriousness of the action's deficiencies and (2) the disruptive consequences of vacatur.

*Allied-Signal*, 988 F.2d at 150–51. The facts here do not warrant departing from the normal statutory remedy.

> ### a. The BiOp's Errors Are Serious and There Is No Serious Possibility NMFS Will Be Able to Substantiate the BiOp.

The first factor is "the seriousness of the order's deficiencies" and whether "there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand." *Allied-Signal*, 988 F.2d at 150–51. While NMFS and Intervenors attempt to paint the issues here as minor "failures to explain," NMFS Mem. 48–49; Chevron Mem. 15–17; API Mem. 19, most of the BiOp's errors are legal errors.

First, the failure to include the incidental take of whales in the ITS is an "obvious . . . legal error." *See Ctr. for Biological Diversity v. Ross* (*Ross II*), 480 F. Supp. 3d 236, 245–46 (D.D.C. 2020). "There is no question that the agency has violated the law and absolutely no possibility of the [agency action's] survival on remand." *Id.* at 245 (alteration in original) (citation omitted). Second, the failure to specify the amount and impact of oil spill take in the ITS omits a legally required part of the ITS. *See Sierra Club*, 899 F.3d at 281, 295 (vacating ITS because it did not set enforceable take limits, "in contravention of [the agency's] statutory requirements"). Third, the vessel strike surrogate violates the legal requirement that the ITS contain a measure to monitor take that has a causal connection to actual take. *See id.* at 271 (citing 50 C.F.R. § 402.14(i)(1)(i)). Fourth, NMFS applied a legally invalid standard when it evaluated the action's impact on only species' survival, not recovery. This error "reads 'and recovery' entirely out of the text" of the ESA's implementing regulations and is a straightforward legal deficiency. *NWF 2008*, 524 F.3d at 931; *see Defs.*, 931 F.3d at 366 (vacating BiOp because it failed to evaluate recovery). Fifth, the BiOp's use of Interior's opinion on the effects of an extremely large oil spill rather than NMFS's is a statutory violation of the

ESA. NMFS cannot "justify those [five] choices by shoring up its reasoning on remand." *Nat. Res. Def. Council v. EPA*, 489 F.3d 1364, 1374 (D.C. Cir. 2007). The only way to remedy them would be to issue an entirely different ITS and make entirely new jeopardy determinations than those in the challenged BiOp. These legal deficiencies require vacatur. *Army Corps*, 909 F.3d at 655.

NMFS also made multiple analytical errors in its jeopardy determinations. These are fundamentally legal deficiencies because they result in NMFS's failure to comply with its legal duty to properly assess whether the action is likely to cause jeopardy. At a minimum, the analytical errors are serious and leave substantial "doubt [that] the agency chose correctly." *Allied-Signal*, 988 F.2d at 150. First and foremost is NMFS's assertion that the action with the RPA will not jeopardize Rice's whales despite not analyzing whether it reduces harm enough to prevent jeopardy. NMFS cannot substantiate an analysis on remand that it never conducted in the first place. Moreover, given the significant remaining harm, there is substantial doubt NMFS could conclude there is no jeopardy on remand. Second, NMFS's use of incorrect baselines for its jeopardy determinations—using pre-Deepwater Horizon population data and failing to incorporate climate change—are also "serious errors" that meant it did not correctly assess the consequences of the action's effects to species. *Appalachian Voices*, 25 F.4th at 278–79 (vacating BiOp and ITS for this reason). The only way to remedy these errors is to conduct new jeopardy analyses that incorporate correct and complete information. NMFS cannot provide further explanation for determinations that did not consider the relevant factors in the first place.

Finally, the various ways the BiOp underestimated oil spill harm seriously undermine its no-jeopardy conclusions. There is no indication NMFS can substantiate the BiOp's original estimates—of the likelihood of >1 million bbl spills or 100,000 bbl to 1 million bbl catastrophic

spills, of the number and size of very large spills, or of the proportion of animals exposed to oil that will suffer fitness consequences—on remand. *See Defs.*, 931 F.3d at 351 (vacating BiOp where agency "ignored significant evidence that undermines the reasonableness of its estimates"). Vacatur is warranted under *Allied-Signal* when an agency "failed to consider an important aspect of the problem," as NMFS did when estimating oil spill effects. *SecurityPoint Holdings, Inc. v. TSA*, 867 F.3d 180, 185 (D.C. Cir. 2017) (citation omitted).

Intervenors cannot downplay these errors by casting them as mere failures to explain "particular choices" in the BiOp. Chevron Mem. 14–17; API Mem. 19. The legal errors are legal errors. And the analytical errors are not a failure to explain how NMFS made its choices but a failure to account for the critical scientific information and to ask the right question in the first place. *See Intertribal Sinkyone Wilderness Council v. NMFS*, No. 1:12-cv-00420 NJV, 2013 WL 8374150, at *1 (N.D. Cal. Nov. 26, 2013) (explaining failure to consider best available science cannot be cured by additional explanation because it goes "to the heart of NMFS's analyses and decisions"). Chevron's cases where an agency simply failed to adequately explain its reasoning are thus inapt: none involve jeopardy determinations or feature similarly foundational analytical errors. Chevron Mem. 15–16 (citing, *e.g. Gulf Restoration Network v. Haaland*, 47 F.4th 795, 804–05 (D.C. Cir. 2022) (finding further explanation of report on remand "should not change the bottom line")).

For its part, NMFS concedes it would need to conduct entirely "new analyses" to address the claims here. NMFS Mem. 49. It would not be substantiating the BiOp. The vague suggestion that NMFS "'may find an adequate explanation' on remand that will address most, if not all, of Plaintiffs' concerns" in a new BiOp does not establish the errors in *this* BiOp are not serious. *Id.* (quoting *Standing Rock Sioux*, 985 F.3d at 1051); *see Env't Def. Fund v. FERC*, 2 F.4th 953, 976

(D.C. Cir. 2021) (vacating where agency's ability to substantiate rationale on remand "is not at all clear"); *Semonite*, 422 F. Supp. 3d at 99 (explaining agencies must show more than just that they "could ultimately substantiate their original substantive decision").

Neither these serious legal and analytical deficiencies nor the BiOp they infect can be substantiated on remand. The first *Allied-Signal* factor weighs against remand without vacatur.

### b. Project-Specific ESA Processes for New and Supplemental Approvals Would Not Be Unduly Disruptive.

NMFS and Intervenors hang most of their argument on the disruptive consequences factor. As explained, this factor does not apply when the errors are legal deficiencies. And the Fourth Circuit has never applied it to weigh against vacating a biological opinion. *Cf. Appalachian Voices*, 25 F.4th at 282 (vacating biological opinion even though vacatur "will further delay the completion of an already mostly finished Pipeline"). Even if the factor did apply, it does not preclude partial vacatur that would cause only minimal disruption.

The majority of the consequences described by NMFS and Intervenors are not implicated by the limited prospective vacatur sought here. Vacatur would not: affect existing permits or activities to "ensure safe and compliant operation[s]" that are already permitted, halt or limit existing production, or even prevent new oil and gas activities and production. API Mem. 20–24; Chevron Mem. 18–25. Rather, by prospectively requiring further review of only a subset of activities, partial vacatur will focus agency resources where they are most needed—the actions most likely to harm listed species—and will require additional protections to benefit species. *See N. Plains Res. Council*, 460 F. Supp. 3d at 1040.

Conservation Groups recognize that a prospective partial vacatur would still pose some burden for NMFS and Intervenors. A project-specific ESA process will cause some increased workload for Interior and NMFS. As a result, approvals of new activities may take longer than

they would under the BiOp. Yet that disruption is not so significant as to outweigh the imperative need to prevent harm to imperiled wildlife during a remand. *Id.* (finding the "need to protect endangered species and critical habitat from harm until the [agency] completes programmatic consultation outweighs any disruption or permitting delays that would result from this partial vacatur").

As for NMFS's concerns, an agency's burden to comply with the ESA "cannot on its own constitute the kind of disruptive consequence intended by *Allied–Signal.*" *AquAlliance v. U.S. Bureau of Reclamation*, 312 F. Supp. 3d 878, 882 (E.D. Cal. 2018); *cf. N. Plains Res. Council*, 460 F. Supp. 3d at 1045 (rejecting agency's alleged burden that "resulted from [its] failure to follow the law in the first instance" (citation omitted)). "Remand without vacatur is not required when there are *any* disruptive consequences, but rather when those consequences are unacceptable in light of the seriousness of the error." *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113, 160 (D.D.C. 2022), *vacated as moot*, No. 22-5036, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023); *see N. Plains Res. Council*, 460 F. Supp. 3d at 1040–41 (rejecting agency's complaint that "the individual permit process proves too expensive and time-consuming"). In addition, any burden here would be mitigated by the facts that the agencies can still tier to the BiOp's analyses not subject to this challenge and that the agencies already have a protocol for doing project-specific reviews (i.e., step-down reviews). A workload burden resulting from partial vacatur is not unacceptable given that the agencies have a legal duty to implement the ESA when authorizing oil and gas activities.

Intervenors' concerns with a delay in receiving new permit approvals are also unjustified. As an initial matter, "it is not clear that economic concerns are as relevant in an environmental case like this one." *Pub. Emps. for Env't Resp. v. FWS*, 189 F. Supp. 3d 1, 3 (D.D.C. 2016).

Further, the risks of disruption are the "nature of doing business, especially in an area fraught with bureaucracy and litigation." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 104 (D.D.C. 2017). Because vacatur would only apply to new approvals, operators should be expected to build in permit processing times to their timelines for commencing new activities. There is no evidence any delay would be significant, particularly because most approvals would involve the same considerations and analyses that could be quickly and efficiently replicated for each approval. And there is no evidence that this process will cause any more disruption than the step-down process and other requirements that operators already need to account for in their current planning. Apart from the step-down process, lease provisions stipulate that substantive and procedural expectations for activities on a lease may change. For example, lessees must "acknowledge and agree that they will be required to implement" any new measures to protect species that are developed in the future. BOEM, Final Notice of Sale Gulf of Mexico Oil and Gas Lease Sale 261 Information to Lessees (2023), https://www.boem.gov/sites/default/files/documents/oil-gas-energy/leasing/Sale-261-ITLs.pdf. Any delay would not interfere with "investment-backed expectations" in lease rights, as Chevron claims, Chevron Mem. 21–23, because, 1) additional procedure to protect species is already a condition of those lease rights and, 2) lease terms can be extended (i.e., suspended) "[w]hen necessary . . . to conduct an environmental analysis" like the ESA process here, 30 C.F.R. § 250.172(d). The potential for delay (such as step-down reviews) is an inherent part of Chevron's lease rights that it should be accounting for in its third-party contracts and timelines to avoid incurring unnecessary financial obligations. *See* Chevron Mem. 21.

Finally, Chevron claims vacatur would cause uncertainty about liability for take under the ESA. However, there would be no change to liability for operations under existing permits

because vacatur would only apply to new approvals. And liability should not be an issue for new and supplemental approvals because NMFS can authorize any anticipated incidental take with those approvals. Chevron's concerns about liability also ring hollow given its disregard for its existing liability for unpermitted take of whales or from oil spills under the existing ITS. *See* note 15, *supra*.

Some delay and extra process is insufficient to depart from vacatur because "[i]n balancing these factors in ESA cases, courts will tip the scales in favor of the endangered species." *Klamath-Siskiyou Wildlands Ctr. v. NMFS*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015). Intervenors' citations to cases remanding without vacatur to prevent disruptive consequences *for the environment* are thus inapposite. *E.g.*, *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 189 (D.C. Cir. 2017); *NWF 2016*, 184 F. Supp. 3d at 949 (remanding without vacatur because the BiOp provided "some protection for the listed species"); *Nat'l Wildlife Fed'n v. NMFS*, 839 F. Supp. 2d 1117, 1128–29 (D. Or. 2011).

While Intervenors and NMFS paint an exaggerated picture of potential consequences, partial vacatur will not affect existing mitigation measures or oil and gas activities that have already been permitted. A potential for delay in permitting new activities is not so seriously disruptive as to depart from partial vacatur of the ITS to protect imperiled species.

### c. *Allied-Signal* Does Not Require a Plaintiff to Demonstrate Harm for the APA's Standard Vacatur Remedy to Apply.

NMFS attempts to create a third *Allied-Signal* factor by claiming, without any legal support, that a plaintiff must demonstrate remand without vacatur will cause them significant harm to be entitled to vacatur. NMFS Mem. 49–51. *Allied-Signal* does not impose such a burden on plaintiffs. Even if it did, Conservation Groups have shown continued implementation of the BiOp and ITS harms ESA-listed species.

Harm to a plaintiff is not considered in the APA statutory remedial analysis. *See Allied-Signal*, 988 F.2d at 150–51. NMFS cites no case requiring a plaintiff to demonstrate harm to obtain vacatur. That is likely because vacatur is the presumptive remedy under the APA; a plaintiff does not need to prove that remedy is necessary. Instead, "defendants bear the burden to prove that vacatur is unnecessary" under the two *Allied-Signal* factors. *Semonite*, 422 F. Supp. 3d at 99. The Court should reject NMFS's invitation to create a new test to shift the burden.[21]

Even if Conservation Groups bore such a burden, they have shown continued operation of the ITS harms species because it expressly authorizes actions to incidentally kill and harm thousands of ESA-listed animals each year. *See* ECF No. 121, at 20–23 (opposing voluntary remand without vacatur); ECF No. 163, at 9–12 (same). As the Court stated in denying voluntary remand, "If the plaintiffs are right [on the merits] that the BiOp unlawfully exposes these species to harm, then presumably permitting that harm to continue unduly prejudices the plaintiffs." Stay Op. 22. NMFS's suggested standard for what constitutes harm is also distorted: that it is not enough if the action kills even thousands of individual animals, but that a plaintiff must show harm will be significant enough to risk jeopardy to the species' survival. NMFS Mem. 49. Courts have rejected that proposition even under the injunction standard where, unlike here, a plaintiff does have to demonstrate irreparable harm. *E.g.*, *Nat'l Wildlife Fed'n v. NMFS*, 886 F.3d 803, 818–19 (9th Cir. 2018) (collecting cases and holding courts are not "required to find a short-term extinction-level threat to listed species in order to find likely irreparable harm for purposes of an ESA injunction"); *Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1512 n.8 (9th

---

[21] NMFS also cites no case importing the requirement that a party demonstrate "irreparable harm" to obtain injunctive relief into a consideration of vacatur, and with good reason. Unlike in an injunction inquiry, the focus in APA review is on the agency and its action—not the plaintiff. *See* 5 U.S.C. § 706(2); Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121, 1138 (2020); *see also Allied-Signal*, 988 F.2d at 150–51.

Cir. 1994) ("We are not saying that a threat of extinction to the species is required before an injunction may issue under the ESA."). NMFS is simply wrong that Conservation Groups are required to establish "imminent, significant harm to listed species" to apply the default remedy of vacatur. NMFS Mem. 51.

    **C.**    **The Court Should Impose a Deadline to Complete a New BiOp.**

Although NMFS previously told the Court it would complete reinitiated consultation by September 2024, ECF No. 102-1, at 7, then by December 2024, ECF No. 161, at 2, that timeline continues to slip, apparently due in large part to NMFS's "concerns" with information Interior has provided about oil spill risk, ECF No. 175-3, at 23–27. NMFS now says it will not complete the BiOp "until late winter or early spring 2025," and potentially later, "depending on the impact of this Court proceeding." 3d Rauch Decl. ¶ 10. NMFS has acknowledged "that a court 'may when appropriate set a time limit for action' by agencies on remand." ECF No. 108-1, at 14 n.7 (quoting *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981)); *see also NWF 2008*, 524 F.3d at 937 (citing "court's discretionary authority to impose a deadline for the remand proceedings" under the APA); *Alaska Ctr. for Env't v. Browner*, 20 F.3d 981, 986 (9th Cir. 1994). A deadline is appropriate in this circumstance to ensure NMFS remains accountable to complete the new BiOp in a timely fashion, particularly given how its last process for this BiOp dragged on for ten years and required a lawsuit to compel its completion.

What that deadline should be depends somewhat on whether the Court partially vacates the ITS. If the Court remands without vacatur, then it is imperative to complete a new BiOp more quickly because species will be unprotected in the meantime. In that case, Conservation Groups would ask that NMFS be held to the December 2024 timeline it put forth when opposing lifting the stay. Insofar as NMFS responds that it cannot meet that timeline or that it should not have a deadline at all, that only weighs further against remanding without vacatur and allowing

interim harm to continue indefinitely. If the Court partially vacates the ITS, Conservation Groups

recognize that the agencies' workloads would increase with project-specific review, but also that

those reviews would provide interim protective measures for species. While some deadline is

still needed in that situation to prevent a yearslong delay, the need would not be as pressing, so a

2025 deadline could be appropriate. In either case, Conservation Groups request that the Court

retain jurisdiction until NMFS completes any remand and order the agency to submit status

updates every three months on whether the timeline for completing the BiOp remains on

schedule. *See Cobell v. Norton*, 240 F.3d 1081, 1109 (D.C. Cir. 2001) ("[F]ederal courts

regularly retain jurisdiction until a federal agency has complied with its legal obligations, and

have the authority to compel regular progress reports in the meantime.").

## VI.    Conservation Groups Have Standing to Challenge a BiOp Covering Activities the BiOp Concludes Will Kill and Harm Rice's Whales, Which the Groups' Members Seek to View in Their Habitat.

One Intervenor raises a one-paragraph argument against one element (injury) of

Conservation Groups' standing to raise one claim. *See* API Mem. 2–3 (referring to "claims

regarding the Rice's whale"); Supp. Compl. ¶¶ 157–63, ECF No. 65-2 (second cause of action

challenging RPAs for the Rice's whale).[22] API's argument that Conservation Groups did not

identify an injury relies on a misreading of the law and of the record on standing. Conservation

Groups have shown that the BiOp's insufficient protections for all imperiled Gulf species,

including the Rice's whale, injures them. *See* ECF No. 121, at 24–28 (responding to API's

earlier standing argument).[23]

---

[22] "[S]tanding is assessed based on the claims asserted and the type of injury alleged not argument-by-argument." *Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893, 910 (9th Cir. 2020) (citations omitted).

[23] Conservation Groups submitted declarations with their May 27, 2022 summary judgment motion that established standing. *See* ECF Nos. 93-5 to 93-11. More than a year and nine months

API's suggestion, API Mem. 3, that interests in observing the Rice's whale do not support standing is wrong. A "desire to . . . observe" the Rice's whale "even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562–563 (1992); *see also Hill v. Coggins*, 867 F.3d 499, 505 (4th Cir. 2017) ("Courts frequently treat an aesthetic interest in the observation of animals as a legally protected interest."). The Groups explained that their members seek to observe and preserve the species at issue in this case, including the Rice's whale. *See, e.g.*, Manuel Decl., ECF No. 93-5 ¶ 6 (Sierra Club); Templeton Decl., ECF No. 93-6 ¶¶ 3–4 (Friends of the Earth); Steinhaus Decl. ¶ 5, ECF No. 93-7 (Turtle Island Restoration Network).

API's further suggestion, API Mem. 3, that no member with such an interest has been identified is also wrong. Rice's whales are in "the area comprising the entire northern Gulf of Mexico Outer Continental Shelf (OCS) between the 100- and 400-m isobaths." ECF No. 147-1. BOEM has mapped this area. *Id.* at 4, displayed as Figure 1 below.

//

//

//

//

//

//

//

//

---

have passed, so the groups have submitted updated declarations. *Cf. Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 685 (D.C. Cir. 2004) (accepting declarations attached to a reply brief where the declarations made standing obvious and no party was prejudiced).



**Figure 1 – Rice's whale areas map from ECF No. 147-1, at 4**

Mr. Wiygul, a Sierra Club member, specifically explained that observing a Rice's whale "is a goal of" his. Wiygul Decl. ¶ 17, ECF. No. 93-10. To further that goal, he has "been going to the federal OCS in the Gulf of Mexico to fish whenever [he] can," averaging a trip to that area once a year. *Id.* ¶ 8. The "core area"—that is, the area the BiOp at issue in this case says the whales are *most* likely to be found—is "directly adjacent to the areas" he uses for fishing; though because whales persistently occur in the Gulf of Mexico outside of those areas—as shown in the map above—he reasonably has "hope that [he] will see one" on one of his trips. *Id.* ¶¶ 16, 17. For Mr. Wiygul, the chance to see this whale is one "incentive" for him to take these trips, and on each of them, he will "spend at least some time looking for them." 2d Wiygul Decl. ¶ 10, attached hereto. For example, in July 2023, he "ran approximately 90 miles south of the Mississippi Coast including out to Viosca Knoll block 824, in about 2,000 feet of water,

traversing that band of the shelf break where Rice's whales can be seen." *Id.* He is "currently trying to schedule at least one OCS trip for this year," though the exact timing of the trip will depend on weather conditions. *Id.* ¶ 11.

Mr. Schmahl, a member of Turtle Island Restoration Network, regularly visits the Flower Garden Banks National Marine Sanctuary—where he formerly served as the Superintendent— and his enjoyment of the area "depends on a heathy and vibrant Gulf . . . , including the most vulnerable species like the Rice's whales and sea turtles." Schmahl Decl. ¶ 7, attached hereto. "About two-thirds of the 17 units in the Sanctuary include waters that are either partially or wholly within the 100-400 meter isobath region" (i.e., within the whale's habitat). *Id.* ¶ 8. "[L]ooking for these whales whenever" he is "in their habitat in the vicinity of Flower Garden Banks NMS is integral to [his] enjoyment of being on the water." *Id.*[24]

API's further suggestion that Conservation Groups have not shown that the inadequate RPA threatens these interests is also wrong. API Mem. 3. The crux of the second cause of action is that NMFS failed to ensure that the challenged action—a programmatic BiOp that covers all oil and gas development and leasing in the Gulf of Mexico—would "avoid jeopardy and adverse modification of critical habitat" for the Rice's whale. Supp. Compl. ¶ 158. As this Court recognized, if the Groups' claims are correct—as must be assumed when assessing standing— "then presumably permitting that harm" injures Conservation Groups. Stay Op. 22; *see Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) ("[E]nvironmental

---

[24] That these members have not yet seen a Rice's whale does not diminish their interests for standing purposes. *See, e.g.*, *CBD v. EPA*, 861 F.3d at 183 (finding an injury where members had not yet seen a species but made trips to do so and would "continue [the] trips in the 'hope'" of seeing the species); *Wishtoyo Found. v. United Water Conservation Dist.*, CV 16-3869-DOC (PLAx), 2017 WL 6940510, at *18 (C.D. Cal. Dec. 1, 2017) ("[S]everal district courts have rejected the argument that proof of having seen an endangered species is a requirement for injury in fact.").

plaintiffs adequately allege injury in fact when they aver that they use the affected area and are

persons 'for whom the aesthetic and recreational values of the area will be lessened' by the

challenged activity." (citation omitted)).

Both common sense and the record back up that conclusion. The BiOp covers a

significant amount of activities that are either within or affect the Rice's whale habitat (*e.g.*, via

vessel traffic): "2,187 active leases, 1,432 platforms, 7,710 wells, and 3,956 pipelines in the

GOM OCS"; "BOEM approvals for plans and permits . . . totaled 236 for 2020, 223 for 2021,

177 for 2022, and 189 for 2023"; and "BSEE approves over 5,000 permits for wells, pipelines,

and facilities per year." 2d Cruickshank Decl. ¶ 7 (reporting figures as of January 31, 2024); *see*

*also* ECF No. 147-1, at 3 (BOEM's Notice to Lessees recommending additional protective

measures that apply "when transiting or performing operations in and near the Expanded Rice's

Whale Area"). The Groups outlined the ways the deficient BiOp leaves the Rice's whale subject

to multiple harms from these activities including marine debris, oil spills and dispersants, seismic

survey noise, vessel noise, and vessel strikes. *See, e.g.*, ECF No. 93-3, at 21–22, 35–36. NMFS

itself acknowledges this serious harm to the estimated 44 Rice's whales—12 deaths and 4 serious

injuries from vessel strikes alone even after implementation of the RPA. *See* p. 33, *supra*. These

threats harm members' interests in the Rice's whale by reducing the whale population and by

delaying or preventing the population's recovery. *See* ECF No. 93-3, at 35–38. Because the RPA

does not sufficiently prevent that harm to the Rice's whale, it makes it less likely that Mr.

Wiygul, Mr. Schmahl, and other members like them will see the Rice's whale and thus injures

their interests and provides standing. *See, e.g.*, *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478

U.S. 221, 230 n.4 (1986) (stating plaintiffs "undoubtedly have alleged a sufficient 'injury in fact'

in that the whale watching and studying of their members will be adversely affected by

continued whale harvesting"); *Oceana, Inc. v. Pritzker*, 125 F. Supp. 3d 232, 241 (D.D.C. 2015) (finding standing where the plaintiffs claimed a "BiOp permits an unlawfully excessive amount of harm to loggerheads, which threatens their enjoyment and study of those animals").

API's reliance, API Mem. at 3, on *Louisiana v. Haaland*, 86 F.4th 663 (5th Cir. 2023), is misplaced because the asserted injuries, challenged agency action, and standing record in this case are quite different. The court there appeared to conclude that the record before it did not show that the asserted injury, which the court summarized as "the death of at least one Rice's whale," was sufficiently likely to occur because of the specific, singular lease sale at issue in that case. *See id.* at 666–667. Here, the scope of the agency action is broader: the BiOp here encompasses *all* oil and gas exploration, development, and leasing activities in the Gulf of Mexico, covering the Rice's whale's entire habitat over the next 50 years. The scope of the injury is broader: the harm to members' interests in the Rice's whale when the BiOp fails to prevent or minimize take and fails to ensure against jeopardy to the species' survival—through deaths or harm that results in reproductive failure—or to recovery through stressors that prevent population growth. And the likelihood of that injury cannot be denied: NMFS itself acknowledges that its RPA will result in 12 deaths and 4 serious injuries from vessel strikes alone to a species that is already on the brink, *see* p. 33, *supra*, while Interior continues to approve hundreds of new activities and permit drilling of thousands of new wells under the umbrella of an illegal BiOp in the Gulf each year. Decl. of Walter D. Cruickshank ¶ 7, ECF No. 175-4. Conservation Groups identified multiple other stressors that routinely harm the Rice's whale population that the RPA declined to assess or address, showing that the impact on the species will be even higher. *See* ECF No. 93-3, at 35–36. The *Louisiana* court's conclusions grounded in the specific claim, specific injury, and specific record before it in that case do not

bear on Conservation Groups' standing to raise the second cause of action in the case before this Court.

## CONCLUSION

While NMFS repeatedly invokes deferential review, a court still "must conduct a searching and careful review to determine whether the agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Appalachian Voices*, 25 F.4th at 269 (cleaned up). The BiOp violates several of the ESA's requirements, uses arbitrary and plainly incorrect assumptions, and fails to consider relevant factors in multiple places. Any one of these errors makes the BiOp unlawful. They add up to a BiOp that fails to ensure that the Gulf's most imperiled species can persist or recover in the face of widespread, intensive oil and gas activity; a BiOp that lacks urgently needed mitigation measures for Rice's whales, sea turtles, and other species. Conservation Groups are entitled to summary judgment in their favor and partial vacatur of the ITS to prevent continued, harmful authorization of oil and gas activity in reliance on a fatally flawed BiOp.

Respectfully submitted this 15th day of March, 2024.

*/s/ Christopher D. Eaton*
Christopher D. Eaton (D. Md. Bar 21544)
Stephen D. Mashuda (*pro hac vice*)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 Telephone
415-217-2040 Fax
ceaton@earthjustice.org
smashuda@earthjustice.org

Susan Stevens Miller (D. Md. Bar 6100)
EARTHJUSTICE
1625 Massachusetts Ave., NW, Ste. 702
Washington, DC 20036

202-667-4500 Telephone
202-667-2356 Fax
smiller@earthjustice.org

*Attorneys for Plaintiffs Sierra Club, Center for Biological Diversity, Friends of the Earth, and Turtle Island Restoration Network*