TODD KIM, Assistant Attorney General
S. JAY GOVINDAN, Section Chief
BRIDGET K. McNEIL, Assistant Section Chief
DAVIS A. BACKER, Trial Attorney (CO Bar No. 53502)
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, South Terrace – Suite 370, Denver, CO 80202
Tel: (202) 514-5243
Fax: (202) 305-0275
Email: davis.backer@usdoj.gov

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| SIERRA CLUB, et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | |
| NATIONAL MARINE FISHERIES SERVICE, et al., | * | |
| | * | No. 8:20-cv-03060-DLB |
| Defendants, | * | |
| | * | |
| and | * | |
| | * | |
| AMERICAN PETROLEUM INSTITUTE, et al., | * | |
| | * | |
| | * | |
| Defendant-Intervenors. | * | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION TO ALTER OR AMEND THE COURT'S JUDGMENT**

Defendants National Marine Fisheries Service and Janet Coit, in her official capacity as Assistant Administrator for NOAA Fisheries (collectively, "NMFS"), respectfully submit this memorandum in support of their motion to alter or amend the Court's August 19, 2024 judgment (ECF No. 204, hereinafter "Order") under Federal Rule of Civil Procedure 59(e).

## INTRODUCTION

Since this Court's August 19, 2024 order and judgment, NMFS has thoroughly evaluated the available options to produce a comprehensive new biological opinion ("BiOp") that complies with the Court's remand order as well as addresses the full suite of issues and information that need to be addressed in the ongoing reinitiated consultation. At bottom, as explained in the Declaration of the NOAA Deputy Assistant Administrator for Regulatory Programs, it is not possible to complete the full scope of this work by the December 20, 2024 vacatur deadline set in the Court's Order. Fifth Declaration of Samuel D. Rauch ("5th Rauch Decl.") ¶ 8. Vacatur of the 2020 BiOp and incidental take statement without a replacement in place will have sweeping effects. The 2020 BiOp provides essential Endangered Species Act ("ESA") coverage to oil and gas operators across the Gulf of Mexico engaging in activities from exploration through development, production, and decommissioning. In the event of any lapse in this mission-critical coverage owing to the vacatur of the 2020 BiOp prior to completion of a new BiOp, the interruption to these services would be dramatic and simultaneously undermine conservation measures for listed species and their habitat across the Gulf of Mexico.

For these reasons, and those explained below, Defendants respectfully request the Court to prevent a gap in ESA coverage by amending its judgment and further delaying its vacatur order until May 21, 2025, to allow NMFS the time to complete the ongoing reinitiated consultation, which will culminate in a new BiOp addressing all issues as directed by the Court's August 2024 Order. If this request is granted, NMFS will provide status updates to the Court regarding progress every 60 days beginning on December 15, 2024. 5th Rauch Decl. ¶ 13.

## STANDARD OF REVIEW

Although the Federal Rules of Civil Procedure do not specify a standard for granting a motion filed under Rule 59(e), the Fourth Circuit has "recognized that there are three grounds for

2

amending an earlier judgment: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998); *see also Zinkand v. Brown*, 478 F.3d 634, 637 (4th Cir. 2007); *Ingle ex rel. Est. of Ingle v. Yelton*, 439 F.3d 191, 197 (4th Cir. 2006).

## ARGUMENT

Under Rule 59(e), Defendants respectfully move the Court to alter or amend its judgment to consider new evidence about NMFS' timeline to issue a comprehensive new biological opinion and to "prevent manifest injustice." *Pac. Ins. Co.*, 148 F.3d at 403. This new information includes NMFS' assessment of its ability to produce a new biological opinion in light of what of needs to be done under the Court's opinion in the context of its current resources. It also provides the Court with an updated assessment of the severe consequences that will follow from the vacatur of the biological opinion until a replacement biological opinion can issue. This would include the elimination of ESA coverage leading to severe interruption to federally regulated oil and gas program activities across the Gulf of Mexico and disruption to protections afforded the species at the heart of Plaintiffs' concerns. However, this result can be avoided by an extension to defer the vacatur[1] deadline until May 21, 2025.

---

[1] Although beyond the scope of this Rule 59 motion, NMFS does not concede that vacatur of the 2020 BiOp and Incidental Take Statement is an appropriate remedy here and reserves the right to appeal on this issue and all others. NMFS disagrees that the Fourth Circuit cases evaluated by the Court uniformly require the vacatur of invalidated biological opinions, even if that may have been the fact-specific result in those cases. And such a rule would be at odds with the numerous other circuits that have found that, even if vacatur is the presumptive remedy under the Administrative Procedure Act, "it is not the only permissible remedy." *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1048 (10th Cir. 2023); *see also Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146 (D.C. Cir. 1993); *Cent. Me. Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001); *Cent. & Sw. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000); *Sierra Club v. EPA*, 60 F.4th 1008, 1022 (6th Cir. 2023); *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015); *Nat'l Org. of Veterans'*

I.  **The Court Should Further Defer Vacatur of the 2020 Biological Opinion to Afford NMFS the Time Required to Produce a New Comprehensive Biological Opinion that Addresses the Court's Remand Order, and to Avoid Severe Disruptive Consequences.**

  A.  **NMFS Requires Until May 21, 2025, to Issue a Comprehensive New BiOp that Addresses All Issues as Directed by the Court's Order.**

This Court has recognized its authority to account for equitable considerations in selecting an appropriate date for vacatur. Information that was not available to Defendants in earlier briefing before this Court's decision weighs strongly in favor of deferring the vacatur date until May 21, 2025. To be sure, Defendants' summary judgment briefing addressed what the appropriate remedy should be in the event the Court found any part of the 2020 BiOp legally or scientifically deficient.[2] *See, e.g.*, ECF Nos. 175-1 at 53-62; 191 at 33-42. The discussion at the time, however, could not account for any eventual holding of the Court.

At the time of the Court's summary judgment decision, NMFS' most recent projection for when it could complete the reinitiated consultation was "late winter or early spring 2025." Fourth Declaration of Samuel D. Rauch, ECF No. 175-3 ¶ 10. NMFS also expressly noted that the timing of a final BiOp "depend[ed] on the impact of this Court proceeding and on whether the [2020 BiOp] is vacated." *Id.* The Court's summary judgment order did not adopt NMFS' then-projected timeline, but instead declared that the BiOp would be vacated on December 20, 2024. In reaching its conclusion, the Court acknowledged that "immediate vacatur appears likely to disrupt oil and gas activity in the Gulf without necessarily mitigating the dangers to listed species," that "[v]acating the BiOp months before a replacement is ready 'could delay or inhibit

---

*Advocs., Inc. v. Veterans Affairs*, 260 F.3d 1365, 1380 (Fed. Cir. 2001). The same is true in ESA cases, as the Ninth Circuit recently reaffirmed. *Wild Fish Conservancy v. Quan*, No. 23-35322, 2024 WL 3842101, at *2 (9th Cir. Aug. 16, 2024) (finding that the district court erred in vacating a biological opinion's incidental take statement, especially in "overlooking the severe disruptive consequences of vacatur").

[2] Still, given the highly technical nature of the relevant issues, and the far-reaching consequences of any vacatur, NMFS requested the opportunity to file supplemental briefing on remedy, which the Court denied. ECF No. 175-1 at 53 n.16.

4

many oil and gas industry activities in the [Gulf] because companies that continue operations without an ESA exemption would risk violation of Section 9 of the ESA,'" and that "[i]mmediate vacatur likely also would disrupt efforts to keep workers safe and prevent serious accidents." Order at 81. The Court further recognized that it was for such reasons that courts facing similar complex circumstances have left biological opinions found to be arbitrary in place until the new consultation could be completed.[3] *Id*. at 82.

The Court nonetheless vacated the biological opinion effective December 20, 2024. However, the Court did not find that December 20, 2024, would allow NMFS sufficient time to complete a new biological opinion, instead finding only that "deferring vacatur of the BiOp until [December 20, 2024] strikes the appropriate balance between the importance of getting this unlawful agency action off the books and the public interest in a predictable, managed transition to a new biological opinion." Order at 83. Respectfully, the Court's balancing does not appear to have taken into account the feasibility of NMFS issuing a new biological opinion by December 2024. And, as detailed herein and in the supporting declarations, NMFS cannot complete the new

---

[3] Given the unique challenges posed by vacatur of biological opinions governing analogously complicated operations of federal water projects, courts have found remand without vacatur to be the appropriate course of action. *See, e.g.*, *Pac. Coast Fed'n of Fishermen's Ass'ns v. Raimondo*, ("*PCFFA*") No. 1:20-cv-00431-DAD-EPG, 2022 WL 789122, at *16 (E.D. Cal. Mar. 11, 2022) (remanding BiOps without vacatur because "[v]acating the highly complex regulatory regime that has been in place for the past few years would be enormously disruptive" and also finding "disruption to be the dispositive factor"); *Nat. Res. Def. Council v. Kempthorne*, No. 1:05-cv-1207 OWW GSA, 2007 WL 4462391, at *1 (E.D. Cal. Dec. 14, 2007) (remanding 2005 Central Valley Project biological opinion without vacatur due to potential draconian consequences); *Nat'l Wildlife Fed'n v. NMFS*, 184 F. Supp. 3d 861, 949 (D. Or. 2016) (declining to vacate biological opinion covering the Federal Columbia River Power System ("FCRPS") of dams and reservoirs because, among other things, vacatur could cause FCRPS operations to cease). While these cases involved courts remanding biological opinions *without vacatur* to afford agencies sufficient time to complete a new consultation on remand and to avoid highly disruptive consequences, it is all the clearer that the Court can further delay vacatur to allow the agency time to undertake necessary work and avoid disruptive consequences.

BiOp by that date. NMFS understands that the Court found the flaws in the biological opinion to be consequential. But that only underscores the magnitude of the work that needs to be done. The logistical challenges and limits on resources available to do the work (even with efforts to find and move resources around) prevent a new biological opinion that responds to the remand order being done on the timeline envisioned by the Court.[4] Accordingly, NMFS asks the Court to reconsider its decision on timing of vacatur to take into account NMFS' assessment of the work remaining, and available resources needed to complete the work.

      NMFS has reviewed the Court's summary judgment order and opinion and has thoroughly evaluated the available options to issue a new biological opinion that will address all issues as directed by the Court's remand order issues. As stated in the Fifth Rauch Declaration, the Court's opinion requires the agency to modify ongoing analyses already begun or develop supplemental analyses; for example, the new BiOp must address the discrete acute effects of very large oil spills and ensure that the vessel strike surrogate incorporates sufficient spatial information in the manner required by the court. 5th Rauch Decl. ¶ 8. NMFS must now both complete its ongoing work on the reinitiated consultation, and supplement, modify, or add new analyses to comply with the Court's opinion. This effort will take time unaccounted for in the previous representations to the Court. Despite NMFS's best efforts, it is simply not possible to issue a new BiOp that concludes its ongoing reinitiation work, which was projected for late winter or early spring, addresses the Court's opinion, and is legally and scientifically defensible

---

[4] The Court suggested that, in the event NMFS could not complete a new biological opinion by December 20, 2024, it will have months to prepare for the transition. Order at 83. However, as the Court acknowledged, there is no readily workable transition. *Id*. at 81, 82 (acknowledging that trying to replace the BiOp with a system of individual consultations would be unworkable and would set back NMFS' work on completing a full biological opinion).

by the December 20, 2024 vacatur deadline set in the Court's Order.[5] NMFS now estimates that it will need until May 21, 2025, to issue a comprehensive new BiOp that is responsive to the full complement of issues that have been raised throughout the course of this litigation. *Id.* ¶ 9.

To that end, NMFS has already made good progress on key elements of the new BiOp. Since receipt of the December 2023 supplemental biological assessment from the Bureau of Ocean Energy Management ("BOEM") and the Bureau of Safety and Environmental Enforcement ("BSEE") (collectively "the Bureaus"), NMFS has drafted new BiOp sections with descriptions of the action, the status of the species, and the environmental baseline, and undertaken its quality assurance and control processes for these sections. *Id.* ¶ 7. NMFS has also generated significant portions of the effects analyses for noise impacts (pile driving, seismic surveys, explosive severance of structures, and vessel operations) and vessel strike. *Id*. And, significantly, it has studied and evaluated the effects of the proposed action with regard to oil spill risk, which it will later incorporate into its own assessment independent of the Bureaus' analysis. *Id.* ¶ 6.

NMFS has also identified additional qualified staff who are able to help and have reassigned them to meet this deadline. *Id.* ¶ 12. But substantial work remains on the BiOp, including completion and review of the best available science to inform these effects analyses. *Id*. ¶¶ 6-8. NMFS must then consider the updated status of the species, environmental baselines, and effects analyses in order to draw jeopardy and adverse modification determinations for all

---

[5] NMFS has considered what it can issue by December 20, 2024, in the form of a revised BiOp. 5th Rauch Decl. ¶ 14. If issued by then, any such document would address only the specific deficiencies identified in the Court's opinion, including the need for improvements to the measures protecting the Rice's whale. *Id*. The agency would, in that case, base the revised BiOp on the same administrative record supporting the 2020 biological opinion. *Id*. NMFS acknowledges, however, that, in the event it issues such a revised BiOp, that will impact the agency's schedule for completion of the full, comprehensive reinitiated BiOp, which it estimates could be issued by December 1, 2025. *Id*. ¶ 15.

7

species and their designated critical habitat. *Id*. Finally, NMFS must then determine whether it will develop new or revised conservation measures and reasonable and prudent alternatives and whether it must develop a new incidental take statement. *Id*. ¶¶ 7, 9. These processes will involve substantial collaboration with the four action agencies involved in the consultation: BOEM, BSEE, the U.S. Environmental Protection Agency, and the NMFS Office of Protected Resources, Permits and Conservation Division. *Id*. As part of this collaboration, NMFS estimates that it will provide a draft reinitiated BiOp to BOEM and BSEE by March 31, 2025. *Id.* ¶ 9. NMFS considers this coordination essential to ensure that selected conservation measures are feasible and effective. *Id.* ¶ 11. But above and beyond these tasks, NMFS must now ensure that any new BiOp is fully responsive to the Court's remand order. This additional work has meant a revision to NMFS' previous estimate of completing the consultation process by late winter or early spring 2025. *Id*. ¶¶ 8-9.

      **B.**      **Any Gap in ESA Section 7 Coverage Owing to the December 20, 2024 Vacatur Deadline will be Enormously Disruptive—for Regulated Parties, Regulating Agencies, and Listed Species Alike.**

As detailed at summary judgment, and further detailed below, vacating the 2020 BiOp before a new BiOp is in place will have highly disruptive and significant consequences. As discussed below, there will be widespread economic impacts. But the consequences will not just be economic: vacatur by December 20, 2024, could serve to undermine the important conservation measures for the ESA-protected species and their habitat that are required under the 2020 BiOp. 5th Rauch Decl. ¶ 3; Fourth Declaration of Walter D. Cruickshank ("4th Cruickshank Decl.") ¶¶ 5, 7. While in the course of its reinitiated consultation, NMFS anticipates that it may further build on the suite of protective measures already in place, 5th Rauch Decl. ¶¶ 9-10, an order mandating vacatur before NMFS can complete a comprehensive new BiOp serves no one if the result is the elimination of any ESA safeguards regulating those oil and gas related

activities across the Gulf that continue despite the vacatur. Additionally, as detailed below, a gap in ESA coverage would significantly impact the ability of BSEE to act on permit actions necessary to ensure operational safety and protect the environment.

The Court has recognized that vacating the 2020 BiOp before a new BiOp is in place will have widespread economic impacts. Order at 81-82; *Sierra Club v. NMFS*, No. 20-cv-3060-PX, 2021 WL 4704842, at *6 (D. Md. May 24, 2021) (denying transfer, in part, since "[i]t is no understatement … that the impact of Plaintiffs' requested relief—to vacate the 2020 biological opinion as arbitrary and capricious—stretches far beyond the local economic interests" in the Gulf of Mexico region). As recognized in the Court's Order vacating the 2020 BiOp effective December 20, 2024, the reality is that the 2020 BiOp is sweeping in scope—encompassing virtually all federally regulated oil and gas activities across the Gulf of Mexico—and that these activities provide significant quantities of oil and gas that are processed into gasoline, aviation, diesel fuel, and other petrochemicals for domestic use and export. Order at 81; *see also* AR 67341 (stating that the "western and central portions of the northern Gulf of Mexico … make up one of the world's major oil- and gas-producing areas and have been a steady and reliable source of crude oil and natural gas for more than 50 years"). These activities "contribute[] to meeting domestic demand and [also] enhance[] national economic security." AR 53378. The full universe of oil and gas operations that span the Gulf of Mexico is a dynamic and highly complex environment that supplies critical services to meet essential needs of this country. Those operations cannot simply be suspended or put on hold. [6]

---

[6] If the 2020 BiOp is vacated on December 20, 2024, without a new biological opinion in place and operations needed to cease due to a lack of incidental take coverage, ongoing activities will have increased risks, should operators not be able to bring their work to a 'safe state.' Declaration of Bryan Domangue ("Domangue Decl.") ¶ 17. Even then, to bring all ongoing activities to a safe state, BSEE would need to immediately to begin processing an overwhelming

Since the Court issued its Order, both NMFS and the Bureaus have worked hard to evaluate the likelihood and extent of these disruptive consequences, compiling additional detail over what was provided during summary judgment briefing. For instance, while the Bureaus previously provided high-level estimates of the number of plans and permits they issue on an annual basis, *see, e.g.*, ECF Nos. 175-4 ¶ 7; 191-2 ¶¶ 8-9, they can now project what the specific backlog and direct impacts will look like in the period beginning December 20, 2024, and ending May 21, 2025.

As of the date of this filing, there are over 1,390 facilities, 7,534 active wells, and 19,157 miles of active pipeline located on the Gulf of Mexico Outer Continental Shelf. Domangue Decl. ¶ 11. Since NMFS issued the 2020 BiOp, BSEE has, on annual average, approved 757 applications for permits to drill ("APD"), 3,668 applications for permits to modify ("APM"), 913 pipeline modification, repair, and decommissioning permits, 116 structure permits (including approximately 100 for platform removal), and 375 facility safety system permits, for a total of 5,829 annual permits. *Id*. BSEE anticipates receiving a similar number of permit applications for calendar year 2025, *id.*, which means potential direct impacts to activities related to approximately 2,430 permits during the period between December 20, 2024, and May 21, 2025.

Delays in issuing or otherwise responding to these permit applications brings significant risk to operational safety and the environment. For instance, APMs are frequently required to remediate casing pressure concerns which, if left unmitigated, can result in blowouts; APMs are also necessary to safely complete and abandon wells. *Id.* ¶ 7. Timely decommissioning of wells is a high priority and delays in BSEE's ability to approve APMs for well decommissioning activities will compromise BSEE's ability to ensure safety and protect the environment. *Id.*

---

number of permits that would be required to bring ongoing operations into a safe shut-in state. *Id.*

Pipeline permits are necessary to maintain the safe operation of pipelines that transport hydrocarbons and other hydrostatic fluids. *Id.* ¶ 8. For example, damaged pressure sensors can lead to delays in leak response and, without a pipeline repair permit, delays to necessary repairs will exacerbate those risks. *Id.* And delays to installation of new pipelines may lead to the use of alternate transportation, like barges, that can present greater risks of environmental impacts. *Id.* APDs cover, among other things, relief wells, which serve to target production wells that have lost well control, allowing drilling mud and cement to be poured into the target well to regain control. *Id.* ¶ 6. Any delay in BSEE's ability to approve an APD for relief wells or related permits for activities necessary to maintain well control could dangerously compromise BSEE's oversight of operational safety and environmental safeguards across the Gulf. *Id.* But importantly, BSEE's portfolio also includes enforcement of regulations that protect worker safety and the environment. These enforcement actions require operators to take corrective action in response to a violation. *Id.* ¶ 12. Those corrective measures can include the need to repair leaking wellheads, recomplete wells, or repair subsea blowout preventers, among other things. *Id.* Under those circumstances, operators are still required to submit and receive approval for the necessary plans and associated permits to conduct those corrective actions. *Id.*

Turning to BSEE's sister agency, BOEM, reveals additional impacts of a gap in ESA coverage. As of August 27, 2024, there were 2,304 active leases on the Gulf of Mexico Outer Continental Shelf. 4th Cruickshank Decl. ¶ 3. On average per month, BOEM approves 16 plans and permits, including Exploration Plans ("EPs"), Development Operations Coordination Documents ("DOCDs"), and geological and geophysical permits. *Id.* Extrapolating those numbers, BOEM can conservatively anticipate a backlog of at least 80 similar plans and permits during the period of vacatur. But, of the 2,304 active leases, 1,465 leaseholders have yet to submit any plan requests. *Id.* Therefore, it is likely that BOEM could receive significantly more

11

plan approval requests than are projected here. *Id.*[7] The five-month period between December 20, 2024, and May 21, 2025, thus potentially puts BOEM in a position of either violating the ESA by approving EPs and DOCDs without any programmatic ESA Section 7 coverage or exceeding the timelines mandated by OCSLA and its implementing regulations for failing to timely approve EPs and DOCDs until it again has programmatic ESA Section 7 coverage. *Id*. ¶ 4. And, even if BOEM had the resources to engage in individual ESA Section 7 consultations on each of these anticipated plans, NMFS has explained that its staff will be fully occupied responding to the Court's Order and addressing the flaws identified in the 2020 BiOp during this period. *Id*. ¶ 3; 5th Rauch Decl. ¶ 14.

Beyond these anticipated planning activities, the Court's Order further casts doubt on how *existing* approved plans and permitted activities would viably proceed past December 20, 2024, if the current BiOp is vacated on that date. Of the 2,304 active leases in the Gulf, 183 have active DOCDs, 143 have active EPs, and 513 have both active DOCDs and EPs.[8] 4th Cruikshank Decl. ¶ 5. It is unclear how, or if, previously authorized activities could be affected by the vacatur, raising complicated questions for the Bureaus and industry operators alike. For instance, it is unclear whether BOEM could allow these previously authorized activities to continue under the conditions of approval corresponding to the requirements of the 2020 BiOp or whether, instead, BOEM should plan to revoke or suspend activities under previously approved plans and

---

[7] The potential for this backlog places BOEM in an impossible position of deciding how to comply with its obligations under both the ESA and the Outer Continental Shelf Lands Act ("OCSLA"). OCSLA, and BOEM's own regulations, require it to take final action on EPs within 30 days once submitted to the agency. 43 U.S.C. § 1340(c)(1); 30 C.F.R. § 550.233(a); see also 4th Cruickshank Decl. ¶ 4. Similarly, OCSLA's implementing regulations require that BOEM take final action on DOCDs within 60 days once submitted to the agency. 30 C.F.R. § 550.270(a).

[8] There are a further 19 active geological and geophysical survey permits with ongoing activities, and six pending permits that may well be authorized before December 20, 2024. 4th Cruickshank Decl. ¶ 5.

...
...
...

permits. If the latter, BOEM would need to dedicate considerable resources identifying those plans and permits issued under the 2020 BiOp with the potential to take ESA listed species. *Id*. ¶ 6. Revoking or suspending plans and permits would affect a significant amount of oil and gas industry activity, including, potentially, surveys necessary to ensure safe operations and installation of facilities, and such decisions could be challenged by the affected permittees and plan holders. *Id.* Such reviews will divert BOEM staff from performing their already demanding duties in managing the complex oil and gas activities in the Gulf. *Id.*

With respect, there is no good cause for a gap in coverage. Vacatur of the 2020 BiOp effective December 20, 2024, will eliminate ESA Section 7 incidental take coverage for thousands of ongoing and anticipated activities across the Gulf of Mexico even though a new BiOp can go into effect in a relatively short time: just over five months later. The unmitigated result is a significant risk that both the supply of vital domestic energy production and critical safety and environmental protection measures will be interrupted, to say nothing of the negative downstream effects to listed species and their habitat. The 2020 BiOp—sweeping in both scope and detail—must be allowed to remain in place during the pendency of the reinitiated consultation. It allows critical and timely action to maintain safety and protection of the Gulf environment, preserves the myriad conservation measures designed to protect listed species, and provides crucial regulatory certainty to the thousands of existing leaseholders across the Gulf. The Court should extend the date of vacatur to May 21, 2025. The alternative—allowing the Court's December 20, 2024 vacatur order to stand—will sow untold and unwarranted uncertainty into an already complex and dynamic regulatory environment. *Cf. PCFFA*, 2022 WL 789122, at *16 (remanding BiOps without vacatur because "[v]acating the highly complex regulatory regime that has been in place for the past few years would be enormously disruptive").

## CONCLUSION

NMFS takes seriously its statutory obligation to, in consultation with the Bureaus, ensure that federally regulated oil and gas program activities do not jeopardize listed species or risk adverse modification to designated critical habitat. To that end, NMFS has been working diligently to address the full extent of the issues raised in the Court's opinion. With the Court's recent Order further clarifying the scope of the ongoing reinitiated consultation, NMFS now anticipates that it will need until May 21, 2025, to issue a new biological opinion that fully responds to the Court and is both legally and scientifically defensible. The Court's Order, however—vacating the 2020 BiOp effective December 20, 2024—creates a scenario where the Bureaus and industry operators alike will be left without any ESA Section 7 coverage for ongoing activities across the Gulf. The consequences of this outcome will be extensive with attendant risk to both economic interests as well as environmental safeguards. Accordingly, to avoid any manifest injustice, NMFS respectfully requests that the Court alter or amend its judgment and further defer its vacatur order until May 21, 2025, to allow NMFS the necessary time to complete the ongoing reinitiated consultation and issue a new biological opinion addressing the full suite of issues identified by both Plaintiffs and the Court.

Dated: September 16, 2024

                                          Respectfully submitted,

                                          TODD KIM, Assistant Attorney General
                                          S. JAY GOVINDAN, Section Chief
                                          BRIDGET K. McNEIL, Assistant Section Chief

                                          */s/ Davis A. Backer*
                                          DAVIS A. BACKER, Trial Attorney
                                          United States Department of Justice
                                          Environment & Natural Resources Division
                                          Wildlife & Marine Resources Section
                                          999 18th Street, South Terrace, Suite 370

Denver, Colorado 80202
Tel: (303) 844-1898
Fax: (202) 305-0275
Email: davis.backer@usdoj.gov

*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

     I hereby certify that, on September 16, 2024, I electronically filed the foregoing brief, along with the motion, the proposed order, and supporting declarations, with the Clerk of the Court using the CM/ECF system, which will send notification of such to the attorneys of record.

                */s/ Davis A. Backer*
                DAVIS A. BACKER
                *Attorney for Defendants*