**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

SIERRA CLUB, *et al.*,

*Plaintiffs*,

v.

NATIONAL MARINE FISHERIES SERVICE, *et al.*,

*Defendants*,

and

AMERICAN PETROLEUM INSTITUTE, *et al.*,

*Intervenors-Defendants.*

No. 8:20-cv-03060-DLB

Hon. Deborah L. Boardman

**INTERVENORS-DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR EMERGENCY MOTION TO ALTER OR AMEND THE JUDGMENT OR, IN THE ALTERNATIVE, FOR A STAY PENDING APPEAL, AND FOR EXPEDITED RULING**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

ARGUMENT ........ 3

I. The Court Should Delay Vacatur Until At Least May 21, 2025 ........ 3

A. Vacatur will seriously disrupt all aspects of oil-and-gas operations across the entire Gulf of Mexico ........ 4

B. Vacatur will prevent activities designed to ensure safety and prevent accidents, impair emergency response to serious problems like well-control incidents and spills, and delay decommissioning ........ 9

C. Vacatur will force Gulf operators to risk substantial ESA liability to comply with other mandatory obligations ........ 11

D. Vacatur will imperil contracts, risk thousands of jobs, and threaten billions of dollars in losses—economic devastation that will be felt nationally ........ 13

II. Alternatively, The Court Should Grant A Stay Pending Appeal ........ 17

A. The Fourth Circuit is likely to conclude that the Court erred in vacating the BiOp effective December 20, 2024, or at least that the Court's vacatur remedy presents serious and difficult questions warranting a stay ........ 18

1. The Fourth Circuit is likely to agree that remand without vacatur is a permissible remedy in Administrative Procedure Act cases ........ 18

2. The Fourth Circuit is likely to agree that vacatur was not mandatory here under remand-without-vacatur precedent ........ 21

3. The Fourth Circuit is likely to agree it would be an abuse of discretion not to delay vacatur until at least May 2025 ........ 24

B. The equitable factors overwhelmingly favor a stay pending appeal ........ 26

III. Expedited Review Is Necessary Because Gulf Operators Require Advance Notice To Demobilize And Are Incurring Costs Now ........ 29

CONCLUSION ........ 30

EXHIBITS

1. Declaration of Holly Hopkins (API)
2. Declaration of Nikki Martin (EnerGeo)
3. Declaration of Erik Milito (NOIA)
4. Declaration of Joe Gordon (Chevron U.S.A. Inc.)
5. Declaration of Brenda Linster (BP Exploration & Production Inc.) (API)
6. Declaration of John Spath (Talos Energy, Inc.) (EnerGeo)
7. Declaration of Thomas Janiszewski (Anadarko Petroleum Corp.) (API)
8. Declaration of Kate Beck (Equinor USA E&P Inc.) (API)
9. Declaration of David Hajovsky (TGS) (EnerGeo)
10. Declaration of Brent Ozenne (Arena Offshore, LP) (NOIA)
11. Declaration of Chris Lorino (Murphy EXPRO) (API)
12. Declaration of Brock Hajdik (Hess Corporation) (API)
13. Declaration of Joseph Leimkuhler (Beacon Offshore Energy) (NOIA)
14. Declaration of Samuel Giberga (Hornbeck Offshore Services, Inc.) (NOIA)
15. Declaration of Court Ramsay (Aries Marine Corporation) (NOIA)
16. Declaration of Steven Stith (Shell Offshore, Inc.) (API)
17. Declaration of Paa-Joe Akoto-Ampaw (Woodside Energy (Deepwater) Inc.) (API)
18. Declaration of Eric Zimmermann (LLOG Exploration Offshore, LLC) (NOIA)
19. Declaration of Reena Ramcharitar (Shearwater GeoServices Inc.) (EnerGeo)
20. Declaration of Alain Viau (CGG Services (U.S.) Inc.) (EnerGeo)
21. Declaration of Phillip Morgan (Halliburton Energy Services, Inc.) (NOIA)
22. Declaration of Ronald Neal (Houston Energy, LP) (NOIA)
23. Declaration of Gregg Falgout (Island Operating Co., Inc.) (NOIA)
24. Declaration of John Shelton (Delmar Systems, Inc.) (NOIA)
25. Declaration of Michael Cole (Fugro USA Marine, Inc.) (NOIA)
26. Declaration of Paul Danos (Danos LLC) (NOIA)
27. Declaration of Christopher Bradshaw (Bristow Group Inc.) (NOIA)
28. Declaration of Simon Johnson (Seadrill Limited) (NOIA)
29. Declaration of Richard Kirkland (Cantium LLC) (NOIA)
30. Declaration of Christopher Dyer (Oceaneering International, Inc.) (NOIA)
31. Declaration of Chester Morrison (Morrison Energy Group LLC) (NOIA)
32. Declaration of Tom Young (Kosmos Energy Gulf of Mexico Operations, LLC) (NOIA)

CERTIFICATE OF SERVICE

**TABLE OF AUTHORITIES**

Page

**CASES:**

*Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021) ........ 26

*Alaska Wildlife All. v. Fish & Wildlife Serv.*, No. 23-35299, 2024 WL 1169411 (9th Cir. Mar. 19, 2024) ........ 12

*Allied-Signal, Inc. v. Nuclear Regul. Comm'n*, 988 F.2d 146 (D.C. Cir. 1993) ........ 2, 20, 23

*American Bankers Ass'n v. National Credit Union Admin.*, 934 F.3d 649 (D.C. Cir. 2019) ........ 21

*American Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020) ........ 20

*Appalachian Voices v. Department of Interior*, 25 F.4th 259 (4th Cir. 2022) ........ 18, 19

*Atlantic Salmon Fed'n U.S. v. Merimil Ltd. P'ship*, No. 1:21-cv-00257, 2022 WL 558358 (D. Me. Feb. 24, 2022) ........ 12

*Bennett v. Spear*, 520 U.S. 154 (1997) ........ 12, 20, 28

*Black Warrior Riverkeeper, Inc. v. Army Corps of Eng'rs*, 781 F.3d 1271 (11th Cir. 2015) ........ 20

*California Cmtys. Against Toxics v. EPA*, 688 F.3d 989 (9th Cir. 2012) ........ 20

*Center for Biological Diversity v. Bureau of Land Mgmt.*, 698 F.3d 1101 (9th Cir. 2012), *modified on reh'g*, No. 10-72356, 2013 WL 12623741 (9th Cir. Apr. 29, 2013) ........ 23

*Center for Biological Diversity v. EPA*, 861 F.3d 174 (D.C. Cir. 2017) ........ 27

*Center for Biological Diversity v. Forest Service*, 687 F. Supp. 3d 1053 (D. Mont. 2023), *on appeal*, No. 23-2886 (9th Cir.) ........ 22

*Center for Food Safety v. Regan*, 56 F.4th 648 (9th Cir. 2022) ........ 21

**TABLE OF AUTHORITIES—Continued**

Page

*Center for Sci. in the Pub. Int. v. FDA*,
74 F. Supp. 3d 295 (D.D.C. 2014) ........ 25

*Central & S. W. Servs., Inc. v. EPA*,
220 F.3d 683 (5th Cir. 2000) ........ 20

*Central Maine Power Co. v. FERC*,
252 F.3d 34 (1st Cir. 2001) ........ 20

*Coalition for TJ v. Fairfax Cnty. Sch. Bd.*,
No. 22-1280, 2022 WL 986994 (4th Cir. Mar. 31, 2022) ........ 26, 28

*Dairy King, Inc. v. Kraft, Inc.*,
665 F. Supp. 1181 (D. Md. 1987) ........ 17

*Daulatzai v. Maryland*,
97 F.4th 166 (4th Cir. 2024) ........ 18

*Dean v. Martinez*,
336 F. Supp. 2d 477 (D. Md. 2004) ........ 20

*Defenders of Wildlife v. Department of Interior*,
931 F.3d 339 (4th Cir. 2019) ........ 18, 20

*Diné CARE v. Haaland*,
59 F.4th 1016 (10th Cir. 2023) ........ 20

*Dow AgroSciences LLC v. NMFS*,
707 F.3d 462 (4th Cir. 2013) ........ 19

*East Tenn. Nat. Gas Co. v. Sage*,
361 F.3d 808 (4th Cir. 2004) ........ 26

*Fernandez v. Keisler*,
502 F.3d 337 (4th Cir. 2007) ........ 19

*Fraser v. ATF*,
No. 3:22-cv-00410, 2023 WL 5617894 (E.D. Va. Aug. 30, 2023) ........ 28

*Friends of De Reef Park v. National Park Serv.*,
No. 2:13-cv-03453, 2014 WL 6969680 (D.S.C. Dec. 9, 2014) ........ 20

*Friends of the Earth v. Haaland*,
No. 22-5036, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023) ........ 28

**TABLE OF AUTHORITIES—Continued**

Page

*Gerber v. Norton*,
294 F.3d 173 (D.C. Cir. 2002) ....................22

*Goldstein v. Miller*,
488 F. Supp. 156 (D. Md. 1980) ....................17, 24

*Gulf Restoration Network v. Haaland*,
47 F.4th 795 (D.C. Cir. 2022) ....................22

*In re Search Warrant Issued June 13, 2019*,
942 F.3d 159 (4th Cir. 2019) ....................18, 26

*Jackson v. Sprint/United Mgmt. Co.*,
633 F. Supp. 3d 741 (D. Md. 2022) ....................3

*Justus v. Clarke*,
78 F.4th 97 (4th Cir. 2023) ....................4

*Kemp v. United States*,
596 U.S. 528 (2022) ....................18

*Liljeberg v. Health Servs. Acquisition Corp.*,
486 U.S. 847 (1988) ....................4

*Long v. Robinson*,
432 F.2d 977 (4th Cir. 1970) ....................17

*Louisiana v. Haaland*,
No. 2:23-cv-01157, 2023 WL 6450134 (W.D. La. Sept. 21, 2023),
*appeal dismissed*, 86 F.4th 663 (5th Cir. 2023) ....................28

*Louisiana Env't Action Network v. EPA*,
955 F.3d 1088 (D.C. Cir. 2020) ....................21

*Maine Lobstermen's Ass'n v. NMFS*,
70 F.4th 582 (D.C. Cir. 2023) ....................12, 19

*Makhteshim Agan of N. Am., Inc. v. NMFS*,
No. 8:18-cv-00961, 2019 WL 5964526 (D. Md. Oct. 18, 2019) ....................20

*Maryland Native Plant Soc'y v. Army Corps of Eng'rs*,
332 F. Supp. 2d 845 (D. Md. 2004) ....................20

*Maryland People's Counsel v. FERC*,
768 F.2d 450 (D.C. Cir. 1985) ....................2

**TABLE OF AUTHORITIES—Continued**

Page

*Montana Env't Info. Ctr. v. Haaland*,
No. 1:19-cv-00130, 2022 WL 4592071 (D. Mont. Sept. 30, 2022)........................................25

*Mountain Valley Pipeline, LLC v. Western Pocahontas Props. Ltd. P'ship*,
918 F.3d 353 (4th Cir. 2019) ........................................................................................26

*National Credit Union Admin. Bd. v. Gray*,
1 F.3d 262 (4th Cir. 1993) ........................................................................................16

*National Org. of Veterans' Advocs., Inc. v. Secretary of Veterans Affs.*,
260 F.3d 1365 (Fed. Cir. 2001)........................................................................................20

*National Wildlife Fed'n v. NMFS*,
184 F. Supp. 3d 861 (D. Or. 2016) ........................................................................................12

*National Wildlife Fed'n v. NMFS*,
839 F. Supp. 2d 1117 (D. Or. 2011) ........................................................................................12

*Natural Res. Def. Council v. EPA*,
808 F.3d 556 (2d Cir. 2015)........................................................................................20

*Natural Res. Def. Council v. Kempthorne*,
No. 1:05-cv-1207, 2007 WL 4462391 (E.D. Cal. Dec. 14, 2007)..........................................12

*Nken v. Holder*,
556 U.S. 418 (2009)........................................................................................17, 26

*Pacific Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*,
606 F. Supp. 2d 1195 (E.D. Cal. 2008)........................................................................................12

*Pacific Coast Fed'n of Fishermen's Ass'ns v. Raimondo*,
No. 1:20-cv-00426, 2022 WL 789122 (E.D. Cal. Mar. 11, 2022)..........................................12

*Pacific Ins. Co. v. American Nat. Fire Ins. Co.*,
148 F.3d 396 (4th Cir. 1998) ........................................................................................3

*PETA v. HHS*,
901 F.3d 343 (D.C. Cir. 2018)........................................................................................14

*Project Vote/Voting for Am., Inc. v. Long*,
275 F.R.D. 473 (E.D. Va. 2011) ........................................................................................17

*Prometheus Radio Project v. FCC*,
824 F.3d 33 (3d Cir. 2016)........................................................................................20

**TABLE OF AUTHORITIES—Continued**

Page

*Public Emps. for Envt'l Resp. v. Beaudreau*,
25 F. Supp. 3d 67 (D.D.C. 2014) ....................22

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
747 F.3d 581 (9th Cir. 2014) ....................22, 25

*Scott v. Baltimore Cnty.*,
101 F.4th 336 (4th Cir. 2024) ....................21

*SecurityPoint Holdings, Inc. v. TSA*,
867 F.3d 180 (D.C. Cir. 2017) ....................22

*Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*,
992 F.3d 1071 (D.C. Cir. 2021) ....................12, 22

*Sierra Club v. Army Corps of Eng'rs*,
909 F.3d 635 (4th Cir. 2018) ....................18, 21

*Sierra Club v. Department of Interior*,
899 F.3d 260 (4th Cir. 2018) ....................19

*Sierra Club v. EPA*,
60 F.4th 1008 (6th Cir. 2023) ....................20

*Small v. Hunt*,
98 F.3d 789 (4th Cir. 1996) ....................3, 16

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
289 F.3d 89 (D.C. Cir. 2002) ....................21

*Tennessee Valley Auth. v. Hill*,
437 U.S. 153 (1978) ....................19

*U.S. Steel Corp. v. EPA*,
649 F.2d 572 (8th Cir. 1981) ....................20

*U.S. Sugar Corp. v. EPA*,
830 F.3d 579 (D.C. Cir. 2016),
*modified on reh'g*, 671 F. App'x 824 (D.C. Cir. 2016) ....................22

*United States v. Fourteen Various Firearms*,
897 F. Supp. 271 (E.D. Va. 1995) ....................17

*United States v. Norman*,
935 F.3d 232 (4th Cir. 2019) ....................19

**TABLE OF AUTHORITIES—Continued**

Page

*United States v. Texas*,
599 U.S. 670 (2023)....................24

*Virginian Ry. Co. v. System Fed'n No. 40*,
300 U.S. 515 (1937)....................28

*Waterkeepers Chesapeake v. FERC*,
56 F.4th 45 (D.C. Cir. 2022)....................22

*West Virginia v. EPA*,
90 F.4th 323 (4th Cir. 2024)....................27

*Western Watersheds Project v. Haaland*,
69 F.4th 689 (10th Cir. 2023)....................22

*Wild Fish Conservancy v. Quan*,
No. 23-35322, 2024 WL 3842101 (9th Cir. Aug. 16, 2024)....................23

**STATUTES:**

16 U.S.C. § 1532(19)....................4

16 U.S.C. § 1536
(b)(4)(iv)....................5
(o)(2)....................5

16 U.S.C. § 1538
(a)(1)....................4
(g)....................4

16 U.S.C. § 1540
(a)....................12
(b)....................12
(g)(1)(A)....................12

43 U.S.C. § 1344(a)....................28

43 U.S.C. § 1802
(1)....................28
(2)....................28

46 U.S.C. § 55102....................13

**REGULATIONS:**

30 C.F.R. § 250.1403....................13

**TABLE OF AUTHORITIES—Continued**

Page

30 C.F.R. §§ 250.168-250.177 .......... 13

50 C.F.R. § 17.3 .......... 4

50 C.F.R. § 222.102 .......... 4

88 Fed. Reg. 89,300 (Dec. 27, 2023) .......... 12

NMFS, Interim Guidance on the Endangered Species Act Term "Harass" (2016), https://perma.cc/LBX7-4FDP .......... 4

**LEGISLATIVE MATERIAL:**

Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1,818, 2,059-61, §§ 50264, 50265(b)(2) (2022) .......... 28

**OTHER AUTHORITIES:**

Ronald M. Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion in Administrative Law*, 53 Duke L.J. 291 (2003) .......... 20

Arathy Somasekhar, *Oil Climbs 3% As Libya Output Cuts Further Supply Concerns*, Reuters (Aug. 26, 2024), https://www.reuters.com/business/energy/oil-climbs-mideast-escalation-fears-us-rate-cut-expectations-2024-08-25/ .......... 16

U.S. Energy Information Administration, Gulf of Mexico Fact Sheet (Sept. 4, 2024), https://perma.cc/Y758-ERH8 .......... 16

U.S. Energy Information Administration, Short-Term Energy Outlook, Global Oil Markets (Sept. 10, 2024), https://perma.cc/XB4J-EKAN .......... 16

Wright & Miller, 11 Fed. Prac. & Proc. Civ. § 2904 (3d ed.) .......... 17

## INTRODUCTION

This Court vacated the 2020 programmatic Biological Opinion (BiOp) and 2021 Amended Incidental Take Statement effective December 20, 2024, on the assumption that the National Marine Fisheries Service (NMFS) could complete its revised BiOp around that time. That assumption has proven inaccurate. NMFS now estimates that even after allocating all practicable resources, the new BiOp cannot be done until at least May 21, 2025.[1] That late-breaking revelation calls for the Court to reconsider the December 20, 2024 vacatur date. As the Government explains, "no amount of planning can mitigate the potentially extreme and dangerous destabilization of the [Gulf] oil and gas industry . . . that will flow from vacatur on December 20," ECF 211-4 ¶ 2—the disastrous consequences of which are underscored in the attached declarations from the American Petroleum Institute (API), EnerGeo Alliance, National Ocean Industries Association (NOIA), Chevron U.S.A. Inc., and nearly 30 of the trade associations' member companies.

Vacatur means that Gulf oil-and-gas production will be seriously curtailed or halted entirely. But production problems are just the tip of the iceberg. Vacatur and its attendant multi-month permitting moratorium will also prevent oil-and-gas activities that keep people and the environment safe, impair emergency-response operations, and delay the environmental benefits of decommissioning. Vacatur will force Gulf operators and service providers to risk penalties under the Endangered Species Act (ESA) in order to comply with other mandatory regulatory obligations, even as they continue to implement the BiOp's precautions to protect wildlife. And vacatur will imperil innumerable contracts, risk thousands of jobs, and threaten the trade

[1] As the Government explains, it initially had told the parties that NMFS would complete its BiOp by August 31, 2025. ECF 211 at 2 n.1. Many declarations therefore refer to that August 31 date. But the overall impact to industry of a May 21 date is equally harmful.

associations' member companies with billions of dollars in losses—economic devastation that will be felt nationally and could even put some companies out of business. The Court should avoid these ripple effects by postponing vacatur until at least May 21, 2025, when NMFS anticipates the new BiOp will be complete.[2]

In the alternative, the Court should grant a stay to allow Intervenors to seek appellate review. Although Intervenors respectfully disagree with the Court's assessment that certain aspects of the BiOp lacked sufficient explanation, NMFS can ultimately incorporate additional explanation into the new BiOp on remand. But a critical question for appeal is the remedy: whether this Court should have allowed "the current [BiOp] to die a natural death" and remain in effect until NMFS issues the new BiOp because, "in the short term," vacatur "would do more harm than good." *Maryland People's Counsel v. FERC*, 768 F.2d 450, 455 (D.C. Cir. 1985) (per curiam). The Fourth Circuit is likely to conclude that the Court abused its discretion in refusing to do so, or, at the very least, that the question of whether to depart from the eleven other circuits recognizing *Allied-Signal, Inc. v. Nuclear Regulatory Commission*, 988 F.2d 146 (D.C. Cir. 1993)'s remedy of remand without vacatur is sufficiently novel and important to warrant maintaining the status quo pending appeal.

Intervenors respectfully request a decision on this motion by **no later than October 21, 2024**, to allow them sufficient time to seek emergency relief in the Fourth Circuit and, if necessary, the U.S. Supreme Court, and to afford those courts adequate time to consider the requested relief before the BiOp is vacated. A decision as soon as possible is also imperative because Gulf operators need advance notice before they can safely suspend Gulf operations, if necessary, and are incurring substantial costs every day that vacatur looms.

---

[2] In moving for reconsideration, Intervenors reserve their right to challenge on appeal any aspect of this Court's opinion, including the BiOp's merits and the remedy ordered.

## ARGUMENT

### I. The Court Should Delay Vacatur Until At Least May 21, 2025.

Reconsideration is warranted in light of the late-breaking development that NMFS now cannot complete the new BiOp until May 2025. This Court opted to delay vacatur until only December 20, 2024 based on the Government's "most pessimistic projections" at the time that the new BiOp would "be ready not long after." Op. 83. The Court rejected "immediate vacatur" because it correctly recognized that "[v]acating the BiOp months before a replacement is ready" would "delay or inhibit many oil and gas industry activities in the Gulf," "disrupt efforts to keep workers safe and prevent serious accidents," and "stall the completion of a replacement" BiOp. Op. 81-82 (cleaned up). Those harms—and the others discussed below—are salient once again because the new BiOp's delayed release date means that vacatur in December 2024 will result in "[v]acating the BiOp months before a replacement is ready." Op. 81.

The Court should accordingly reconsider its remedial order so that the BiOp is not vacated until at least May 21, 2025. "Two rules enable a court to reconsider a final judgment: Rule 59(e) authorizes a district court to alter, amend, or vacate a prior judgment, while Rule 60 provides for relief from judgment." *Jackson v. Sprint/United Mgmt. Co.*, 633 F. Supp. 3d 741, 745 (D. Md. 2022). Reconsideration under Rule 59(e) is appropriate, among other things, "to account for new evidence" or "to prevent manifest injustice." *Pacific Ins. Co. v. American Nat. Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998). Rule 60(b)(5) permits a party to obtain relief from a judgment if, among other things, "applying it prospectively is no longer equitable," such as "significantly changed factual conditions" that "make compliance . . . more onerous, unworkable, or detrimental to the public interest." *Small v. Hunt*, 98 F.3d 789, 795 (4th Cir. 1996) (citation and quotation marks omitted). And Rule 60(b)(6) offers a catchall for "any other reason that justifies relief," which "provides the court with a grand reservoir of equitable power

to do justice" in "extraordinary circumstances," *Justus v. Clarke*, 78 F.4th 97, 116 (4th Cir. 2023) (citation omitted), such as intervening changes in facts, *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 n.11 (1988).

Reconsideration is warranted under any of these standards. NMFS's anticipated May 2025 completion date is significant new information that renders the Court's vacatur order manifestly unjust. Intervenors cannot control the new BiOp's timing, nor can they prevent the looming Gulf-wide paralysis that vacatur will trigger. And the Government has articulated no "transition" plan guaranteed to maintain normal operations in the interim. *Contra* Op. 83. The Court should therefore grant reconsideration and defer vacatur until at least May 21, 2025.

### A. Vacatur will seriously disrupt all aspects of oil-and-gas operations across the entire Gulf of Mexico.

As the Court recognized, vacating the BiOp months before it can be replaced will "delay or inhibit many oil and gas industry activities in the Gulf." Op. 81 (cleaned up). That is because "[t]he BiOp is the linchpin for oil and gas operations in the Gulf of Mexico," Hopkins Decl. ¶ 11, so its vacatur guts the regulatory regime guiding Gulf operations.

The ESA makes it illegal to "take" listed species, even incidentally, absent authorization. 16 U.S.C. § 1538(a)(1), (g). The ESA defines "take" broadly as encompassing not just killing listed species, but also as actions that "harass, harm, pursue, . . . trap, capture, or collect" listed species, or "attempt to engage in any such conduct." *Id.* § 1532(19).[3]

The ESA allows takes of protected species in the course of otherwise lawful activities—known as "incidental take"—when NMFS issues a biological opinion and incidental take

[3] NMFS further defines "harm" as including "significant habitat modification or degradation" that significantly impairs essential behavioral patterns, 50 C.F.R. § 222.102, and other agencies define "harass" as including a "negligent act or omission which creates the likelihood of injury," 50 C.F.R. § 17.3; *see* NMFS, Interim Guidance on the Endangered Species Act Term "Harass" 2 & n.4 (2016), https://perma.cc/LBX7-4FDP.

statement "set[ting] forth the terms and conditions . . . that must be complied with" by the action agency and regulated parties, *id.* § 1536(b)(4)(iv), (o)(2)—here, the Bureau of Ocean Energy Management (BOEM) and the Bureau of Safety and Environmental Enforcement (BSEE) (collectively, "the Bureaus"), and the Gulf oil-and-gas industry. The BiOp reflects that "[a]ll phases" of oil-and-gas development "will have stressor-causing activities" projected to result in some amount of statistically inevitable incidental take. AR0013388-89; *see also, e.g.*, Martin Decl. ¶¶ 6-8. If incidental take occurs during activities that are otherwise lawful and comply with the incidental take statement's terms and conditions designed to protect wildlife and the environment, the taking party is protected from ESA liability. 16 U.S.C. § 1536(o)(2).

The BiOp is a "Gulf-wide programmatic opinion," meaning that it governs "*all* permitted actions and plans" for Outer Continental Shelf oil-and-gas operations. AR0013252, 0013255 (emphasis added). NMFS and the Bureaus rely on the programmatic approach because the "vast number" of Gulf oil-and-gas activities, "operating simultaneously across all of the [development] stages," is simply "not conducive" to individual ESA consultations. AR0013267. The Bureaus' practical ability to issue permits and approvals depends on having a programmatic BiOp in place.

Without the BiOp, the Bureaus would no longer be able to issue the thousands of permits and approvals necessary to all stages of oil-and-gas operations, and Gulf operations will grind to a halt. The Bureaus and NMFS do not have the staff to conduct the individual ESA consultations that would otherwise be required, *see* ECF 211-1 at 12; ECF 211-3 ¶ 14; *see also* ECF 175-1 at 46-47; ECF 191 at 28-31; ECF 175-4 ¶¶ 6-7, 10; ECF 191-2 ¶¶ 8-12; ECF 175-3 ¶¶ 18-19, 22-23; ECF 191-1 ¶¶ 5, 7-9; Hopkins Decl. ¶¶ 15-17, and this Court has acknowledged that individual consultations would be "unworkable," Op. 81 (citation omitted).

The scale of the permitting problem is staggering: As of August 2024, there were 2,304 active oil-and-gas leases; over 1,390 facilities; 7,534 active wells; and 19,157 miles of active pipeline across the Gulf. ECF 211-1 at 10-11. Each year, BSEE approves more than 5,000 permits for wells, pipelines, and facilities, and BOEM approves hundreds of plans and permits. ECF 211-3 ¶ 11; ECF 175-4 ¶ 7. Gulf of Mexico operators and service providers submit permit requests every day. Hopkins Decl. ¶ 17; *see also* Gordon Decl. ¶ 15 (Chevron submitted 16 of one type of permit revisions to BSEE in August 2024 alone); Martin Decl. ¶ 6 (weekly average of three-plus geological and geophysical permits); Ozenne Decl. ¶ 11 (company has 200-plus pending requests). Industry Intervenors will require numerous authorizations throughout the next year to maintain operations.[4] BP Exploration & Production Inc. (bp) has "over $650 million" in planned activities requiring permits. Linster Decl. ¶ 5. One NOIA member will seek more than 150 permits in just the next six months, Ozenne Decl. ¶ 11, which alone far exceeds NMFS's capacity for individual consultations—currently just 20 to 30 per year nationwide, ECF 175-3 ¶ 23. NMFS adopted the programmatic BiOp precisely because there is no other way to address this high volume of time-sensitive requests.

The Government's inability to issue prompt authorizations will effectively halt every aspect of Gulf oil-and-gas operations—from initial surveying and exploration through drilling, production, and decommissioning—that depend on those authorizations. *See, e.g.*, Martin Decl. ¶ 11; Hopkins Decl. ¶¶ 14-17; Gordon Decl. ¶¶ 14-15, 18-42; Leimkuhler Decl. ¶ 8; Lorino Decl. ¶¶ 5-6. Permits for each phase of development typically require multiple revisions that must themselves be separately approved. An initial drilling permit, for instance, typically undergoes

[4] *See, e.g.*, Linster Decl. ¶¶ 5, 11; Gordon Decl. ¶¶ 14, 18, 21, 29, 32; Stith Decl. ¶¶ 7-8; Lorino Decl. ¶¶ 6, 13; Akoto-Ampaw Decl. ¶¶ 3, 5; Beck Decl. ¶ 5; Janiszewski Decl. ¶ 8; Hajdik Decl. ¶ 7; Spath Decl. ¶¶ 5, 13; Kirkland Decl. ¶¶ 5, 11; Zimmerman Decl. ¶¶ 4, 6, 12; Leimkuhler Decl. ¶ 5; Viau Decl. ¶ 11; Young Decl. ¶¶ 3, 9.

10 to 20 revisions, each requiring a separate BSEE approval. Gordon Decl. ¶ 18. Chevron alone required nearly 250 revisions and modifications to initial drilling permits in the last two years. *Id*. ¶ 15. Revisions are necessary for common events like re-routing to account for unexpected geological features and changes to cementing or drilling-fluid programs. *Id*.; Hopkins Decl. ¶ 16. Development-and-production permits also require updates or separate authorizations for common activities like repairing or replacing compressors or other equipment; routine pipeline-installation work tied to existing assets; and "tying back" already-drilled wells to existing production facilities. Gordon Decl. ¶¶ 20, 28, 30; Janiszewski Decl. ¶ 8. And because permitting in each development phase depends on having permits in place from previous phases, delays in one phase will have knock-on effects for other downstream development. *See, e.g.*, Martin Decl. ¶ 13.

If the Government cannot reliably issue permits and authorizations for ongoing oil-and-gas production, including timely revisions related to safety and operations conditions, those activities will have to be curtailed or stopped altogether. *See, e.g.*, Hopkins Decl. ¶ 17 ("properly drilling a well depends on the ability to obtain a revision, if necessary"). But halting operations presents an "enormous" and "highly complex" logistical challenge. Gordon Decl. ¶¶ 23, 34; *see also* Beck Decl. ¶ 8. There is no "off" switch that allows industry to instantaneously idle the Gulf for months. Gordon Decl. ¶¶ 23, 34; *see* ECF 211-1 at 9 (Gulf oil-and-gas "operations cannot simply be suspended or put on hold"). Although individual facilities or operations can be made safe and brought to minimum capacity for acute emergencies like hurricanes, that is nothing like the logistical difficulties of operators attempting to wind down the literally thousands of activities across the entire Gulf of Mexico that rely on the BiOp simultaneously. Gordon Decl. ¶¶ 23, 34. For example, "pipelines and infrastructure at deep depths often cannot

be emptied of fluids without risking their collapse due to the weight of the ocean above them," but "idling fluid-filled equipment increases the risk that blockages will form, requiring intervention" that is "costly, logistically challenging, and increase[s] the risk of potential environmental consequences." Janiszewski Decl. ¶ 9. Forcing operators to "shut-in oil and gas production" for many months, Zimmerman Decl. ¶ 13, would likewise be extremely complicated and would require moving vast amounts of tremendously expensive equipment, which will be in demand all across the Gulf at exactly the same time, Gordon Decl. ¶¶ 23, 34; Beck Decl. ¶ 8. And "production wells risk permanent damage from a prolonged shut-in and lack of maintenance, such that they may not be able to produce at the same scale once reactivated." Hopkins Decl. ¶ 22; *see also* Beck Decl. ¶ 8; Janiszewski Decl. ¶ 9.

"Restarting operations after months of shutdown would also be tremendously difficult." Gordon Decl. ¶¶ 26, 34; *see also* Beck Decl. ¶ 8. Operators would be required to "reverse the shutdown process by obtaining permits to reinitiate activities, potentially renegotiate and reactivate contracts, remobilize equipment to sites across the Gulf, and return the work force." Gordon Decl. ¶¶ 26, 34. The necessary highly specialized equipment may no longer be available, potentially for years. *See id.*; Janiszewski Decl. ¶ 9 ("contractors [may] elect to send their assets into more stable work environments of the world"); Viau Decl. ¶ 8 (surveying company "may lose its ability to reserve vessel allocation slots and secure proprietary technology to restart operations"); Hajovsky Decl. ¶ 7. And "there will be an increase in risks to worker and public health and safety associated with stopping and restarting operations," Leimkuhler Decl. ¶ 9, because "facilities are designed to run efficiently, not to swing rapidly through production rates and stoppages," Linster Decl. ¶ 8; *see also* Beck Decl. ¶ 8 (describing "unpredictable consequences on restart" of equipment); Janiszewski Decl. ¶ 9; Stith Decl. ¶ 11.

The permitting backlog would not disappear when NMFS completes the new BiOp. *See, e.g.*, Hopkins Decl. ¶ 23; Martin Decl. ¶ 13; Milito Decl. ¶ 9. The new BiOp's completion would allow the Bureaus to only begin the process of catching up on the many thousands of applications that would have accumulated. The consequences of a de facto permitting moratorium would therefore continue long after the revised BiOp is issued, disrupting operators' operational timelines for additional months or years to come.

**B. Vacatur will prevent activities designed to ensure safety and prevent accidents, impair emergency response to serious problems like well-control incidents and spills, and delay decommissioning.**

A de facto permitting moratorium also prevents Gulf operators from undertaking activities that are necessary to "maintain safe operations and avoid potentially serious accidents, e.g., approvals for well workovers, platform and infrastructure updates, and plan updates for safety equipment and pollution control." ECF 175-4 ¶ 7; *see generally* ECF 211-3; *see also, e.g.*, Janiszewski Decl. ¶ 9. For example, of the 828 Gulf drilling permits BSEE approved last year, 713 were for revisions that "may be necessary for safety purposes, such as if an operator determines it is necessary to set a liner deeper in the wellbore due to results from a formation integrity test." Hopkins Decl. ¶ 16. In the next year, operators will need authorizations for "modifications to safety systems, such as fire-fighting equipment, emergency generators, HVAC systems, subsea safety valves to control wells, and flammable gas leak detection systems." Linster Decl. ¶ 9; *see also, e.g.*, Gordon Decl. ¶¶ 14, 18-19, 29, 32. Vacatur, "therefore, puts the safety of personnel working offshore at greater risk." Linster Decl. ¶ 9.

The impact on emergency-response operations—those designed to respond to and prevent serious problems like well-control incidents and oil spills—would also be significant. Leimkuhler Decl. ¶ 8; *see also* Janiszewski Decl. ¶ 9 ("reduced ability to respond to an integrity issue, personnel safety incident or environmental event"). Numerous emergency operations

require BiOp coverage, including operations "essential to limit and mitigate oil spill pollution events from subsea wells" and "monitoring[ ] required to ensure safety of onsite first responders." Leimkuhler Decl. ¶ 8. Any delay in obtaining those authorizations "increases potential environmental exposure" and "introduces unacceptable safety risks." *Id.*; *see also* Spath Decl. ¶ 13. One company's quick response time—recently "capping a subsea well in 5,600 feet of water located 300 miles offshore from Houston in just 3.6 days"—"would not have been possible without a viable BiOp and ITS in place." Leimkuhler Decl. ¶ 8.

A permitting moratorium also "prevents operators like bp from improving their impacts to the environment, including ESA-listed species and critical habitats," Linster Decl. ¶ 9, and would increase environmental risks, *see* Beck Decl. ¶ 8; Spath Decl. ¶¶ 11-12; Ozenne Decl. ¶ 8. For example, a moratorium would prevent planned "improvements to systems designed to control impacts on the environment," including "natural gas leakage detection equipment, and greenhouse gas leakage measurement equipment." Linster Decl. ¶ 9.

A permitting moratorium would also prevent operators from obtaining the approvals necessary to decommission obsolete infrastructure. *See, e.g.*, Ozenne Decl. ¶ 8 (company's "ongoing efforts to responsibly and timely decommission infrastructure would be thwarted"); Leimkuhler Decl. ¶ 9 (company "will be unable to comply with its plugging and abandonment obligations"); Linster Decl. ¶¶ 9, 14 (similar). For example, significant decommissioning obligations have been assigned to operators like Chevron as a result of the recent bankruptcies of others in the industry—obligations known as "boomerang" decommissioning projects. Gordon Decl. ¶ 38. Gulf operators are scheduled to conduct numerous decommissioning activities, including on boomerang projects, in the next year, but if BSEE is unable to provide timely authorizations, operators "will be unable to safely plug and abandon 'boomerang' wells," or

"conduct structure removal and site-clearance activities necessary for decommissioning." *Id.* ¶¶ 40, 42; *see also* Janiszewski Decl. ¶ 7; Spath Decl. ¶ 10. The result is that mothballed oil-and-gas infrastructure, including wells, are likely to remain in the Gulf for months or years longer, which "risks exposing aged infrastructure to degradation from the elements and lack of activity, posing multiple environmental and safety risks." Hopkins Decl. ¶ 22; *see also* Beck Decl. ¶ 8. And that, as bp explains, "would increase the potential for oil spills." Linster Decl. ¶ 9.

### C. Vacatur will force Gulf operators to risk substantial ESA liability to comply with other mandatory obligations.

Operators' inability to obtain necessary permits in a timely fashion will leave many companies unable to comply with their non-ESA regulatory obligations, will force the companies to risk significant ESA liability to meet them, or both. *Cf.* Op. 81.

Offshore platforms use highly specialized equipment to monitor and control oil-and-gas production operations that occur at high temperatures and pressures—equipment that must be operated and maintained around the clock. Gordon Decl. ¶ 24. "For safety reasons," these "multi-billion-dollar production facilities" "are not designed to and generally should not be 'turned off,' left 'unmanned,' and idled for months." *Id.* Regulations and permitting conditions therefore "require personnel to be present on producing facilities," and under normal circumstances, Gulf operators have thousands of workers residing at least part time offshore to maintain equipment. *Id.*; *see* Beck Decl. ¶ 8; Hopkins Decl. ¶ 21.

These workers depend on essential supplies transported by boat, many of which are operated by third-party vessel contractors. Milito Decl. ¶¶ 10-12; Hopkins Decl. ¶ 19; AR0013298-301. "[O]ffshore platforms cannot operate without vessel support," Milito Decl. ¶ 11; *see* Giberga Decl. ¶ 3, yet vessel operations are among the activities that the BiOp concludes will result in takes of listed species, *e.g.*, AR0013388. Even if the vast majority of

workers could be brought ashore—and attempting to move thousands of people presents its own difficulties given the limited helicopters, vessels, and other support services available for immediate use in the Gulf, *see* Gordon Decl. ¶ 23; Janiszewski Decl. ¶ 9—at least some skeletal crew must remain behind to maintain critical infrastructure, which in turn, necessitates some level of continued vessel support. Milito Decl. ¶¶ 11-12.

Yet vessel operations could take place only at the operator's "own peril," because " 'any person' who knowingly 'takes' an endangered or threatened species is subject to substantial civil and criminal penalties, including imprisonment." *Bennett v. Spear*, 520 U.S. 154, 170 (1997); *see* 16 U.S.C. § 1540(a), (b); 88 Fed. Reg. 89,300, 89,302 (Dec. 27, 2023).[5] Such risks are why courts ordinarily refuse to vacate incidental take authority.[6] On top of that, agencies and operators could face ESA citizen suits by private parties like Plaintiffs seeking to enjoin the Bureaus from authorizing, and operators from carrying out, continued activities. 16 U.S.C. § 1540(g)(1)(A); *see, e.g.*, *Atlantic Salmon Fed'n U.S. v. Merimil Ltd. P'ship*, No. 1:21-cv-00257, 2022 WL 558358, at *3 (D. Me. Feb. 24, 2022) (citizen suit to limit dam operations after incidental take authority expired while NMFS was preparing a new biological opinion).

At the same time, Gulf operators cannot simply walk away from ongoing operations, drilling, and required maintenance activities without risking non-compliance with lease obligations and permits. This no-win situation traps operators "between the Scylla and Charybdis" of violating their obligations or violating the ESA. *Shafer*, 992 F.3d at 1096.

[5] *See also, e.g.*, Giberga Decl. ¶ 6; Akoto-Ampaw Decl. ¶ 8; Johnson Decl. ¶ 6; Dyer Decl. ¶ 6; Danos Decl. ¶ 6; Cole Decl. ¶ 6; Kirkland Decl. ¶ 6; Leimkuhler Decl. ¶¶ 6-7; Ramsay Decl. ¶ 5; Shelton Decl. ¶¶ 6-9; Viau Decl. ¶¶ 6-7.

[6] *E.g.*, *Alaska Wildlife All. v. Fish & Wildlife Serv.*, No. 23-35299, 2024 WL 1169411, at *6 (9th Cir. Mar. 19, 2024); *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1096 (D.C. Cir. 2021); *Maine Lobstermen's Ass'n v. NMFS*, 70 F.4th 582, 601 (D.C. Cir. 2023); *Pacific Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1202-03 & n.5 (E.D. Cal. 2008); *National Wildlife Fed'n v. NMFS*, 839 F. Supp. 2d 1117, 1129 (D. Or. 2011); *National Wildlife Fed'n v. NMFS*, 184 F. Supp. 3d 861, 949 (D. Or. 2016); *Natural Res. Def. Council v. Kempthorne*, No. 1:05-cv-1207, 2007 WL 4462391, at *1 (E.D. Cal. Dec. 14, 2007); *Pacific Coast Fed'n of Fishermen's Ass'ns v. Raimondo*, No. 1:20-cv-00426, 2022 WL 789122, at *16 (E.D. Cal. Mar. 11, 2022).

Operators face other conflicting legal obligations, too. Permitting delays threaten operators' ability to meet certain benchmarks in order to maintain their leases, which they have invested hundreds of millions in. Gordon Decl. ¶ 37; *see* 30 C.F.R. §§ 250.168-250.177. For example, one member company is "operating under an approved [authorization] that requires [it] to execute work" on "ongoing projects and installation contracts with defined windows of time," but a "delay in permit approvals will prevent contractors from meeting their deadlines." Leimkuhler Decl. ¶ 12. Permitting delays also threaten operators' abilities to meet deadlines set by BSEE's decommissioning orders, Gordon Decl. ¶¶ 39-41; Spath Decl. ¶ 11, which could result in civil penalties of up to $54,352 per day per violation, *see* 30 C.F.R. § 250.1403. And vessel operators that redeploy their fleet internationally in the wake of a multi-month collapse in Gulf demand would risk the "permanent loss" of their qualifications under the Jones Act, 46 U.S.C. § 55102, which "permanently bars the vessel from regaining its Jones Act trading privileges in the United States" once demand returns. Giberga Decl. ¶ 11.

### D. Vacatur will imperil contracts, risk thousands of jobs, and threaten billions of dollars in losses—economic devastation that will be felt nationally.

Harms from halting or severely curtailing Gulf oil-and-gas operations would ricochet through the entire industry, hurting far more than oil-and-gas companies. It would imperil innumerable contracts oil-and-gas companies have with third-party service contractors[7]—many of them small and family-owned businesses—for wide-ranging services, including marine-vessel transport, helicopter transport, seismic surveys, groceries and other personnel supplies, drilling

[7] *See, e.g.*, Linster Decl. ¶ 14 (bp's inability to proceed with planned activities "would result in cancellation of contracts"); Zimmerman Decl. ¶ 13 (company "would need to cancel third-party contracts," which would "create serious financial issues for [the company], its working interest partners, and its third-party vendors"); Spath Decl. ¶ 15 ("would be forced to cancel a rig contract and all existing orders with our suppliers and service providers"); Leimkuhler Decl. ¶¶ 9, 11 ("a halt in operations will result in the cancellation and/or breach of third-party contracts"); Kirkland Decl. ¶¶ 8, 10 (similar); Gordon Decl. ¶¶ 25, 35 (similar); Beck Decl. ¶ 8 (similar).

and other operational supplies, maintenance and monitoring, and many more.[8] If those contracts cannot be performed, there will be difficult questions about who will bear the resulting losses. *See, e.g.*, Shelton Decl. ¶ 8 (contract-breach claims "could easily be tens of millions of dollars"); Gordon Decl. ¶ 25 (contract costs "would likely exceed multiple millions of dollars *per day* in several scenarios").

Canceled contracts would result in the elimination of thousands of jobs.[9] The dynamics of Gulf employment—idled employees will seek work elsewhere—mean those losses could be permanent, *see, e.g.*, Falgout Decl. ¶ 7; Ramsay Decl. ¶ 6; Beck Decl. ¶ 8; Janiszewski Decl. ¶ 11, and "losing highly skilled labor" would "hinder future operations and the ability to respond effectively when the regulatory environment stabilizes," Spath Decl. ¶ 12; Cole Decl. ¶ 7. Some companies may be forced to the brink of bankruptcy, Martin Decl. ¶ 12, and others may be driven out of business entirely, *see, e.g.*, Kirkland Decl. ¶ 8 ("viability as a company will be at risk"); Cole Decl. ¶ 7 ("could force the company to leave the market"). Such "injur[ies] to innocent third parties" "fall beneath the 'manifest injustice' umbrella" and warrant relief. *PETA v. HHS*, 901 F.3d 343, 355 (D.C. Cir. 2018) (citation omitted).

---

[8] *See, e.g.*, Bradshaw Decl. ¶ 7 (flight personnel company currently "under contract to provide transportation services worth millions of dollars"); Danos Decl. ¶¶ 3, 7 (personnel supplier); Falgout Decl. ¶¶ 3, 6-7 (personnel); Shelton Decl. ¶¶ 3, 6-7 (mooring-systems supplier); Cole Decl. ¶¶ 3, 7 (surveying company); Dyer Decl. ¶¶ 3, 7 (technology company); Hajovsky Decl. ¶¶ 3, 7 (data company); Morrison Decl. ¶¶ 3, 6-7 (service provider); Ramsay Decl. ¶¶ 2, 6-7 (marine assets); Giberga Decl. ¶¶ 3, 5-7, 10-12 (vessels); Ramcharitar Decl. ¶¶ 3, 6-8 (vessels); Johnson Decl. ¶¶ 3, 7 (vessels); Morgan Decl. ¶¶ 3, 6 (vessels).

[9] *See, e.g.*, Danos Decl. ¶ 7 (canceled contracts "will force" personnel supplier "to lay off [3,000] employees," and the "impact of these layoffs will extend to [the] employees' communities and families"); Falgout Decl. ¶¶ 3, 7 ("over five hundred of our operators' jobs will be eliminated," nearly 65% of total positions); Johnson Decl. ¶ 7 ("terminating or furloughing close to 300 offshore employees"); Morrison Decl. ¶ 7 (facing "the elimination of hundreds of jobs"); Cole Decl. ¶ 7 (surveying company's "150 positions will be put at risk"); Shelton Decl. ¶¶ 3, 7 (mooring-systems supplier "will have to consider laying off" its 70 employees); Kirkland Decl. ¶ 8 (shallow-water producer "would need to adjust its workforce, such as eliminating jobs"); Spath Decl. ¶ 8 (would be "forced to lay off our offshore workforce"); Ramsay Decl. ¶ 6 ("the company will be forced to lay off crews"); Neal Decl. ¶¶ 3, 7 ("may affect its ability to pay its employees, contractors, and the contractors' employees").

Permitting delays also risk derailing major projects and investments, which could be "cancelled indefinitely due to [the] inability to secure financial commitments from potential underwriters." Viau Decl. ¶ 12; *see also* Kirkland Decl. ¶ 8 (effects "would cascade down to our banks and surety providers"); Hajovskly Decl. ¶ 9 ("detrimental impact" on "ability to secure funding"); Ramcharitar Decl. ¶ 7; Hajdik Decl. ¶ 8. For one NOIA member company, the BiOp's "vacatur puts billions of dollars of capital investment at risk" for "a major project" scheduled to enter production within the next 24 months. Zimmerman Decl. ¶ 10. Another member company "is in the process of executing an over $2 billion development that will be detrimentally impacted if development operations had to be put on hold." Leimkuhler Decl. ¶ 9.

The immediate production losses and extended production deferrals would be substantial—at least hundreds of thousands of barrels for many companies. Leimkuhler Decl. ¶ 9; Spath Decl. ¶ 13; Janiszewski Decl. ¶ 10; *cf.* Ozenne Decl. ¶ 8; Linster Decl. ¶¶ 8, 10, 12, 14; Gordon Decl. ¶¶ 3, 19-22. "Those financial and production volume impacts would be difficult to recoup and could be felt for years." Janiszewski Decl. ¶ 10.

The result "would be financially catastrophic." Kirkland Decl. ¶ 8. Member companies "would suffer immediate financial loss due to lost production." Ozenne Decl. ¶ 8. One company anticipates that delays requiring it to idle two drillships "will cost approximately $1.1 million per day." Leimkuhler Decl. ¶ 9. Chevron similarly anticipates "additional costs in the range of hundreds of thousands of dollars to a million dollars or more *per rig, per day* if drilling is delayed or discontinued." Gordon Decl. ¶ 36; *see also, e.g.*, Linster Decl. ¶ 8; Spath Decl. ¶ 14.

The overall financial impact would be so vast and so unprecedented that totals are essentially impossible to quantify—but they start in the billions. Bp alone anticipates losses of "over a billion dollars." Linster Decl. ¶ 13. Five other member companies expect tens or

hundreds of millions of dollars in losses, Leimkuhler Decl. ¶ 10; Hajovsky Decl. ¶ 8; Zimmerman Decl. ¶ 10; Ozenne Decl. ¶ 13; Falgout Decl. ¶ 7; and two others estimate losses "in the millions," Cole Decl. ¶ 7; Ramcharitar ¶ 7; *cf. Small*, 98 F.3d at 797 (reconsideration warranted given "the enormous expense" of changed circumstances).

The fallout would be felt far beyond the Gulf. The Gulf accounts for nearly 15% of U.S. crude oil production and 5% of U.S. dry natural gas production.[10] Gulf crude oil output—averaging 1.9 million barrels per day—far exceeds that of Libya, and global oil prices spiked 3% when Libya's production dropped from 1.1 to 0.4 million barrels per day in August 2024.[11] Federal and State budgets also depend on Gulf revenue: In fiscal year 2023, the Gulf oil-and-gas industry generated $7 billion in revenue for the federal government and more than $353 million in revenue for state and local governments. ECF 175-4 ¶ 2. And as of 2020, at least 2,400 companies across all 50 States depended on Gulf-derived production as part of their supply chains, Hopkins Decl., Ex. B at 46. The Gulf oil-and-gas industry is also estimated to have supported over 412,000 jobs in 2023, Hopkins Decl., Ex. A at 4, 21. A multi-month de facto permitting moratorium and its attendant financial devastation, enormous job losses, and supply-chain disruption would reverberate through the entire economy. *Cf.* Hopkins Decl. ¶¶ 22, 25. If any case "cries out for the exercise of th[e] equitable power to do justice," *National Credit Union Admin. Bd. v. Gray*, 1 F.3d 262, 266 (4th Cir. 1993) (cleaned up), it is this one.

---

[10] U.S. Energy Information Administration, Gulf of Mexico Fact Sheet (Sept. 4, 2024), https://perma.cc/Y758-ERH8.

[11] U.S. Energy Information Administration, Short-Term Energy Outlook, Global Oil Markets (Sept. 10, 2024), https://perma.cc/XB4J-EKAN; Arathy Somasekhar, *Oil Climbs 3% As Libya Output Cuts Further Supply Concerns*, Reuters (Aug. 26, 2024), https://www.reuters.com/business/energy/oil-climbs-mideast-escalation-fears-us-rate-cut-expectations-2024-08-25/.

## II. Alternatively, The Court Should Grant A Stay Pending Appeal.

If the Court does not amend the judgment to delay vacatur until the new BiOp issues, the Court should grant a stay pending appeal. A party is entitled to a stay when it shows "(1) that it will likely prevail on the merits of the appeal; (2) that it will suffer irreparable injury if the stay is denied; (3) that other parties will not be substantially harmed by the stay; and (4) the public interest will be served by granting the stay." *Dairy King, Inc. v. Kraft, Inc.*, 665 F. Supp. 1181, 1189 (D. Md. 1987) (citing *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970)); *see also Nken v. Holder*, 556 U.S. 418, 426 (2009). The first factor also "weighs in favor of granting a stay" when "clear precedent from the Court of Appeals does not dictate the outcome of the substantive issue decided by th[e] court and presented by the appeal." *United States v. Fourteen Various Firearms*, 897 F. Supp. 271, 273 (E.D. Va. 1995); *see also, e.g.*, *Project Vote/Voting for Am., Inc. v. Long*, 275 F.R.D. 473, 474 (E.D. Va. 2011); Wright & Miller, 11 Fed. Prac. & Proc. Civ. § 2904 (3d ed.) ("Many courts also take into account that the case raises substantial difficult or novel legal issues meriting a stay."). This Court therefore need not necessarily "change its mind or develop serious doubts concerning the correctness of its decision in order to grant a stay pending appeal." *Goldstein v. Miller*, 488 F. Supp. 156, 172 (D. Md. 1980).

Intervenors make all four showings here. The Fourth Circuit is likely to reverse this Court's decision to vacate the BiOp before a replacement is ready, or at least conclude it presents novel and serious questions; Intervenors and their members will be irreparably harmed if Gulf operations are halted because of permitting logjams and they are forced to risk ESA liability to meet other mandatory regulatory obligations; Plaintiffs will not be substantially injured by the current BiOp continuing until a new one issues; and the public interest overwhelmingly favors protecting domestic energy supply and national security.

**A. The Fourth Circuit is likely to conclude that the Court erred in vacating the BiOp effective December 20, 2024, or at least that the Court's vacatur remedy presents serious and difficult questions warranting a stay.**

The Fourth Circuit is likely to find that the Court abused its discretion when it vacated the BiOp effective December 20, 2024. This Court held that "[b]inding precedent requires the Court to vacate the BiOp." Op. 78. But the Court misunderstood the Fourth Circuit and other precedent it cited, and "a court by definition abuses its discretion when it makes an error of law." *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 171-172 (4th Cir. 2019) (citation omitted).[12] The Fourth Circuit is also likely to conclude that it would be an abuse of discretion not to at least delay vacatur until the new BiOp is completed.

**1. The Fourth Circuit is likely to agree that remand without vacatur is a permissible remedy in Administrative Procedure Act cases.**

The Fourth Circuit has not decided whether remand without vacatur is a permissible remedy, noting that it "has never formally embraced the *Allied-Signal* remand-without-vacatur approach." *Sierra Club v. Army Corps of Eng'rs*, 909 F.3d 635, 655 (4th Cir. 2018). In the one case where the issue arose, the court punted because "even if [the court] were to follow *Allied-Signal*," remand without vacatur was not called for. *Id*.

Despite the Fourth Circuit's express deferral of the question, this Court nevertheless concluded that existing Fourth Circuit precedent *forbids* remand without vacatur, based on four cases in which the parties did not ask for remand without vacatur and the Fourth Circuit said nothing about it. Op. 78 (citing *Appalachian Voices v. Department of Interior*, 25 F.4th 259 (4th Cir. 2022); *Defenders of Wildlife v. Department of Interior*, 931 F.3d 339 (4th Cir. 2019); *Sierra*

[12] For these same reasons, the Court could alternatively grant reconsideration under Rule 59(e), *see Daulatzai v. Maryland*, 97 F.4th 166, 178 (4th Cir. 2024) (allowing court "to reconsider its ruling on virtually any basis that it determines might have been an error or mistake in its judgment"), or Rule 60(b)(1), *see Kemp v. United States*, 596 U.S. 528, 534, 536 (2022) (relief from judgment appropriate for court's "legal and factual errors").

*Club v. Department of Interior*, 899 F.3d 260 (4th Cir. 2018); and *Dow AgroSciences LLC v. NMFS*, 707 F.3d 462 (4th Cir. 2013)). Reading into the silence of these cases strays from the Fourth Circuit's crucial principle that "judicial decisions do not stand as binding 'precedent' for points that were not raised, not argued, and hence not analyzed." *United States v. Norman*, 935 F.3d 232, 240 (4th Cir. 2019) (citation omitted); *see also Fernandez v. Keisler*, 502 F.3d 337, 343 n.2 (4th Cir. 2007) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (citation omitted)).

This Court's reasoning underscores why that rule exists. The Court found it significant that, in the four cases, the Fourth Circuit vacated a biological opinion "without any indication that any other remedy was an option." Op. 77-78. But the Fourth Circuit had no reason to indicate the availability of a remedy no one had requested. And the Fourth Circuit's vacatur of *project-specific* biological opinions—three cases involved not-yet-operational pipelines, while the other involved the re-registration of three pesticides—says nothing about the appropriateness of vacating a *programmatic* biological opinion supporting *thousands* of existing and ongoing activities across the entire Gulf of Mexico.

The Court was also mistaken that "*Appalachian Voices* is particularly clear that vacatur is necessary," Op. 79 n.3, based on oft-quoted language about the ESA's "directive" to "halt and reverse the trend towards species extinction, whatever the cost." *Appalachian Voices*, 25 F.4th at 283 (quoting *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978)). After *Tennessee Valley*, Congress amended the ESA because "Congress did not want economic activity stopped in its tracks." *Maine Lobstermen's Ass'n*, 70 F.4th at 596. The Supreme Court unanimously held that Congress's "obvious" objective—"if not indeed the primary one"—in amending the ESA was

"to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives," making "economic consequences . . . an explicit concern of the ESA." *Bennett*, 520 U.S. at 176-177. The amended ESA is thus fully consistent with remand without vacatur. *Appalachian Voices* did not hold differently.

This Court also erred in concluding that *Defenders of Wildlife* "explain[ed] that in the Fourth Circuit, a court must 'vacate agency action.' " Op. 77 (quoting *Defenders of Wildlife*, 931 F.3d at 345). The word "must" does not appear in the sentence this Court quoted, which came from the Fourth Circuit's boilerplate recital of the standard of review: that although review is "highly deferential" in Administrative Procedure Act (APA) cases, courts "will vacate agency action" that violates the APA. 931 F.3d at 345. At most, *Defenders of Wildlife* confirms that "vacatur is the normal remedy," *American Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020) (citation omitted), but that is far different than saying it is the *only* remedy.

Intervenors' argument that remand without vacatur is a permissible remedy is particularly likely to succeed because *every* circuit to consider the question,[13] and district judges in this Court and this circuit,[14] have repeatedly concluded that courts have discretion to remand without vacatur. *See* Ronald M. Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion in Administrative Law*, 53 Duke L.J. 291, 377 (2003) ("[R]emand without vacation may legitimately be applied, consistently with the APA, in a broadly discretionary fashion."). The

[13] *See Central Maine Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001); *Natural Res. Def. Council v. EPA*, 808 F.3d 556, 584 (2d Cir. 2015); *Prometheus Radio Project v. FCC*, 824 F.3d 33, 52 (3d Cir. 2016); *Central & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000); *Sierra Club v. EPA*, 60 F.4th 1008, 1022-23 (6th Cir. 2023); *U.S. Steel Corp. v. EPA*, 649 F.2d 572, 577 (8th Cir. 1981); *California Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012); *Diné CARE v. Haaland*, 59 F.4th 1016, 1049 (10th Cir. 2023); *Black Warrior Riverkeeper, Inc. v. Army Corps of Eng'rs*, 781 F.3d 1271, 1289 (11th Cir. 2015); *Allied-Signal*, 988 F.2d at 150-151; *National Org. of Veterans' Advocs., Inc. v. Secretary of Veterans Affs.*, 260 F.3d 1365, 1380 (Fed. Cir. 2001).

[14] *See, e.g.*, *Maryland Native Plant Soc'y v. Army Corps of Eng'rs*, 332 F. Supp. 2d 845, 863 (D. Md. 2004); *Makhteshim Agan of N. Am., Inc. v. NMFS*, No. 8:18-cv-00961, 2019 WL 5964526, at *4 (D. Md. Oct. 18, 2019); *Dean v. Martinez*, 336 F. Supp. 2d 477, 492 (D. Md. 2004); *cf, Friends of DeReef Park v. National Park Serv.*, No. 2:13-cv-03453, 2014 WL 6969680, at *3 (D.S.C. Dec. 9, 2014).

Fourth Circuit, when squarely presented with the issue, is likely to follow all of its sister circuits (and many of its district courts) because it "tr[ies] to avoid creating circuit splits." *Scott v. Baltimore Cnty.*, 101 F.4th 336, 348 (4th Cir. 2024). At the very least, the Court should stay its order to allow the Fourth Circuit to decide for itself whether it wants to be alone in categorically refusing to recognize remand without vacatur.

**2. The Fourth Circuit is likely to agree that vacatur was not mandatory here under remand-without-vacatur precedent.**

The Fourth Circuit is also likely to hold that this Court mistakenly concluded that vacatur would still be "mandatory" even if the Fourth Circuit followed *Allied-Signal*. Op. 79. This Court reasoned that "vacatur is the only permissible remedy when the agency decision is contrary to law." Op. 77. But the D.C. Circuit and other courts have held that remand without vacatur is appropriate even where the agency's decision was "contrary to law," *American Bankers Ass'n v. National Credit Union Admin.*, 934 F.3d 649, 673 (D.C. Cir. 2019); *see also, e.g.*, *Louisiana Env't Action Network v. EPA*, 955 F.3d 1088, 1091, 1100 (D.C. Cir. 2020), including where the agency "violated the ESA," *Center for Food Safety v. Regan*, 56 F.4th 648, 656 (9th Cir. 2022). As the D.C. Circuit has explained, the view that "if the [agency] violated the APA . . . its actions must be vacated" is "simply not the law." *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002).

The Fourth Circuit's decision in *Sierra Club* is not to the contrary. *Contra* Op. 78. *Sierra Club* held that, even if *Allied-Signal* applied, remand without vacatur was inappropriate because the challenged Clean Water Act authorizations "exceeded the Corps' statutory authority" to issue. 909 F.3d at 655. That is consistent with *Allied-Signal*, which considers the possibility that the agency may be able to justify its decision on remand. If the agency "ha[s] no statutory authority to issue the license under review, there is no possibility that [the agency] may

find an adequate explanation for its actions on remand." *Waterkeepers Chesapeake v. FERC*, 56 F.4th 45, 49-50 (D.C. Cir. 2022) (cleaned up). This Court did not hold that the BiOp exceeded NMFS's statutory authority—nor does anyone dispute that NMFS has the authority to issue a programmatic BiOp covering Gulf oil-and-gas activities—so *Sierra Club* is beside the point.

This Court also erred in concluding that "vacatur is the only permissible remedy" when an "agency entirely failed to consider an important aspect of the problem" or "offered an explanation counter to the record." Op. 77. Intervenors cited (*e.g.*, ECF 198 at 11-12 & n.10) numerous cases in which a court of appeals ordered remand without vacatur in the face of an agency's "complete failure to address an important issue," *Shafer*, 992 F.3d at 1096, and where the agency ignored contrary "credible evidence" in the record, *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 803 (D.C. Cir. 2022). This Court did not address those cases, instead citing one that said nothing about remand without vacatur. Op. 77 (citing *SecurityPoint Holdings, Inc. v. TSA*, 867 F.3d 180, 185 (D.C. Cir. 2017)).

Another good indication that vacatur was not mandatory here is that many of the cases this Court cited for its merits decision remanded without vacatur,[15] or vacated only after conducting the *Allied-Signal* inquiry,[16] or initially vacated only to subsequently reverse that decision on rehearing.[17] That these cases recognized remand without vacatur as a permissible remedy in similar circumstances confirms that the Court should have considered it.

---

[15] *See, e.g.*, *Western Watersheds Project v. Haaland*, 69 F.4th 689, 722-723 (10th Cir. 2023) (remanding without vacating biological opinion) (cited at Op. 25); *Gerber v. Norton*, 294 F.3d 173, 186 (D.C. Cir. 2002) (remanding without vacating incidental take permit) (cited at Op. 14, 16, 18); *Public Emps. for Envt'l Resp. v. Beaudreau*, 25 F. Supp. 3d 67, 130 (D.D.C. 2014) (similar) (cited at Op. 13-18); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 655 (9th Cir. 2014) (noting district court remanded without vacating biological opinion) (cited at Op. 40).

[16] *See, e.g.*, *Center for Biological Diversity v. Forest Service*, 687 F. Supp. 3d 1053, 1088-89 (D. Mont. 2023) (cited at Op. 33), *on appeal*, No. 23-2886 (9th Cir.).

[17] *See U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 632, 667 (D.C. Cir. 2016) (vacating portion of Clean Air Act regulation) (cited at Op. 20, 23, 69), *modified on reh'g*, 671 F. App'x 824 (D.C. Cir. 2016) (reversing and

But having erroneously concluded that vacatur was mandatory, this Court never engaged in *Allied-Signal*'s two-step analysis. This Court did not consider whether "[i]t is conceivable" that the deficiencies the Court identified in the BiOp could be remedied on remand. *Allied-Signal*, 988 F.2d at 151. Nor did this Court consider those deficiencies in light of the "disruptive consequences of vacating" the BiOp. *Id*. As Intervenors explained, that proper analysis yields only one outcome: Vacatur is unjustified because all the issues the Court identified with the BiOp are fixable through further explanation, and upending the Gulf of Mexico oil-and-gas regulatory regime while NMFS completes a new BiOp would be tremendously disruptive. *See* ECF 179-1 at 14-15; ECF 198 at 9-15; ECF 182-1 at 18-25; *see also, e.g.*, *Wild Fish Conservancy v. Quan*, No. 23-35322, 2024 WL 3842101, at *1-2 & n.1 (9th Cir. Aug. 16, 2024) (district court abused discretion in "disregard[ing]" and "overlooking" *Allied-Signal* factors and vacating incidental take statement). The Fourth Circuit is likely to agree.

The Fourth Circuit is also likely to agree that this Court abused its discretion by granting Plaintiffs greater relief than they asked for. Plaintiffs repeatedly disclaimed any remedy that would "affect existing permits or activities," "halt or limit existing production," "affect decommissioning activities," or "eliminate any of the BiOp's protective measures." ECF 185 at 45, 52. The Court nonetheless ordered categorical relief doing exactly what Plaintiffs disclaimed—apparently because Intervenors and the Government "argue[d] persuasively" that Plaintiffs' requested relief was functionally unworkable and did "not correspond to the claims they brought." Op. 80; *see* ECF 191 at 28-29 nn. 11-12; ECF 198 at 4-5; ECF 195 at 13-15. That disconnect should have resulted in *remand without vacatur*, not a remedy broader than

remanding without vacatur); *Center for Biological Diversity v. Bureau of Land Mgmt.*, 698 F.3d 1101, 1128 (9th Cir. 2012) (vacating biological opinion) (cited at Op. 25), *modified on reh'g*, No. 10-72356, 2013 WL 12623741, at *1 (9th Cir. Apr. 29, 2013) (reversing vacatur given "pending publication of the revised BiOp").

Plaintiffs requested. Plaintiffs' concessions confirmed that they had not shown the "truly extraordinary circumstances" necessary to justify "an extraordinary remedy like vacatur." *United States v. Texas*, 599 U.S. 670, 702 (2023) (Gorsuch, J., concurring in the judgment). The Fourth Circuit is likely to agree that the Court abused its discretion by declining to "think twice—and perhaps twice again—before granting such sweeping relief." *Id.* at 702 (citation and quotation marks omitted). At a minimum, "there is little doubt" that many of the issues surrounding remand without vacatur "present serious questions of first impression" in the Fourth Circuit that warrant a stay from this Court. *Goldstein*, 488 F. Supp. at 175.

**3. The Fourth Circuit is likely to agree it would be an abuse of discretion not to delay vacatur until at least May 2025.**

If this Court does not grant reconsideration and delay vacatur until at least May 2025, the Fourth Circuit is likely to find that decision to be an abuse of discretion. Even if vacatur were "require[d]," Op. 78—and it is not—this Court recognized that it "need not order immediate vacatur," but could instead "defer vacatur to a particular date." Op. 80. In light of NMFS's explanation that it cannot complete the new BiOp until May 2025, it would be an abuse of discretion not to defer vacatur until at least that date.

The Fourth Circuit is likely to agree for at least two reasons. First, the Court's vacatur decision was based on the understanding that the new BiOp would be completed around December 2024. NMFS has now explained it "cannot complete the new BiOp" until May 2025. ECF 211-1 at 5-6. This Court previously acknowledged the severe consequences of "[v]acating the BiOp months before a replacement is ready." Op. 81. Those consequences necessitate delaying vacatur until the new BiOp is completed. The Fourth Circuit is likely to agree it would be an abuse of discretion to conclude otherwise.

Second, the Fourth Circuit is likely to agree that it would be an abuse of discretion not to defer to NMFS's projected timeline for completing the BiOp. This Court's vacatur decision (at 81) favorably cited *Montana Environmental Information Center v. Haaland*, which deferred to the Government's requested 19 months for delaying vacatur because "[c]ourts 'routinely defer to the judgment of agencies when assessing timelines that involve complex scientific and technical questions.' " No. 1:19-cv-00130, 2022 WL 4592071, at *13 (D. Mont. Sept. 30, 2022) (quoting *Center for Sci. in the Pub. Int. v. FDA*, 74 F. Supp. 3d 295, 301 (D.D.C. 2014)). There, like here, the agency supported its request with a declaration explaining why it needed the additional time—"insufficient staffing to complete the edits"—and "the requested duration [wa]s consistent with extensions granted by other courts." *Id*. If delaying vacatur by 19 months was appropriate for an environmental review of mining activities on fewer than 7,000 acres, *Montana Env't Info. Ctr.*, 2022 WL 4592071, at *11, delaying vacatur by five additional months for a BiOp covering *all* oil-and-gas activities on *nearly 100 million acres* across the entire Gulf of Mexico, AR0013386-87, is plainly appropriate.

The Government has explained the many complexities necessitating the additional time to complete the BiOp. Among others, the Government must incorporate the Court's 84-page opinion into the next BiOp, as well as the Rice's whale critical habitat final rule anticipated by December 2, 2024, at the same time the Government stares down a looming vacatur date with its attendant regulatory chaos. *See* ECF 191 at 32; *Natural Res. Def. Council v. Raimondo*, No. 1:20-cv-02047 (D.D.C. Aug. 23, 2024), ECF 37 (discussing the anticipated timeline for the Rice's whale critical habitat final rule). "Deadlines become a substantive constraint on what an agency can reasonably do," and no one is "ultimately well-served by the imposition of tight deadlines in a matter of such consequence." *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at

606. The Fourth Circuit is likely to agree it would be an abuse of discretion to disregard the Government's "unrebutted, legally significant evidence" regarding its legitimate need for more time to issue a new BiOp. *In re Search Warrant*, 942 F.3d at 172 (citation omitted).

**B. The equitable factors overwhelmingly favor a stay pending appeal.**

The three equitable factors confirm the necessity of a stay here. First, Intervenors have demonstrated irreparable harm for the same reasons that reconsideration is warranted. *See supra*, pp. 4-16. Gutting the governing regulatory regime without a replacement "is no mere 'administrative inconvenience,' " but rather "constitutes a 'genuinely extraordinary situation' justifying interim equitable relief." *Coalition for TJ v. Fairfax Cnty. Sch. Bd.*, No. 22-1280, 2022 WL 986994, at *5 (4th Cir. Mar. 31, 2022) (Heytens, J., concurring) (citations omitted). The economic impact on Intervenors would be enormous and unrecoverable. *See Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021) (per curiam) (recognizing "risk of irreparable harm" from "significant financial cost[s]"); *Mountain Valley Pipeline, LLC v. Western Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (similar). If an estimated $5 million loss in "construction delay" was irreparable harm, *see East Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 829 (4th Cir. 2004), the loss of billions of dollars here is plainly irreparable. The trade associations' member companies that are "under contractual obligation to provide" services would also suffer irreparable harm from being "forced to breach these contracts," *East Tenn. Nat. Gas*, 361 F.3d at 829, and the resulting breach would harm other member companies of more "modest means," *Alabama Ass'n of Realtors*, 594 U.S. at 765. And, of course, the "inability to satisfy these commitments would have negative impacts on [companies'] customers and the consumers they serve." *East Tenn. Nat. Gas*, 361 F.3d at 829.

Second, a stay would not "substantially injure" Plaintiffs, *Nken*, 556 U.S. at 426, who disclaimed this remedy and have consistently refused to explain how they would be injured at all

by maintaining the BiOp during remand. There is no evidence that the BiOp's existing measures are not adequately protecting listed species. This Court acknowledged as much, observing that "immediate vacatur appears likely to disrupt oil and gas activity in the Gulf without necessarily mitigating the dangers to listed species." Op. 81. Plaintiffs have repeatedly confirmed over the last four years of litigation that they are in no rush to see the BiOp vacated. *E.g.*, ECF 162 at 3. They never sought a preliminary injunction and repeatedly cut back their requested remedy in the face of the Government and Intervenors' showings that vacatur would be ruinous.

If anything, Plaintiffs confirmed that they, too, are harmed by vacatur because vacatur threatens environmental hazards from permitting delays, including potential well-control incidents and spills; an inability to inspect and maintain wells, platforms, pipelines and other infrastructure; and an inability to decommission. *See supra*, pp 9-11. Moreover, delaying or halting decommissioning is at odds with Plaintiff Center for Biological Diversity's complaint in other litigation that Gulf "decommissioning is not occurring within the required timeframes." Compl. ¶ 6, *Center for Biological Diversity v. Haaland*, No. 1:24-cv-02014 (D.D.C. July 11, 2024), ECF 1. Courts will remand without vacatur "if vacating would at least temporarily defeat the enhanced protection of the environmental values covered by the [action] at issue." *Center for Biological Diversity v. EPA*, 861 F.3d 174, 188 (D.C. Cir. 2017) (cleaned up). That same policy similarly supports a stay pending appeal.

The Fourth Circuit recognizes that a stay is appropriate "to maintain the status quo pending review" when "years [have] passed" in reliance on the current regulatory regime, and additional "months of previously [agency]-approved practices would have a relatively minor effect." *West Virginia v. EPA*, 90 F.4th 323, 332 (4th Cir. 2024). That is this case. The BiOp has been in place since 2020, and there is no evidence that allowing oil-and-gas activities to

continue through May 2025 under the current BiOp and the wildlife protections it ensures—as they have for the last four-and-a-half years—will have *any* effect on Plaintiffs' interests.

Third, the public interest favors maintaining Gulf of Mexico energy production, economic stability, and national security, and facilitating an orderly transition to the new BiOp. The public has an "interest in the efficient production of electricity and other industrial activity," *West Virginia*, 90 F.4th at 332, which favors avoiding massive disruptions to a critical American industry and the broader U.S. economy. *See supra*, p. 16.

The public also has a strong interest in maintaining the balance Congress struck between economic development and environmental protection in the Gulf of Mexico. *See Virginian Ry. Co. v. System Fed'n No. 40*, 300 U.S. 515, 552 (1937) ("The fact that Congress has indicated its purpose . . . is in itself a declaration of public interest and policy which should be persuasive in inducing courts to give relief."). The Outer Continental Shelf Lands Act mandates that Interior "maintain an oil and gas leasing program" with the goal of "develop[ping] oil and natural gas resources . . . to meet the Nation's energy needs as rapidly as possible," "assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade." 43 U.S.C. §§ 1344(a), 1802(1), (2). When Interior purported to "pause" oil-and-gas leasing and a district court vacated a single lease sale, Congress responded by mandating that Interior complete the remaining sales in the 2017-2022 leasing program and conditioning future offshore wind-energy development on Interior offering millions of acres for oil-and-gas leasing.[18] And the ESA is not to the contrary, because "economic consequences are an explicit

[18] *See* Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1,818, 2,059-61, §§ 50264, 50265(b)(2) (2022); *Louisiana v. Haaland*, No. 2:23-cv-01157, 2023 WL 6450134, at *4 (W.D. La. Sept. 21, 2023), *appeal dismissed*, 86 F.4th 663 (5th Cir. 2023); *Friends of the Earth v. Haaland*, No. 22-5036, 2023 WL 3144203, at *1 (D.C. Cir. Apr. 28, 2023).

concern of the ESA." *Bennett*, 520 U.S. at 177. This congressional balance does not countenance shutting down oil-and-gas operations or threatening operators with ruinous liability.

Nor does the public interest favor "the significant logistical difficulties and time constraints associated with" upending the regulatory regime governing Gulf oil-and-gas activities pending a new BiOp. *Coalition for TJ*, 2022 WL 986994, at *1 (Heytens, J., concurring). The Government "would be placed in a difficult position of changing and then re-changing its guidance" to oil-and-gas operators, "causing significant confusion" for all stakeholders. *Fraser v. ATF*, No. 3:22-cv-00410, 2023 WL 5617894, at *4 (E.D. Va. Aug. 30, 2023). "[T]he more prudent course is to allow the current" oil-and-gas development regime "to proceed according to settled expectations." *Coalition for TJ*, 2022 WL 986994, at *6 (Heytens, J., concurring).

## III. Expedited Review Is Necessary Because Gulf Operators Require Advance Notice To Demobilize And Are Incurring Costs Now.

Intervenors respectfully request a decision on this motion no later than October 21, 2024, to allow Intervenors sufficient time to seek emergency relief in the Fourth Circuit and, if necessary, the U.S. Supreme Court, and to afford those courts adequate time to consider Intervenors' applications. Gulf operators have already begun to incur substantial costs as a result of this Court's vacatur decision, and they require a final decision on whether the December 20, 2024 vacatur date will be stayed weeks before that occurs. *E.g.*, Gordon Decl. ¶ 23 ("preparation for a prolonged curtailment of offshore activity . . . would require several weeks to execute"). As a result, many operators must decide by early December whether, absent relief, "to suspend drilling activities" and begin demobilization actions, including installing barriers in certain wells, which would require additional advance agency approvals to implement. *Id.* ¶ 33; *see* ECF 211-1 at 9-10 n.6; ECF 211-3 ¶ 17. And all Gulf operators are facing similar dilemmas, underscoring the need for a swift decision.

Expedited review is also appropriate because Gulf operators are currently incurring substantial costs as a result of this Court's decision. Gulf operators must "make important business and operational decisions months in advance of essential planned activities," and "[t]he cloud of a vacatur on December 20, 2024 will negatively influence those decisions, likely causing plans and projects, and associated investments, to be significantly delayed." Hopkins Decl. ¶ 25; *see also* Milito Decl. ¶ 12; Martin Decl. ¶ 14. Gulf operators plan "many geophysical, exploration, production, development, and decommissioning activities a year or more in advance," including "contracting for specialized equipment or services." Gordon Decl. ¶¶ 10, 14. As a result of this Court's order, operators are assessing whether to terminate certain ongoing contract negotiations for equipment to be used in 2025. *See id*. ¶ 12; Ramcharitar Decl. ¶ 7; Milito Decl. ¶ 12. Operators are also currently incurring "significant legal expenses" as they evaluate their options in the "unprecedented scenario" that the BiOp is vacated without a replacement—costs that would not be incurred but for this Court's vacatur order, will not be recouped, and will continue to escalate absent swift relief. Gordon Decl. ¶¶ 11-13; *see also* Milito Decl. ¶¶ 12, 16; Leimkuhler Decl. ¶ 7; Lorino Decl. ¶¶ 8, 14; Ozenne Decl. ¶ 7. Intervenors do not just need relief from the Court's December 20, 2024 vacatur date; they need relief *now*.

**CONCLUSION**

For the foregoing reasons, the Court should amend its judgment to delay vacatur until at least May 21, 2025. In the alternative, the Court should grant a stay pending appeal.

Respectfully submitted,

/s/ Nathan C. Brunette
Nathan C. Brunette, Bar No. 0612120104
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
(503) 294-9678
nathan.brunette@stoel.com

Ryan P. Steen, *pro hac vice* Bar No. 815000
Jason T. Morgan, *pro hac vice* Bar No. 815002
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
(206) 624-0900
ryan.steen@stoel.com
jason.morgan@stoel.com

*Counsel for American Petroleum Institute, EnerGeo Alliance, and National Ocean Industries Association*

/s/ Dana A. Raphael
Catherine E. Stetson (*pro hac vice*)
Sean Marotta (*pro hac vice*)
Dana A. Raphael (D. Md. Bar No. 30434)
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5600
cate.stetson@hoganlovells.com
sean.marotta@hoganlovells.com
dana.raphael@hoganlovells.com

Sarah C. Bordelon (*pro hac vice*)
HOLLAND & HART LLP
5470 Kietzke Ln Suite 100
Reno, NV 89511
(775) 327-3000
scbordelon@hollandhart.com

Nikesh Jindal (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Ave. N.W., Suite 200
Washington D.C. 20006
(202) 661-7800
njindal@kslaw.com

*Counsel for Chevron U.S.A. Inc.*

September 16, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2024, I electronically filed the foregoing using the CM/ECF system, which will send notification of this filing to the attorneys of record.

/s/ Dana A. Raphael
Dana A. Raphael